UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTIRCT OF KENTUCKY
LONDON DIVISION

**WILLIAM HARRIS ASHER, et al.**

**Civil Action No. 6:06-CV-548-DCR**

Plaintiffs,

Filed Electronically

v.

**UNARCO MATERIAL HANDLING, INC.,**
A Tennessee corporation; and
**ATLAS MATERIAL HANDLING, INC.**

Defendants,

AND

**ATLAS MATERIAL HANDLING, INC.**

Third-Party Plaintiff,

v.

**RCI RACK CONVEYOR INSTALLATION, INC.**

Third-Party Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY THIRD-PARTY DEFENDANT, RCI RACK CONVEYOR INSTALLATION, INC.**

---

Third-Party Defendant, RCI Rack Conveyor Installation, Inc., by and through its counsel, Deasey, Mahoney & Valentini, Ltd. and Hamm, Milby & Ridings, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b) as follows:

**PROCEDURAL BACKGROUND**

On December 18, 2006, Plaintiffs commenced this Action against defendants, UNARCO Material Handling, Inc. ("UNARCO") and Atlas Material Handling, Inc.

1

("Atlas"), alleging personal injuries as a result of alleged exposure to carbon monoxide which Plaintiffs claim was produced by propane generators operated inside a refrigerator/freezer building where the various Plaintiffs work. *See*, Exhibit "A". Plaintiffs subsequently filed an Amended Complaint on July 17, 2007, simply adding additional plaintiffs, but not making any additional allegations. *See*, Exhibit "B".

Defendants, Atlas and UNARCO, are original defendants in the Amended Complaint filed by the Plaintiffs. *See*, Exhibit "A". Third-Party Defendant, RCI Rack Conveyor Installation, Inc. ("RCI"), was impleaded by original Defendant/Third-Party Plaintiff, Atlas. *See*, Exhibit "C". Defendant, UNARCO, filed a cross claim for common law indemnity against Third-Party Defendant, RCI, which has since been dismissed by Order of the Court dated January 10, 2008.

## FACTS GIVING RISE TO THE CLAIMS

On or about October 2005, Defendant, UNARCO, entered into a Contractor's Agreement with non-party, Wal-Mart Stores East, LP ("Wal-Mart"), to provide and install rack systems and equipment at various Wal-Mart Distribution Centers, including the Distribution Center in London, Kentucky. *See*, Exhibit "D".

Pursuant to paragraph 9 of that contract, Defendant, UNARCO, undertook responsibility for safety and for initiating, maintaining and supervising all safety programs and precautions in the performance and conditions of the work under the contract. Paragraph 9 states, in pertinent part:

> SAFETY REQUIREMENTS – Contractor is totally responsible for safety. Contractor shall be responsible for initiating, maintaining and supervising all safety programs and precautions with the Work. Contractor shall at all times comply with all federal, state and local laws, rules and regulations (including but not limited to OSHA) relating to work plan conditions and safety.

Defendant, UNARCO, subsequently engaged the services of Defendant/Third-Party Plaintiff, Atlas, to assist in carrying out the work to be performed under the contract with Wal-Mart and specifically, with the work to be performed at Distribution Center 6097, located in London, Kentucky, where the Plaintiffs in this matter were employed. *See*, Exhibit "E". Atlas, in turn, engaged the services of Third-Party Defendant, RCI, to assist in performing the rack repairs and installation, which would require the act of welding. *See*, Exhibit "F". There was no formal written contract executed between Atlas and RCI. However, Atlas and RCI did exchange correspondence and a purchase order for RCI to provide labor to perform the rack repairs.

Among others, an October 24, 2005 email communication from David Onorato, of Atlas set forth the scope of work for the project *See*, Exhibit "F". The scope of work dictated by Atlas required the use of propane welders. In that October 24, 2005 communication, David Onorato of Atlas, advised Walt Thompson of RCI, that the welding project to be performed in London, Kentucky would "***definitely have to use a propane welder***." *See*, Exhibit "F". (emphasis added)

Demetrio Islas, employee of RCI testified that David Onorato of Atlas instructed RCI to use propane-operated generators to perform the welding work. *See*, Exhibit "K", p. 16, l. 2-25. *See also*, Exhibit "F". Employees of RCI were trained by Atlas to perform the repair work inside the refrigerator/freezer building. *See*, Exhibit "K", p. 17, l. 5-25 to p. 18, l. 1-11. Mr. Islas testified that David Onorato of Atlas was providing instructions of how to do the job "all the time." *See*, Exhibit "K", p. 20, l. 12-14. In fact, David Onorato also admitted at his deposition that employees of RCI were trained by Atlas. *See*, Exhibit "M", p. 13, l. 22-24.

As further evidence of the fact that Atlas had direct and complete control and supervision of the employees of RCI, Atlas required RCI employees to introduce themselves to Wal-Mart personnel as employees of Defendant/Third-Party Plaintiff, Atlas. *See*, Exhibit "K", p. 23, l. 14-21. Atlas went so far as to provide employees of RCI with badges identifying them as "Atlas" personnel when performing work for Wal-Mart. *See*, Exhibit "K" p. 23, l. 22-25 to p. 24, l. 1-19. *See also*, Exhibit "L".

Moreover, when employees of RCI signed in at the workplace, they were instructed by Atlas to sign in as employees of Atlas. *See*, Exhibit "K", p. 25, l. 1-7. David Onorato admits he told employees of RCI to make the inference that they were Atlas employees and that the reason for doing so was to prevent Defendant, UNARCO, from knowing that the work was being completed by RCI employees so that UNARCO would continue doing business with Atlas rather than with RCI directly. *See*, Exhibit "M", p. 64, l. 23 to p. 66, l. 1. *See also*, Exhibit "J", p. 66, l. 16-19. David Onorato further admitted that, given his instructions, his expectation would have been that the RCI employees would have signed in as "Atlas". *See*, Exhibit "M", p. 89, l. 4-5.

Walt Thompson, owner of Third-Party Defendant, RCI, has stated that RCI is in the business of "selling labor." *See*, Exhibit "J", p. 6, l. 17. Walt Thompson also testified at his deposition that Atlas provided the training to RCI employees for performance of the welding work. *See*, Exhibit "J", p. 7, l. 22-25 to p. 8, l. 1-2. *See also*, Exhibit "J", p. 8, l. 16-21. Defendant, UNARCO, provided the materials for the welding work that was to be done, including drawings specifying how the repairs were to be made. *See*, Exhibit "J", p. 44, l. 7 to p. 45, l. 15. *See also*, Exhibit "J", p. 47, l. 10-14.

4

Walt Thompson further testified that it was the decision of Atlas to bring the propane generators used on the job inside. *See*, Exhibit "J", p. 13, l. 4-8. Atlas told RCI to use propane generators to power the welding equipment. *See*, Exhibit "J", p. 48, l. 6-16. Walt Thompson also acknowledged that David Onorato of Atlas instructed RCI employees to identify themselves as employees of Atlas. *See*, Exhibit "J", p. 99, l. 15 to p. 100, l. 14. Walt Thompson further testified that it was explained to him by David Onorato of Atlas that the reason Atlas wanted RCI employees to identify themselves as Atlas employees was so they "wouldn't compete against each other." Walt Thompson explained that "in other words, they wouldn't come to me directly, so we were always 'Atlas'." *See*, Exhibit "J", p. 131, l. 16-21."

It is abundantly clear that Atlas controlled the work being done by RCI including but not limited to: training employees of RCI in the performance of the work; requiring RCI to use propane generators inside the refrigerator/freezer; instructing RCI employees to identify themselves as employees of Atlas; and supplying RCI employees with Atlas employee badges. The employees supplied by RCI were "borrowed" servants of Atlas, and thus, subject to their direction and control.

## LEGAL ARGUMENT

Federal Rule of Civil Procedure 56(b) states as follows:

> A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

Fed. R. Civ. P. 56(b)(2007).

The rule of law recognized by the Kentucky Court of Appeals is that "a servant may be loaned or hired by his master for some special purpose so as to become, as to that

5

service, the servant of the party to whom he is loaned or hired, and this is true even though the servant is selected, paid, and may be discharged by the original employer. The test turns on who controls the servant in the named employment." *Bowen v. Gradison Construction Company*, 236 Ky. 270, 32 S.W.2d 1014, 1016 (Ky. App. 1930). *See also*, *Kern v. Chicago Bridge & Iron Co.*, 115 F. Supp. 85, 87, 1953 U.S. Dist. LEXIS 2366 (W.D. Ky. 1953). The present matter is the exact scenario contemplated by the Court of Appeals of Kentucky.

Third-Party Defendant, RCI, simply provided or "loaned" its employees to Defendant/Third-Party Plaintiff, Atlas, for the purpose of performing rack repairs in the Wal-Mart facility as directed by Atlas. The employees of RCI, wore name tags identifying themselves as Atlas employees and were instructed to introduce themselves to the people at the Wal-Mart Distribution Center as Atlas employees. *See*, Exhibit "L". In addition, Atlas trained the employees of RCI on how to perform rack repairs inside a freezer facility (albeit at a rack repair job performed before the London, Kentucky Distribution Center). Moreover, Atlas controlled the entire scope of the work, including the requirement that propane generators be used to perform the welding work inside the refrigerator/freezer of Wal-Mart Distribution Center. *See*, Exhibit "F". Additionally, it was either Atlas or UNARCO - but definitely not RCI - who provided the rack repair kits and the instructions for the installation of those repair kits. RCI was merely a supplier of labor to perform the work. Clearly, under these circumstances, Atlas should not be permitted to obtain indemnity from RCI, especially since RCI simply did exactly as Atlas directed them to do!

The Court in *Bowen* made a distinction between an employee and an independent contractor by stating that an "independent contractor" is one who is doing his own work in his own way and that he must be subject to no control in the details of its doing. The Court went even further by stating that, "who selects the servant, and who pays him, are of such minor importance in comparison to whose work is being done and who has the power to direct it." *Bowen,* 236 Ky. at 278, 32 S.W.2d at 1017.

Clearly, RCI was not acting as an independent contractor as Atlas wants this Court to believe. RCI had no power to determine the method of the work, nor did it have any control in the details of the repairs being performed. All of this power was in the hands of Defendant/Third-Party Plaintiff, Atlas. Employees of Atlas trained the employees of RCI, instructing them on how to repair the racks and requiring them to use propane generators inside the freezer to perform the work. Moreover, Atlas even provided badges for the RCI crew identifying them as "Atlas", and instructed RCI personnel to hold themselves out to Wal-Mart as Atlas employees.

Clearly, the RCI crew were acting as the "borrowed employees" of Atlas. Atlas should not be permitted to seek indemnity from RCI for what Atlas trained and instructed the workers from RCI to do. It is specious for Atlas to now assert that RCI was an independent contractor from whom Atlas should be entitled to indemnity in the event of an adverse finding of liability by the jury in this case.[1] This is especially true considering the fact that Atlas required employees of RCI to wear badges identifying themselves as "Atlas" employees, as well as requiring RCI employees to identify themselves as Atlas employees to Wal-Mart personnel. Clearly, it was the intention of Atlas to not only

---

[1] It bears mentioning that even Atlas maintains that RCI did nothing wrong to cause the alleged injuries of which plaintiffs' complain – only that RCI should be obligated to indemnify Atlas in the event the jury finds that liability should be imposed against Atlas. (See Exhibit "C" attached hereto)

7

control the work being performed, but to maintain control over the entire assignment and the employees of Third-Party Defendant, RCI. Moreover, it was Atlas' intention to have Wal-Mart believe that all of the individuals performing the rack repair work were employees of Atlas.

The Court in *Kern* explained that "he to whom workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen." *Kern,* 115 F. Supp. at 89, 1953 U.S. Dist. LEXIS AT 10. Walt Thompson, owner of RCI, testified that his company provides the labor and that Atlas trained the RCI employees on how to perform the work. *See*, Exhibit "J". *See*, p. 6, l. 17; *See also*, p. 7, l. 22-25 to p. 8, l. 1-2. *See also*, p. 8, l. 16-21. Specifically, and most important to the issues in this case, Atlas specifically instructed RCI to use propane powered welders inside the freezer facility. *See*, Exhibit "E", and *See also* Exhibit "M", p. 48, l. 6-16.

In *Tindall v. Perry*, 283 S.W.2d 700, 1955 Ky. LEXIS 317 (App. Ky. 1955), the Court also contemplated the role of master and servant. In *Tindall*, Blanton had a contract with Robinson to supply stone. Blanton employed Webb to haul the stone. Webb hired Perry's truck with Peyton as the driver. Blanton paid Webb for all the stone hauled, including that in Perry's truck, and Webb paid Perry at a rate per ton for the stone hauled in his truck. Perry paid Peyton's salary and furnished the gas and oil for the truck. On the day of the accident, an employee of Webb was at the Blanton stone quarry, and he instructed Peyton on where the stone was to be delivered. The Webb employee was described by witnesses as Webb's "foreman-in-charge". The Court held that "Webb had

8

the actual and potential control of Perry's truck and driver, and Webb was responsible for the acts of this unit while performing Webb's work." *Id*.

The facts in the present matter are astonishingly similar. The evidence of record in this case show Atlas had actual and potential control of the work performed by employees of RCI. There can be no dispute that Atlas clearly dictated the scope of the work performed by the RCI workers. Atlas, through its contract with UNARCO, dictated the type of repair kits to be used for the racks[2], and required RCI to use the propane generators inside the refrigerator/freezer. Atlas even showed the RCI crew how this work was done in other Wal-Mart Distribution Centers before the London, Kentucky job, when Atlas trained and instructed the RCI workers as to how the repairs were being performed. Moreover, it is patently clear that Atlas required employees of RCI to hold themselves out as employees of Atlas while performing work at the Wal-Mart Distribution Center in London, Kentucky.

Even if the act of welding inside of the refrigerator/freezer building were deemed to be negligent, RCI cannot be held liable to Atlas for indemnity because the RCI employees were acting as the "borrowed" servants of Atlas, under the direct supervision and control of Atlas.

In *Decker v. Glasscock Trucking Service, Inc.*, 397 S.W.2d 773, 1965 Ky. LEXIS 83 (App. Ky. 1965), the Court of Appeals of Kentucky followed its holding in *Tindall*. In *Decker*, Glasscock had a contract to transport road material in connection with the construction of a roadway. Glasscock was under pressure to complete the work on time. Therefore, he entered into an oral agreement with Traylor for the latter to furnish trucks

---

[2] These repair kits required welding to be performed, rather than a completely mechanical means of fastening.

9

and drivers to haul asphalt at so much per ton mile. Glasscock supplied Traylor with his gas and spare parts at cost. Traylor was paid by Glasscock once each month, the cost of the gas and oil used by Traylor being deducted. Traylor settled with his drivers. Glasscock told Traylor where to haul, what to haul, and which roads to travel over. Glasscock could regulate the number of Traylor trucks to be used or could terminate the agreement at any time. Likewise, Traylor could call off the haulage agreement at will. A foreman of Glasscock gave general directions to Traylor concerning all hauling. The Court in *Decker* pointed out that "the factor that largely determines whether there is the relationship of master and servant or of independent contractor is the *right to control* upon the part of one who purports to be a master. It is immaterial, as noted in the Perry case, whether the master did in fact control. The question is did the master have a right to control?" *Id*. at 775 (*emphasis added*).

The Court of Appeals of Kentucky further emphasized its opinion in *Carnes v. Department of Economic Sec.*, 435 S.W.2d 758, 1968 Ky. LEXIS 214 (App. Ky. 1968). In *Carnes*, the Department of Economic Security administered a program that arranged for low income parties to work on projects sponsored by the state or local government. In that particular case, low income participants in the program were lent to a city to work on a project that involved burning brush. A fire destroyed property owned by the plaintiff, who then sued the Department. The court found that although the Department had retained the right to discharge participants from the program, the city for which the participants were performing the project had retained the right to start, stop and direct the manner in which the work was performed. The Court opined that the participants were

10

loaned servants to the city and that the Department was, therefore, not liable to the plaintiff. *Id*.

In the case at bar, the evidence of record demonstrates that Atlas not only had the right to control the work of RCI, but exercised that right.  RCI merely furnished its workmen to allow Atlas to complete the job that it contracted with UNARCO to perform. Atlas was (and is) responsible to UNARCO for the acts of RCI' employees. *See*, Exhibit "D".  Atlas dictated the scope of work, the type of materials, and mandated that propane welders be used.  Clearly, Atlas maintained considerable control over the job, and should have no right to seek indemnification from RCI.

WHEREFORE, Third-Party Defendant, RCI Rack Conveyor Installation, Inc., respectfully requests this Honorable Court to grant its Motion for Summary Judgment and dismiss any and all claims against Third-Party Defendant, RCI Rack Conveyor Installation, Inc., with prejudice.

        Respectfully submitted,

        **DEASEY, MAHONEY & VALENTINI, LTD.**

        /s/ Gerald J. Valentini, Esquire
        Gerald J. Valentini, Esquire
        Diana P. Sisum, Esquire
        1601 Market Street
        Suite 3400
        Philadelphia, PA 19103-2301
        GJValentini@dmvlawfirm.com
        Phone: (215) 587-9400
        Fax: (215) 587-9456

        and

        **HAMM, MILBY & RIDINGS**

        /s/ Brandon C. Jones

              Marcia Milby Ridings, Esquire
              Brandon C. Jones, Esquire
              120 North Main Street
              London, KY  40741
              Phone:  606-864-4126
              Fax:  606-878-8144

              Counsel for Third-Party Defendant,
              RCI Rack Conveyor Installation, Inc.

## **CERTIFICATE OF SERVICE**

   I hereby certify that on November 15, 2007, I electronically filed the foregoing Joint Motion with the Clerk of the Court using the CM/ECF system;

Don Russo, Esq.
Don Russo, PA
7990 S.W. 57th Avenue
Miami, Florida  33143

Elizabeth Russo, Esq.
Russo Appellate Firm
6110 S.W. 76th Street
Miami, Florida  33143

Douglas W. Langdon, Esq.
Frost Brown Todd, LLC
400 West Market Street
Suite 3200
Louisville, Kentucky  40202-3363

Gerald J. Valentini, Esq.
Deasey, Mahoney & Valentini, LTD
1601 Market Street
34th Floor
Philadelphia, Pennsylvania  19103

Thomas K. Herren, Esq.
Herren & Adams
148 North Broadway
Lexington, Kentucky  40507

Todd Page, Esq.
Stoll Keenon Ogden, PLLC
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507

B. Clark Batten, II, Esq.
Garmer & O'Brien, LLP
141 North Broadway
Lexington, Kentucky 40507

Dated this the 30th day of January, 2008.

/s/ Gerald J. Valentini

/s/ Brandon C. Jones