UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| WILLIAM HARRIS ASHER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | Civil Action No. 6: 06-548-DCR |
| | ) | |
| UNARCO MATERIAL HANDLING, INC., | ) | |
| and ATLAS MATERIAL HANDLING, | ) | |
| INC., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| RACK CONVEYOR INSTALLATION, | ) | |
| INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Third-Party Defendant Rack Conveyor Installation, Inc.'s ("RCI") motion for summary judgment and Defendant/Third-Party Plaintiff Atlas Material Handling, Inc.'s ("Atlas") cross-motion for partial summary judgment. [Record Nos. 179, 193] Because Atlas retained the right to control the work done at the location in issue, and because RCI's employees acted as loaned servants to Atlas, the Court will grant RCI's motion and deny the relief sought by Atlas.

**I.    BACKGROUND**

This litigation arises out of an alleged discharge of carbon monoxide gas in the enclosed freezer section of the Wal-Mart Distribution Center ("Distribution Center") in London, Kentucky,

between November 29 and December 12, 2005.  The Plaintiffs filed their Complaint on November 21, 2006, in the Laurel Circuit Court alleging claims for negligence and loss of consortium.  More specifically, the Plaintiffs assert that Atlas and Defendant Unarco Material Handling, Inc. ("Unarco") acted negligently in operating propane-powered welders inside the Distribution Center, resulting in the Plaintiffs' exposure to carbon monoxide gas.  The Plaintiffs are past or present employees of the Distribution Center and their spouses.

The Defendants removed the action to this Court on December 18, 2006.  Thereafter, on February 16, 2007, Atlas filed a motion for leave to file a third-party complaint against RCI, alleging that RCI performed work on behalf of Atlas. The Court granted Atlas' motion on February 23, 2007. Subsequently, on January 31, 2008, RCI filed the motion for summary judgment that is currently before the Court.  More specifically, RCI claims that it merely "loaned" its employees to Atlas to perform the work and, therefore, cannot be liable to the Plaintiffs for their alleged injuries under Kentucky law.

In response, Atlas contends that there are disputed issues of material fact that preclude summary judgment in favor of RCI.  Atlas asserts that RCI performed the work at the Distribution Center as an independent contractor, rather than as loaned employees.  Further, Atlas seeks partial summary judgment in its favor regarding the issue of whether RCI was an independent contractor.

**II.     LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The party

moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists. *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 983 (E.D.Ky. 1993). However, once a moving party has met its burden of production, "'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D.Ky. 1993) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex*, 477 U.S. at 324.

In reviewing a party's motion for summary judgment, all evidence must be viewed in the light most favorable to the non-moving party, and summary judgment is appropriate whenever that non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

**III.    ANALYSIS**

Under Kentucky law, "a servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the party to whom he is loaned or hired, and this is true even though the servant is selected, paid, and may be discharged by the original employer." *Bowen v. Gradison Const. Co.*, 32 S.W.2d 1014, 1016 (Ky. 1930). In such cases, the

original employer is relieved of liability for any negligence in the conduct of the work because "he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen." *Kern v. Chicago Bridge & Iron Co.*, 115 F. Supp. 85, 88 (W.D.Ky. 1953). Further, "[t]he principal consideration in determining the question is the right to control the manner of doing the work. . . . However, it is not the actual exercise of the right by interfering with the work but the *right to control* which constitutes the test." *Bowen*, 32 S.W.2d at 1019 (emphasis added). Generally, "the question is one of fact." *Id.*

In the present case, RCI contends that the undisputed facts establish that it relinquished control of its employees to Atlas for the purpose of performing the rack repairs at the Distribution Center. RCI asserts that it merely supplied the labor, while Atlas "controlled the entire scope of the work." [Record No. 179, p.6] In particular, RCI notes that Atlas: (1) trained RCI's employees on how to perform the rack repair at a prior job site; (2) required RCI's employees to use certain methods, such as the use of the propane generators; (3) provided the rack repair kits, including instructions on how to use them; and (4) instructed the RCI employees to identify themselves as Atlas employees. Additionally, RCI asserts that Atlas had the right to control the manner in which the work was performed and required RCI to provide daily productivity reports to Atlas.

In response, Atlas contends that RCI acted as an independent contractor and did not relinquish control of it employees. Atlas does not dispute that it controlled the scope of the work, required RCI to use the propane generators, and instructed RCI's employees to introduce themselves as Atlas employees. However, it contends that it did so pursuant to its contract with Unarco. [Record no. 194, p.3-4] More specifically, Atlas asserts that Wal-Mart hired Unarco to provide the materials and install and repair the rack systems at the Distribution Center. Then Unarco hired Atlas

to do the installation work. Thereafter, Atlas subcontracted the installation work to RCI and instructed RCI regarding the scope of the work and the materials to be used in accordance with its contract with Unarco. According to Atlas, the use of propane generators and the Unarco rack kits were a condition of Atlas' contract with Unarco. Additionally, Atlas admits that it directed RCI's employees to introduce themselves as Atlas employees "to prevent the two companies from becoming direct competitors for UNARCO's business." [*Id*. at p.12] Simply put, Atlas desired to maintain its existing relationship with Unarco, rather than having Unarco contract directly with RCI to perform the work. [*Id*. at p.6]

Atlas also does not dispute that it required progress reports from RCI concerning the work, although it contends that the crew leader, Demetrio Islas, primarily provided those reports to RCI. [*Id*. at p.6] According to Atlas, it instructed RCI only with regard to the final result, while RCI had discretion over the exact manner and method to perform the work. Atlas asserts that the alleged "training" that took place over a year earlier was simply "an opportunity for RCI crews to receive 'some points of view' from Atlas as they were first exposed to UNARCO rack kits." [*Id*. at p.3] Atlas further asserts that the training took place over the course of three job sites in ambient warehouses, rather than the freezer building that was the subject of the Distribution Center job, and that "the training focused primarily on the use of the EasyLift Jack, a sophisticated 20-ton jack sometimes used in repairs." [*Id*. at p.3, 9]

Finally, Atlas contends that there are several undisputed facts which show that RCI never relinquished control over its employees in connection with the work performed at the Distribution Center. Most notably, Atlas contends that RCI retained the right to hire and fire its employees and to determine the amount of generators to be used and the dealer from which the generators would

be rented. Atlas further asserts that RCI's crew leader, Mr. Islas, allowed the RCI crew or a specific crew member to take a day off on at least three occasions without consulting Atlas. [Record No. 194, p.5-6] Finally, Atlas notes that RCI "independently opted to use a different welding method than Atlas used during the training." [*Id*. at p.10]

As noted above, the determination of whether a particular relationship falls within the "loaned servant" or independent contractor category is generally one of fact. *See Bowen*, 32 S.W.2d at 1019. According to the Court of Appeals of Kentucky[1],

> [i]t is impossible to lay down a rule by which the status of men working and contracting together can be definitely defined in all cases as employees or independent contractors. Each case must depend on its own facts, and ordinarily no one feature of the relation is determinative, but all must be considered together . . . . The principal consideration in determining the question is the right to control the manner of doing the work. Generally speaking, it may be stated that, if the employee is under the control of the employer, he is a servant or employee and not an independent contractor, but, if in the performance of the work he is not under the control of the employer, he is an independent contractor. However, it is not the actual exercise of the right by interfering with the work but the right to control which constitutes the test.

*Id.* (citations omitted). In other words, "[t]o determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." *Kern*, 115 F. Supp. at 89 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221 (1909)).

In *Tindall v. Perry*, 283 S.W.2d 700 (Ky. 1955), the court addressed the application of the loaned servant/independent contractor inquiry and held that the determining factor was which party had the "actual and potential control" over the operation. *Tindall*, 283 S.W.2d at 701. In that case,

---

[1]  Prior to 1976, the Court of Appeals of Kentucky was the Commonwealth's highest state court.

Blanton Stone Company ("Blanton") entered into a contract with Robinson Company to supply stone for a construction project. Blanton hired Webb Transfer Line ("Webb") to haul the stone, and Webb contracted to use John Perry's truck, to be driven by Peyton. Perry supplied the gas and oil for the truck and paid Peyton. Subsequently, after taking direction from an employee of Webb, Peyton was involved in an accident, causing injuries to the plaintiff. After considering the principles enumerated in *Bowen, supra*, the court held that "the fact that the servant is selected, paid or may be discharged by the original employer is not material." *Id*. Rather, because Webb had the "actual and potential control over Perry's truck and driver" and because Perry "relinquished whatever control or right of control he may have had with respect to that day's activity," Webb was the employer for purposes of determining liability. *Id*.

Similarly, in *Decker v. Glasscock Trucking Service, Inc.*, 397 S.W.2d 773 (Ky. 1965), the court emphasized that "[t]he factor that largely determines whether there is the relationship of master and servant or of independent contractor is the right to control upon the part of one who purports to be a master." *Id*. at 775  The court specifically noted that "[i]t is immaterial, as noted in the *Perry* case, whether the master did in fact control. The question is did the master have a right to control?" *Id*. In *Decker*, Glasscock Trucking Service, Inc. ("Glasscock") hired Traylor Trucking Service ("Traylor") to provide trucks and drivers to haul asphalt. Glasscock supplied the gas and spare parts for the trucks and paid Traylor, who, in turn, paid his drivers. Glasscock instructed Traylor on how many trucks to use, "where to haul, what to haul, and which roads to travel over." *Id*. at 774. Further, "[a] foreman of Glasscock gave general directions to Traylor concerning all hauling." *Id*. Based on these undisputed facts, the court found that Glasscock had the right to control the trucks of Traylor, regardless of the fact that Traylor actually hired and paid the truck drivers. *Id*.; *see also*

*Bowen*, 32 S.W.2d at 1016 (noting that "[w]ho selects the servant, and who pays him, are of such minor importance in comparison to whose work is being done and who has the power to direct it, that this record presents no question of independent contractor").

Applying these principles to the case currently before the Court, it is clear that Atlas, not RCI, had the ultimate right to control the work done at the Distribution Center. In viewing the facts in the light most favorable to Atlas, it is undisputed that Atlas controlled the scope of the work, provided the rack repair kits to perform the work, directed RCI to use particular machinery including the propane generators, generally trained RCI's employees in how to perform the work, instructed RCI's employees to identify themselves as Atlas' employees, and requested daily productivity reports from RCI's crew leader. Although Atlas contends that RCI's crew leader did not always make his reports to Atlas and that RCI used a different welding technique than Atlas used in its training, Atlas had the right to control the work, regardless of whether they exercised that right. [*See* Record No. 206, Att. 1 (Deposition of David Onorato), p.12 (noting that the crew leader "failed to report daily productivity which he's charged with doing"); *see also* p.13].

As the court noted in *Bowen*, "it is not the actual exercise of the right by interfering with the work but the right to control which constitutes the test." *Bowen*, 32 S.W.2d at 1019. "Furnishing workmen and appliances further complicates this question, but the test seems to be whose work is being done, who has the power to direct the particular manner of its doing, in the use of the appliances, and has the right to divert the appliances from one particular use to another." *Id*. Here, the work being done was Atlas' work, Atlas had the power to direct how the work was done, and Atlas provided the materials and general methods for doing the work.

Although Atlas contends that it instructed RCI's employees to identify themselves as Atlas' employees as a mere formality, *citing United Engineers & Constructors, Inc. v. Branham*, 550 S.W.2d 540 (Ky. 1977), this undisputed fact indicates that Atlas not only reasonably knew that RCI's employees were being considered employees of Atlas, but had a substantial interest in seeing that this was the case. Atlas candidly admits that it wanted to continue the existing relationship with Unarco, rather than have Unarco contract directly with RCI. Further, although this fact is not necessary for the Court to determine that Atlas controlled RCI's employees, it is yet another indication that Atlas had the right to control the employees and the work done at the Distribution Center.

It is not feasible, as Atlas argues in its cross-motion, to consider RCI as an independent contractor under the circumstances presented. While certain facts indicate that RCI did not always follow Atlas' instructions and made some independent decisions (such as when to allow employees to take a day off and what welding method to use), these few instances do not detract from the Court's conclusion that Atlas had the *right to control* RCI's employees. Likewise, Atlas' reliance on the fact that RCI retained the right to hire and fire the employees is not dispositive. Kentucky courts have repeatedly noted that the right to terminate employees is, in many cases, immaterial. *See Bowen*, 32 S.W.2d at 1016, *Decker*, 397 S.W.2d at 774.

### III.  CONCLUSION

For the reasons discussed above, it is hereby

**ORDERED** that Third-Party Defendant RCI's motion for summary judgment [Record No. 179] is **GRANTED**. Further, Defendant/Third-Party Plaintiff Atlas' motion for partial summary judgment [Record No. 193] is **DENIED**.

This 11th day of June, 2008.



-10-