Volume 5-1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF KENTUCKY
 2                     SOUTHERN DIVISION AT LONDON

 3

 4   WILLIAM HARRIS ASHER, et al.,        )
                                          )
 5              Plaintiffs,               )    6:06-CV-548
                                          )    London, Kentucky
 6        vs.                             )    December 2, 2008
                                          )    8:09 a.m.
 7   UNARCO MATERIAL HANDLING, INC.,      )
                                          )    Testimony of
 8              Defendants.               )    Leon Prockop, M.D.

 9

10                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE AMUL R. THAPAR,
11           UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   FOR THE PLAINTIFFS:      DON RUSSO
                              Attorney at Law
14                            Russo Appellate Firm, PA
                              6101 Southwest 76th Street
15                            Miami, FL  33143

16                            MATTHEW E. MAZUR, JR.
                              Attorney at Law
17                            2655 Le Jeune Road, Suite 500
                              Coral Gables, FL  33134
18
                              THOMAS K. HERREN
19                            CHARLES C. ADAMS, JR.
                              Attorneys at Law
20                            Herren & Adams Law Office
                              148 North Broadway
21                            Lexington, KY  40507

22                            STEPHEN M. O'BRIEN III
                              Attorney at Law
23                            Garmer & O'Brien, LLP
                              141 North Broadway
24                            Lexington, KY  40507

25
```

Volume 5-2

```
 1   APPEARANCES:  (Continued)

 2   FOR THE DEFENDANT          TODD S. PAGE
     UNARCO:                    DAVID C. SCHWETSCHENAU
 3                              CARL NORMAN FRAZIER
                                EILEEN M. O'BRIEN
 4                              PERRY M. BENTLEY
                                Attorneys at Law
 5                              Stoll Keenon Ogden PLLC
                                300 West Vine Street, Suite 2100
 6                              Lexington, KY  40507

 7   COURT REPORTER:            Rhonda S. Sansom, RPR, CRR
                                United States District Courthouse
 8                              101 Barr Street, Room 413
                                Lexington, KY  40507
 9                              (859) 619-3624

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by mechanical stenography, transcript
     produced with computer.
25
```

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-3

1        (At 8:08 a.m. on December 21, 2008, with counsel for the

2    parties and the parties present, the following proceedings were

3    had.)

4        THE HONORABLE AMUL R. THAPAR:  Good morning.  I promised

5    the plaintiffs they could make their record on this Dr. Prockop

6    thing.  So go ahead.

7        MR. MAZUR:  Thank you, your Honor.  Your Honor, I direct

8    you to our previous filing, DE367, which is a response to the

9    defendant's motion to exclude the opinion testimony of

10   Dr. Prockop.

11       And specifically in there, I cite to Dr. Prockop's

12   deposition, which was attached as Exhibit A on Pages 227 to

13   229, and also Pages 146-147, dealing with some areas that the

14   defense left out in their prior motions.

15       Specifically, I asked Dr. Prockop:  "Looking at your

16   report that you created on November 1, 2007, was Donald Greg

17   Wells one of the set of depositions and medical records that

18   you reviewed in preparation for this report?"  He answered:

19   "Yes.  He's listed under 1D, Donald Greg Wells."

20       I go on and ask him:  "Okay.  According to the report that

21   we have here, you reviewed medical records on the claimants,

22   including Donald Greg Wells?"  Answer:  "Yes."

23       Going on to Page 227-228:  "Now, doctor, in preparation

24   to draft this report on November 1, 2007, you reviewed the

25   deposition testimony of Greg Wells?"  Answer:  "Yes, I did."

Volume 5-4

1    Question:  "And based upon your review and analysis of

2  his deposition testimony, along with the medical records

3  provided by the University of Kentucky, you came up with this

4  framework that is in this report?"  Answer:  "Yes, yes."

5    Question:  "Okay.  And that was bolstered by the other

6  individuals that are listed in here, their depositions and

7  their reports?"  "Yes."

8    And then it doges on to Pages 227-228, a discussion about

9  the specific medical records he reviewed for Donald Greg

10  Wells about the specific symptoms he reviewed for the eight

11  areas that he decided was the minimal life care plan that he

12  reported on November 1 and 2, 2007.

13    I think that's all I need to supplement.  Thank you.

14        MR. PAGE:  May I respond to that?

15        THE COURT:  Very briefly.  I think the record is pretty

16  clear on this.

17        MR. PAGE:  I will note on Page 221 of Dr. Prockop's

18  deposition that we did object to that line of questioning on the

19  basis that he was addressing an individual's opinion that was

20  not contained in his report.

21    I then note at Page 242, Dr. Prockop agreed that there was

22  no specific reference in his report to Mr. Wells suffering from

23  any delayed neurological sequelae or Parkinsonism, which was

24  what was requested of Dr. Prockop at his deposition to address.

25    We went to address Dr. Prockop:  "It was to be a general

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-5

1  report for all the clients, not specifically Mr. Wells?"  He

2  said, "Yes."

3      We asked him:  "In reviewing medical records you had on hand

4  on November 1 that helped you draft that report, you did note

5  that Greg had DNS?" was the question by Mr. Mazur.  And

6  Dr. Prockop's response was:  "I can't recall that at this

7  moment, one way or the other."

8      So his deposition was as clear as his report.  These were

9  general opinions, not specifics.

10          MR. RUSSO:  Would you like to hear from me, Judge?

11          THE COURT:  Sure.

12          MR. RUSSO:  This was an unusual deposition.  I was

13  there.  And Dr. Prockop brought 20 boxes to the deposition.  And

14  each time that he was asked a question about a particular

15  patient in that deposition, the attorney from Atlas who was

16  conducting the deposition said, "Well, if you don't remember it,

17  I'm not going to allow you to go into the box."

18      We had all the past medical records there at the

19  deposition.  Dr. Prockop had notes on individual patients,

20  all of his opinions --

21          THE COURT:  Why couldn't he go into the box?  I'm not

22  following you.

23          MR. RUSSO:  Well, the attorney said, "Well, that's okay,

24  you don't need to go into the box."

25      And that happened repeatedly throughout the deposition.

Volume 5-6

1    And Dr. Prockop, who is here this morning to testify, will

2    verify that.

3        So when it came to what we had prepared for in the

4    deposition, Dr. Prockop had prices, he had notes, he had

5    notes on individual patients.

6            THE COURT:  Why didn't he supplement his report, which I

7    agree with Mr. Page is very generalized, and group dynamic with

8    individual reports or a supplemental report laying out what

9    you're talking about that he couldn't go into in the deposition.

10           MR. RUSSO:  Well, there was no -- the -- we came to the

11   deposition with 20 boxes of individual medical records there to

12   be testified about.  We came with prices, we came with the

13   individual assessment of each patient.  And at the deposition,

14   the defense lawyer didn't want to hear about the individual

15   assessment.

16           THE COURT:  Is that in the transcript?

17           MR. RUSSO:  Yes, it is.

18           THE COURT:  Where?

19           MR. RUSSO:  I would have to look at the deposition.

20           MR. MAZUR:  Here is an example, 146 to 147.

21           MR. RUSSO:  This was an example:  "Would the same be

22   true if I were to ask you whether or not any one of these

23   individuals goes to church or has a support system that is based

24   on his or her religion?"  "I could tell you that, if I had time

25   to spend a few minutes on looking at the charts, but I don't

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-7

1    want to guess at this at this deposition.  I can't tell you, off

2    the top of my head."

3        And then we came to this deposition with abundant

4    material that was individual in nature.  Dr. Prockop formed

5    his opinions based upon all the medical records and

6    interviewing each one of these clients personally before the

7    report was done.

8            THE COURT:  Well, where?  I want to see, what's the --

9    do you know where the deposition is filed in the record, the

10   number?

11           MR. RUSSO:  Yeah.

12       While we're looking for that, in the report, Dr. Prockop

13   indicated that "It should be understood that the life

14   expectancy and work life expectancy of these individuals will

15   be reduced significantly.  A specific statement concerning

16   each individual could follow, if necessary."

17       Now, we came to the deposition expecting that the

18   questioning would go into each individual patient, and we

19   were prepared to go into that.  We had the prices of care, we

20   had everything there.  And he states in his report:  "The

21   former will be approximately ten years less than the

22   prevailing expectancy of 78 years for U.S. males.  These

23   opinions regarding future medicals are based upon my

24   extensive experience, knowledge, evaluation, and treatment

25   and management of CO victims."

Volume 5-8

1    But these opinions that he came to the deposition to

2    provide were adequately and completely dependent upon his

3    interview of each individual patient and his review of the

4    medical records of each individual patient. And Dr. Prockop

5    would say there's no other way to do it.

6    If he as a physician did not review the medical records

7    or did not review -- or did not interview 12 of the 15

8    patients, he would have no basis for any opinion at all. But

9    at the time of the deposition -- and the deposition is 553.

10   THE COURT: Okay. And where in the deposition, in

11   response to specific questions about individuals, does he say,

12   "Let me look?"

13   MR. MAZUR: Your Honor, the first example I could point

14   you to dealt with the support systems, which is a portion of his

15   life care plan, and that was on Page 146 to 147.

16   And --

17   MR. RUSSO: So just as an example --

18   MR. MAZUR: Your Honor, I would also point you to a

19   series of questions on Page 155 through 156, where the question

20   on Line 15, ends, "No, we're not going to do that today, doc, in

21   the interest of time. Maybe we will do that at trial."

22   THE COURT: Where is that? What page?

23   MR. MAZUR: 155-156. It deals with who had cardiac

24   problems, and how Dr. Prockop determined that cardiac follow-up

25   was necessary.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)

Volume 5-9

1      THE COURT:  You said 156, what line?

2      MR. MAZUR:  I'm sorry, your Honor.  On 155, it starts on

3  Line 5 and goes through Line 20.  But the specific portion in

4  there is Line 15 on 156, where the question goes:  "No, we're

5  not going to do that today, doc, in the interest of time.  Maybe

6  we'll do that at trial."

7      And your Honor, if I may, if you look up to Line 9, it's

8  Dr. Prockop's response to the initial question.  He's

9  requesting from Line 9 to 14 to look at the rest of the

10  individuals and provide the information they're requesting.

11  So there was a conscious decision made on the part of all the

12  defendants there that day not to allow this man to get into

13  specifics.

14      MR. PAGE:  Your Honor, there's a good reason for that.

15  His report stated that he was offering general opinions.

16  Repeatedly in his deposition he stated he was offering general

17  opinions.  If we had gotten into specific opinions the argument

18  then would have been that we had opened the door and we allowed

19  him to supplement his report to the deposition, which plaintiff

20  has attempted in other contexts to do.

21      So we were very careful not to supplement his opinion.

22  He had the affirmative duty -- plaintiffs' counsel had the

23  affirmative duty of supplementing the opinion if they wanted

24  to go beyond the report.  They never did.

25      MR. RUSSO:  Your Honor, may I respond to that?  Now,

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-10

1    it's clear that counsel had admitted that they went into this

2    deposition with the strategy of not going into that.  In fact,

3    that is exactly what happened.  There were 23 boxes of medical

4    records there.  There's not a physician in the world who can

5    give an opinion about the future medical needs of a patient

6    without reviewing the medical records or without reviewing the

7    medical situation of the patient.

8         And we came there, if that was their strategy, they

9    certainly carried it out.  Because at this deposition, they

10   had -- and in every other deposition, they always went into

11   every single detail in the world.  So if it was their intent not

12   to go into these things, that's their problem.

13             MR. PAGE:  Your Honor, Dr. --

14             MR. RUSSO:  But if his strategy is, okay, because his

15   report was general, we don't want to know, then --

16             MR. PAGE:  Dr. Prockop is not a treating physician.  He

17   is an expert.  He had an obligation to state al of his opinions

18   by November 1.  We were not entitled or obligated to allow him

19   to supplement or give us additional opinions beyond the date of

20   his report.  He had that obligation, that affirmative

21   obligation.  It was not our obligation to pull out additional

22   information from him.

23             MR. RUSSO:  Well, they went into the topics, and

24   whenever he went to go get it, they would stop it.  That was

25   their strategy.  They said, "No, we don't want to know.  You're

 1  not allowed to go get information from your boxes."  Dr. Prockop

 2  started off the deposition by saying, "I have it here.  I don't

 3  remember it, I have it here."

 4      They asked him the questions, but then when he went to

 5  pull the records to answer the questions, they said, "No, we

 6  will do that later."

 7          MR. PAGE:  Let me make another very clear point..

 8  "Counsel, before we go on we want to put a stipulation on the

 9  record that that is limited to Dr. Prockop's report of November

10  1, 2007; is that agreed?"  Mr. Russo, "Yes."

11      The reason that was agreed is because Dr. Prockop conducted

12  a number of IMEs after the November 1 deadline and we wanted to

13  make very certain that he wasn't going to get into anything he

14  did after November 1.  Counsel for the plaintiffs agreed that as

15  long as we did not get into those issues he would not attempt to

16  introduce those IMEs.

17      So it was intentional and agreed upon both sides at the

18  start that we were going to limit our scope to what he knew on

19  November 1, because that was the date of his expert report and

20  we were going to be very cautious not to open the door to

21  after-November 1 opinions.

22          MR. RUSSO:  Yes, but that's a whole different issue,

23  those IMEs.  The question is, did they inquire about the basis

24  of his opinions?  They did, and they prevented him from

25  answering the questions by going to the materials he had.

Volume 5-12

1          THE COURT:  Is he going to testify as to the IMEs?

2          MR. RUSSO:  I'm sorry, is he going to?

3          THE COURT:  Yes, testify to the IMEs?

4          MR. RUSSO:  No.

5          THE COURT:  He's only going to testify to pre-November

6     1st.

7          MR. RUSSO:  That's right.

8          MR. PAGE:  Mr. Russo was free to cross-examine if he

9     felt --

10          THE COURT:  All right.  I'm done.  I looked at the case

11     law this morning.

12          To be candid, Mr. Russo, I found that the report barely,

13     if at all, complies with Rule 26.  I think the defendants

14     were, under the rule, entitled to more notice, if you look at

15     Rodgers v. Monumental Life Insurance Company, which is 289

16     F.3d 442.  However, the Sixth Circuit there reversed the

17     District Court for excluding testimony, because the District

18     Court failed to perform the appropriate analysis.  Even if

19     the -- here is what I am quoting, from Page 451:

20     "Furthermore, even if the plaintiff's other allegation are

21     meritorious, sanctions under Federal Rule of Civil Procedure

22     37(c)(1) still may not be appropriate if Monumental's failure

23     to comply with Rule 26 is determined to be harmless.  This

24     question is best left to the District Court."

25          I tried to figure out what that means.  I looked at

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-13

1   Thompson v. Doane Pet Care Co., which is 470 F.3d 1201,

2   again, reversing a District Court.  There, it says that "A

3   District Court should not make parties have magic language in

4   their reports."  And the District Court did not allow a

5   witness to explain and elaborate on his report in his direct

6   examination.  The Court then held, because the summary report

7   did not repeat the words on the contract expressly stating

8   that the witness's opinion and calculations were based --

9   sorry, on generally accepted accounting principles, the

10  witness could not even read his report to the jury at all,

11  and all the Court would allow there was specific testimony

12  related to the report.

13      The District Court was reversed.  In there, it says "The

14  rule contemplates that the expert will supplement, elaborate

15  upon, explain, and subject himself to cross-examination upon

16  his report."

17      "Parties may ordinarily seek permission to depose such

18  experts prior to trial.  No such request was made in this

19  case.  Rule 26(a)(2)(B) should not be used here as a trap for

20  the unwary lawyer not familiar with the particular

21  preferences of individual judges, a preference that the Court

22  below in this case repeatedly referred to as 'Judge Higgins'

23  rule.'"

24      Then the question is, is this harmless or not, based on

25  that.  And I find that it is, if the report is not

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-14

 1    sufficient.  There's an argument that Mr. Russo made -- and

 2    the report does provide, and I'll find it -- that he would be

 3    willing to provide information on individuals if requested.

 4    What I've got is Page 4 of 10, which I printed off of ECF.

 5    But it's the signature page.

 6        A specific quote, I'm quoting him:  "A specific statement

 7    concerning each individual could follow if necessary."  So

 8    arguably, Mr. Russo is right, although I think this isn't

 9    enough, that the report could provide -- could be sufficient

10    enough to put the defendants on notice.

11        The key to all of the rules under Rule 26 is notice.  And

12    here, it's clear the defendants have notice.  Their choice

13    not to go into it in the deposition so as to protect their

14    record is fine, and they can take that up with the Sixth

15    Circuit.  But it seems to me that the spirit and the language

16    of all these cases goes ultimately to whether the defendants

17    are on notice.

18        This one is an unpublished decision, so I recognize it

19    for that value only.  It's Cetlinski v. Brown, and in that

20    case the Court held that "Patients were not prejudiced by

21    alleged nondisclosure of defense expert's prospective

22    testimony on informed consent issue in expert reports."

23        Here, the key issue is whether the defendants -- or the

24    plaintiffs, in this instance, had notice.  And the argument

25    was that during the deposition, on -- I'll quote on 387-388.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Volume 5-15

1    "On January 9, 2002, while taking the de bene esse deposition

2    of Robert Levy, one of the defense experts, plaintiff's

3    attorney learned that Levy intended to opine on the issue of

4    informed consent."  Therefore, the Court held that he had

5    notice, they had further opportunity to find out about that,

6    and the key to the rule was notice.

7         Therefore, I will again deny the motion in limine to

8    exclude Dr. Prockop, but I will caution the plaintiffs that

9    his testimony has to be particularized, it has to be as to

10   the individuals.  Any group consensus testimony that he

11   gives, I will strike.  And I'm not going to allow him to

12   refer to all 30, as he does in his report.

13        And I ask that the plaintiffs specifically admonish him

14   to refer only to the 16.

15             MR. RUSSO:  When I bring him in, if I could have one

16   minute to make sure that I can tell him that.

17             THE COURT:  Okay.

18             MR. PAGE:  Just one request, your Honor.  I could either

19   ask it when he's testifying or now, but could we limit him to

20   the individuals that he indicated in his invoice that he

21   reviewed their records?

22             THE COURT:  Yes.

23             MR. PAGE:  Because there are two or three that he has no

24   knowledge of it.

25             THE COURT:  I know, I saw it.  There's 13, by my count.

Volume 5-16

1          MR. RUSSO:  Your Honor, he does, because he reviewed the

2      medical records of those patients.

3          MR. PAGE:  Not according to his invoice.

4          THE COURT:  Not according to his report.

5          MR. RUSSO:  Okay.  So he's limited to the people he

6      listed in the report.

7          MR. BENTLEY:  Your Honor, may I ask one thing?

8          THE COURT:  We have one minute before the jury comes in.

9          MR. BENTLEY:  Your Honor, at the risk of raising the

10     Court's ire, I would respectfully question the time limits.  I

11     would like to talk about that with the Court later.  I want to

12     say that early on so I haven't waived anything.

13         Thank you, your Honor.

14         THE COURT:  To make my record very clear, I think I have

15     been very indulgent.  I think there has been a lot of questions

16     asked that neither the jury nor any lay person would understand

17     or care about by both sides.  I think 60 hours is more than

18     sufficient.  I looked at the case law, and it's abundantly clear

19     that I'm being overly generous with my time, as many Judges have

20     told me.

21         So I'm happy to consider going down.  I'm very unlikely

22     to consider going up.  And 60 hours translates into 20 days

23     of testimony, in addition to three already.  I think it's

24     sufficient.

25         I will always, if I feel like you all are moving it along

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)

Volume 5-17

1    and then I will be -- would be willing to reconsider.  But as

2    long as I feel like that the jury's time is not being best

3    used, I'm going to continue to impose it.

4        MR. BENTLEY:  And I understand.  And also, your Honor,

5    again with all due respect, if I hear something I hope the Court

6    will allow me or members of my team to approach so that we don't

7    blurt out something that's going to cause a mistrial.

8        THE COURT:  Absolutely.  But I would say, out of all the

9    lawyers, Mr. Page is the only one that's followed my request.

10   Although I think with leading it's hard to cite the specific

11   rule in the objection so that I can look quickly and see.

12       And so I would ask that the parties continue to do that.

13   Approaching, look, with the time limits, I will let you

14   approach all you want.  It's on your time.  My only caution

15   is, if I understand your objection and it's clear to me what

16   it is, based on it, then I may say "No" and rule on the

17   objection.  You can make your record later, but I mean,

18   there's some times I clearly understand your objection.

19   Having said that, I think every approach has been valuable,

20   like I said yesterday.

21       MR. BENTLEY:  I say that with all due respect, your

22   Honor.  I wanted to draw a line on that.

23       THE COURT:  Right.  I can't say that the approaches

24   haven't been valuable.

25       MR. BENTLEY:  Thank you, your Honor.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-18

1          THE COURT:  Is the jury ready?

2          COURT SECURITY OFFICER:  They are not up yet.  They are

3   bringing them, your Honor.

4          THE COURT:  Okay.  Thank you.

5          COURT SECURITY OFFICER:  Your Honor, they are present

6   now.

7          THE COURT:  Are you ready?  Bring them in.

8      Mr. Russo, did you talk to him?

9          MR. RUSSO:  Yes, I did.

10          THE COURT:  Okay.

11      (Jury enters the courtroom at 8:34 a.m.)

12          THE COURT:  You may be seated.

13      Mr. Russo, please call your next witness.

14      Good morning, everyone.

15      (Witness enters the courtroom.)

16          THE COURT:  For the record, Mr. Russo, who are you

17   calling?

18          MR. RUSSO:  Dr. Leon Prockop.

19          LEON PROCKOP, M.D., PLAINTIFFS' WITNESS, SWORN

20                     DIRECT EXAMINATION

21   BY MR. RUSSO:

22   Q.  Dr. Prockop, if you would, please tell the jury your name

23   and your address?

24   A.  Dr. Leon Prockop.  I live in Tampa Florida, 3004 Justamere

25   Lane.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-19

1  Q.  Dr. Prockop, if I could, I would like to briefly go through

2  your qualifications.

3       First of all, where did you grow up?  In Pennsylvania, I

4  believe?

5  A.  I grew up in a small town in Pennsylvania called

6  Aquashicola.  It's a village outside of a town called Palmerton,

7  P-A-L-M-E-R-T-O-N.

8  Q.  Did you prior to your attendance at Princeton University,

9  did you have work experience?

10  A.  Well, I was a small-town boy.  I had to work a lot, enjoyed

11  it.  I worked in orchards.  I worked at Bethlehem Steel.  I

12  drove a truck for a farm for some summers.  I did a lot of jobs

13  before I got my education.

14  Q.  And did you graduate from Princeton in 1955?

15  A.  Yes, I did.

16  Q.  And did you pursue other education; and if so, what did you

17  do?

18  A.  After I finished my premedical training at Princeton

19  University, I went to the University in Philadelphia, which is

20  in Philadelphia, which is just 80 miles south of where I grew up

21  in Palmerton.  So I went to medical school there and finished in

22  1959.

23  Q.  Did you do a rotating internship at Lennox Hill Hospital in

24  New York City?

25  A.  Yes.  The next year I went to New York City, which was also

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-20

1  close by, and did a rotating internship at the Lennox Hill

2  Hospital.

3  Q.  Were you a research assistant at the National Heart

4  Institute and National Institutes of Health in Bethesda,

5  Maryland, from 1960 to 1962?

6  A.  Yes.  In those days there was a doctors' draft, so doctors

7  had to serve in the military.  So I chose and was fortunate

8  enough to go to Bethesda, Maryland, where there was a research

9  possibility.  I was in the U.S. Public Health Service in that

10  capacity, so I did my two years of Selective Service at

11  Bethesda, Maryland, while I did my research there.

12  Q.  Then did you go to the Department of Physiology at the

13  School of Medicine at George Washington University in

14  Washington, D.C.?

15  A.  This was while I was at Bethesda, Maryland, doing my

16  Selective Service time.  I had the privilege of being able to go

17  into the city -- Bethesda is just outside of Washington, D.C.,

18  and I served on the faculty there.  That was a part-time

19  affiliation, that wasn't my main job.

20  Q.  Did you also serve at Presbyterian Medical Center in New

21  York City from 1962 to 1964?

22  A.  Well, during my research time at Bethesda, Maryland, at the

23  National Institutes of Health, it's called, I decided I would

24  pursue a career in neurology, which is one of the specialties of

25  medicine.  And I went to Columbia Presbyterian Medical Center,

1   which was in New York City, where I had already done my

2   internship, and served a three-year residency in neurology.

3   Q.  Did you then attend Columbia Presbyterian Medical Center,

4   and were you an assistant in neurology there at the College of

5   Physicians and Surgeons at Columbia University from 1964 to '65?

6   A.  Well, for two years after I finished my neurology residency

7   I stayed on in the clinic, seeing patients and in a research

8   capacity at Columbia Presbyterian Medical Center.  So I stayed

9   there for a total of five years; there years as a resident, and

10  two years on the faculty at the medical school.

11  Q.  Could you run through the academic appointments through the

12  years, just to give us a summary?

13  A.  Well, I was an instructor, I think I was at Columbia, and

14  then I went back to the University of Pennsylvania where I had

15  done my medical school and was an assistant professor.  Stayed

16  there for about seven or eight years.  I was promoted from

17  assistant professor to associate professor.

18      And then at that time, having -- it was going back to about

19  1972.  There was a new medical school opening in Tampa,

20  Florida -- the University of South Florida, it's called -- and

21  I was asked to come there as the first neurologist on the

22  faculty.  I have been there for some 35 years, first as the

23  professor of medicine then the professor of neurology.  I was

24  the chair of the Department of Neurology for some 25 years,

25  until I stepped aside voluntarily from that position about five

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-22

1  years ago.

2  Q.  Now, you have an interest in neurotoxicity.  Could you

3  explain neurotoxicity, please, to the jury?

4  A.  All right, I will try.  The phrase we use is that the world

5  abounds with potential neurotoxins.  There are a lot of

6  substances in our water, in the soil, in the air which, given

7  the right concentration and the right exposure, can poison the

8  body.

9      Not everything does poison the body.  There are what we

10  call potential toxins, but there are any and many of these

11  things.  Our water supply is an example that contains

12  potential toxins.  We chlorinate water, using that as an

13  example, to kill the bacteria.  But if you put too much

14  chlorine in the water, that's a toxin, it can damage the

15  body.

16      The people that chlorinate our water are trained so that

17  they put the right amount of chlorine, enough to kill the

18  bacteria but not enough to kill the human being that's going

19  to drink the water.

20      If they made a mistake and put too much chlorine in the

21  water, when we would all be getting toxic from our water

22  supply.  I use that as a simple example.

23      There's some part of the world, for example, where

24  arsenic leeches in the water.  In Bangladesh and other parts

25  of the world, arsonic that comes out leeches in the water.

1   Any small amount of arsonic is very toxic to the body, a

2   small amount of chlorine isn't toxic to the body.

3       So we, as neurotoxicologists, are interested in and try

4   to go survey, look at situations where there are potential

5   toxins.  We want to be sure that they aren't causing toxic

6   damage to the brain or to the nervous system.  If they do, we

7   want to try to diagnose what's going on and try to treat

8   these people to prevent further problems.

9       So that's sort of the job of a neurotoxicologist, which I

10  like to think I am.

11  Q.  In the years that you functioned as chairman of the

12  Department of Neurology, did you develop this interest in toxins

13  and did you eventually become the chairman of the World Congress

14  on Neurotoxicity?

15  A.  Yes.  To me, it was an interesting journey, so to speak.  My

16  responsibilities as a chairman of the Department of Neurology

17  were primarily teaching medical students and residents patient

18  care.  And then I had some time and the privilege of being able

19  to do research.

20      I chose to do my clinical research not in the laboratory,

21  but in clinical terms in the area of neurotoxicology.  And I

22  studied these toxins and tried to see when they affect human

23  beings and in what way they affect human beings.

24      One of the special toxins that came up was carbon

25  monoxide, which I think is the subject of what we're

1    discussing today.  But carbon monoxide came up as a

2    world-wide toxin, and I became interested in carbon monoxide

3    and its effect on the nervous system and studied that in a

4    written research on that -- excuse me, written papers on that

5    and have done clinical research on that topic.

6    Q.  In addition to doing that, have you treated carbon monoxide

7    patients on a long-term basis and consulted with them and

8    examined them when called upon to examine them?

9    A.  Yes.  Let me explain my responsibilities at the University

10   of South Florida College of Medicine.  My responsibilities, as I

11   mentioned, are primarily in teaching.  But you can't teach

12   without seeing patients yourself.  So I always see patients

13   every -- every week.  I'm seeing patients practically every day.

14       Therefore, I see patients and sometimes consult on them,

15   decide what the problem is and issue a report to the primary

16   care physician, the person that referred the patient to me,

17   suggesting that they do this, that, or the other thing.

18       However, sometimes the primary care physician says to me,

19   "Look, I'm not comfortable with treating this patient.  Will

20   you treat the patient?"  In those cases, I take on the

21   treatment myself and treat them in any way that they need to

22   be treated.

23   Q.  And the World Congress on Neurotoxicity, is that an

24   organization of physicians like yourself who have an interest in

25   toxins affecting people from a neurologic standpoint?

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-25

1   A.  Yes.  There's an overall group called the World Federation

2   of Neurology.  This is neurologists from around the world.  And

3   there's every four years a meeting of the World Federation of

4   Neurology and a committee or a subgroup, I'll say.

5       The World Federation of Neurology is the research group on

6   environmental toxicology, which I was asked to be the chair.

7   And I have been the chair for about, I think, eight or ten

8   years.

9   Q.  And do you all investigate carbon monoxide accidents that

10  occur around the world?

11  A.  Yes.  It's unfortunately a major problem around the world;

12  sometimes in the United States, but more so in other countries

13  of the world.  So we try to investigate when the carbon monoxide

14  poisoning occurs, how it affects the human beings, what to do

15  about the human beings that have been afflicted, and then try to

16  do preventive measures to prevent further occurrences down the

17  road.

18  Q.  Have you, Dr. Prockop, seen patients that I have referred in

19  the past to examine them and to determine if they were carbon

20  monoxide poisoned, or not?

21  A.  Yes, I have.  You have sent and asked me to evaluate

22  patients, which I've done and issued reports or talked to you on

23  the telephone or however.

24  Q.  In addition to your interest in carbon monoxide, do you

25  also -- do you also function as the editor of a neuroimaging

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

Leon Prockop, M.D., Direct Examination

Volume 5-26

1   journal?

2   A.  Well, one of the societies, professional societies in which

3   I've been active over many years is called the American Society

4   of Neuroimaging.  About 20 years ago, that society decided they

5   would start a journal, called the "Journal of Neuroimaging."  I

6   was asked to be the founding editor, which I was, and am the

7   founding editor.  After eight years, I relinquished that

8   responsibility and turned it over to somebody else, but I have

9   still been active in the issue of neuroimaging and publishing in

10  neuroimaging.

11  Q.  When assessing carbon monoxide toxicity, is neuroimaging or

12  EEGs, are they part of the evaluation to assess how much

13  toxicity from carbon monoxide actually occurred?

14  A.  Yes.  It's important to have what we call markers, things

15  that help us make diagnoses.  A patient may come to see you and

16  say they have been exposed to carbon monoxide or chlorine or

17  whatever.  We will do an examination and decide whether they

18  have signs of neurological damage.  Then we want to do tests to

19  help us conclude whether it's the carbon monoxide or whether

20  it's something else.

21      So neuroimaging is brain CT, brain MRI, and such studies.

22  EEG is also important.  So we do these tests to help us come

23  to a diagnosis, a conclusion about what the problem is and

24  what we can try to do about the problem.

25  Q.  The Department of Homeland Security here in the United

1  States, are you part of a panel selected by the Department of

2  Homeland Security to be consulted in case there is a terrorist

3  attack that uses neurotoxins?

4  A.  Yes.  This is, unfortunately, in our day and age, a real

5  danger.  And I'm very concerned about that.  I'm concerned about

6  that in all of the United States, but particularly in Tampa,

7  where we have a lot of chemicals at the -- it's called the Port

8  of Tampa.  And around the Port of Tampa there are large

9  containers containing chemicals, ammonia, chlorine, a variety of

10  other subjects.  God forbid, one of the tankers were exploded,

11  all of downtown Tampa would be inundated by ammonia or chlorine

12  or these terrible toxic gases that are poison to human beings.

13      So I have been part of a group to see if we could protect

14  ourselves, so to speak, from these attacks and also treat the

15  human beings that might be afflicted if these attacks occur,

16  God forbid.

17  Q.  And you were contacted by the federal government to serve on

18  that panel?

19  A.  Yes, I was.

20  Q.  In terms of publications, I see your publications go back to

21  1960.  And they continue on up into the "Journal of

22  Neuroimaging" in 2008; is that correct?

23  A.  Well, I think that CV, I don't know what you're looking at,

24  but I continue to publish.  As an example, I have a number of

25  articles and book chapters that are called in press.  We have a

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-28

1  system where you write an article and it's designated to have

2  been published; but also, if you've written something and it's

3  been accepted for publication but it isn't out yet, it's called

4  in press.

5     So I have a number -- I have a number of publications

6  that are currently in press.

7  Q.  And you have published in the field of carbon monoxide

8  poisoning, as well?

9  A.  Yes, I have.

10  Q.  Now, you're a contributor and you have authored portions of

11  books since 1962 up until the present day; is that correct?

12  A.  That's correct.

13  Q.  In this particular case -- I will give you a chance to --

14  A.  Thank you.

15  Q.  Sure.

16     In this particular case, did you have the opportunity to

17  review individual cases with regard to assessing their future

18  medical needs here?

19  A.  Yes.  I came to London, Kentucky, about a year ago, roughly.

20        MR. PAGE:  Objection.  Approach?

21        THE COURT:  Yes.

22     (The following proceedings were held at the bench outside

23  the presence of the jury.)

24        MR. PAGE:  He's talking about coming a year ago.  He may

25  be talking about after November 1 of 2007.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-29

1      MR. RUSSO:  He's not.

2      MR. PAGE:  And his report does not indicate anywhere on

3  the invoice that he ever came to London.

4      THE COURT:  You can probe that part on cross, but I do

5  want him to state before November 1.

6      MR. RUSSO:  I will.  I'm sorry.

7    (Bench conference was concluded, at which time the following

8  proceedings were held in the presence of the jury.)

9  BY MR. RUSSO:

10  Q.  Dr. Prockop, did you come to London, Kentucky, before you

11  issued your report of November 1, 2007?

12  A.  I just pulled the file here, and I'm pretty sure, if my

13  memory serves me correctly, I was in London, Kentucky, on

14  February 2, 2008.  So what is your question again?

15  Q.  Did you come to London, Kentucky, before November 1, 2007?

16  Just a simple question.

17  A.  No.

18  Q.  Okay.  Did you interview any clients before November 1,

19  2007?

20  A.  No.

21  Q.  Okay.  Then we will go to the next.

22      Did you review the medical records for the individuals

23  that you provided future medical expenses for?

24  A.  Yes.  Before I came to London, Kentucky, I reviewed medical

25  records.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-30

1   Q.  All right.  Could we take an individual patient, any of them

2   of your choice, and we will go through the methodology you used

3   and we will provide the jury the opinions that you have

4   regarding their future medical needs?

5   A.  All right.  Just to clarify, I have at my right hand a box,

6   a container that has individual files, like this one.  This

7   particular one is on a man named Shade, S-H-A-D-E, Deaton,

8   D-E-A-T-O-N.  D-E-A-T-O-N.

9       And I had seen his medical records, I don't know if it's

10  all of them, but at least some of his medical records prior

11  to the time I met him on February 2, 2008.

12          MR. PAGE:  Your Honor, can I approach one more time?

13  I'm sorry.

14          MR. RUSSO:  I'll take care of it.

15  BY MR. RUSSO:

16  Q.  We're going to skip any discussions you had with Mr. Deaton

17  after November 1, 2007, and we're going to concentrate, if

18  you don't mind, on the medical review that you did before

19  November 1, 2007.  Is that okay?

20  A.  Let me make sure I understand.  We're going to concentrate

21  on things before November 1st?

22  Q.  2007, when you issued your report.

23  A.  All right.

24  Q.  All right?  So if you could, tell us the basis of your

25  projection of future medical from your review of the medical

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-31

1    records of Mr. Deaton.

2    A.  I'm not sure I answer -- I understand the question.  I'm

3    sorry.

4    Q.  That's okay.  I probably didn't ask it the right way.

5        You issued a report on November 1, 2007; is that correct?

6    A.  I issued a report that I have in front of me dated February

7    17, 2008.

8            MR. PAGE:  Object, your Honor.

9            THE COURT:  Sustained.

10       Hand it to the CSO.

11           THE WITNESS:  Thank you.

12       Yes, excuse me, I did issue a report dated November 1, 2007.

13   BY MR. RUSSO:

14   Q.  Now, in that report does it have a list of carbon monoxide

15   victims you evaluated, based on their review of the previous

16   medical records?

17   A.  Yes.

18   Q.  If you could, let's go down the list.  I think this starts

19   out with Shade Deaton, anyway.

20   A.  Yes.

21   Q.  If you could tell us, if you don't mind, what about his

22   medical records provided the basis for you to project his future

23   medical needs?

24   A.  Well, let me read my report here dated November 1, 2007, so

25   I'm clear.

1    Yes.  In this report I referred to a number of

2  individuals, including Shade Deaton.  And based on my review

3  of the medical records and other data that was provided to

4  me, I came to the conclusion that they most probably had been

5  exposed to toxic amounts of carbon monoxide and most likely

6  they had brain and nervous system damage as a result of the

7  toxic exposure.

8    Based on the review of the medical records, I constructed

9  plans or suggestions as to how they should be evaluated and

10  treated in the future.

11  Q.  Okay.  If you could, confining ourselves to Shade Deaton,

12  would you look at your report that you have on Shade Deaton and,

13  if you wouldn't mind, start out by telling us what about his

14  medical records provided the basis for the opinions you have on

15  Mr. Deaton's future medical needs?

16      MR. PAGE:  Objection, 602, foundation.

17      THE COURT:  Lay the foundation on how he comes up with

18  this first.  Sustained.

19  BY MR. RUSSO:

20  Q.  Dr. Prockop, are you qualified in terms of reviewing medical

21  records to determine the future needs of a patient, first?

22  A.  Yes.

23  Q.  And is that qualification that you have based upon what?

24  Your experience, your literature review, and your experience in

25  treating, actually treating long-term carbon monoxide patients?

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-33

1    A.  Well, I think it's based on all those and the fact that I am

2    trained as a general physician prior to becoming a neurologist.

3    But as a neurologist I'm experienced, as I mentioned before, in

4    seeing cases that have been toxic -- people have been toxically

5    damaged.  And based on records, I can determine whether or not

6    they have been exposed to toxins.

7        And based on records, assuming the records are good

8    records and submitted by people that I have respect for, I

9    can come to a conclusion that they did or do not have damage,

10   in this case from carbon monoxide, and can conclude what

11   further treatment they will need and what their potential

12   treatment in the future will be.

13   Q.  And when it comes to those kinds of opinions, do you derive

14   those opinions from having actually done this for real, live

15   patients?

16   A.  Yes, it's -- the practice, as a consulting neurologist, I'll

17   see a patient and they will come with medical records, tests

18   that have been performed when they came to see me.  And I will

19   analyze those records, and it'll be incorporated in my

20   decision-making process as to what's wrong with them, what their

21   damage is, and what to do about them.

22   Q.  All right.  If you wouldn't mind, could you go through the

23   matters you reviewed with Shade Deaton; in other words, what

24   records did review, what depositions, if any, and so on?

25   A.  All right.  Well, I reviewed the records of Dr. Berger dated

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-34

1   8/22/06.  Parenthetically, I know Dr. Berger and I would respect

2   his statements, his examination techniques, his historical

3   review, and his conclusions.

4       I mentioned before that part of my responsibility is to

5   be thoughtful and decide whether a medical record is a valid

6   one.  Not -- I mean, they're all valid, but some have more

7   value than others.

8       If, for instance, I didn't know about Dr. Berger and his

9   skills, I might not weigh this as heavily as I did.  But I

10  know him professionally, and I respect his opinions.  So

11  therefore, I could base part of my own conclusions on his --

12  not completely, but incorporated in my thought process.

13          MR. PAGE:  Your Honor, object as to nonresponsive and

14  move to strike.

15          THE COURT:  Overruled.

16  BY MR. RUSSO:

17  Q.  Let's go through the other medical records you reviewed.

18  For instance, did you have any records regarding neuroimaging or

19  EEGs for Mr. Deaton?

20  A.  Yes, I had brain EEG and brain MRI data.

21  Q.  And of what use was that?

22  A.  Well, those were helpful.  Because the EEG, as an example,

23  doesn't say on the report or on the study that this is carbon

24  monoxide, but it shows whether the brain is damaged or not.

25      And the EEG, in his case -- let me go to that.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-35

1   I'm having trouble finding the EEG report.  I have the

2   MRI report here, but let me look further for the EEG report.

3   While I know I looked at the EEG report, I don't have it

4   in front of me right now.  I do have the MRI report, however.

5   Q.  We will find the EEG report.

6   A.  Thank you.

7   Q.  When it comes to the MRI report, what effect if any did that

8   have on the effect of the evaluation of Mr. Deaton's needs?

9   A.  Well, the MRI is very important.  The MRI, without going

10   into technicalities, is a very sensitive test, we call it.  It

11   shows damage to the brain from a variety of reasons.  For

12   instance, it will show a brain tumor long before the person is

13   symptomatic of a brain tumor.  It will show signs of MS, as an

14   example -- multiple sclerosis -- even with people that don't

15   complain about problems related to MS.  So it's a very sensitive

16   test.

17   Therefore, we use it often in analysis of carbon monoxide

18   and other forms of toxicity.  And it's a very sensitive test.

19   It will show us brain damage in a very important way that

20   will tell us about the future or the future outcome of this

21   particular patient.  So the MRI is a very important test.

22   Q.  What does Mr. Deaton's MRI show?

23   MR. PAGE:  Objection, your Honor.  May I approach?

24   THE COURT:  Yes.

25   (The following proceedings were held at the bench outside

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-36

1    the presence of the jury.)

2         MR. PAGE:  I have some foundation issues, but he needs

3    to establish -- and I don't believe that he has -- that he

4    reviewed either the MRI or the EEG before the November 1 report.

5    I was looking for the deposition testimony.  I think he didn't

6    have the studies before the November 1 report.

7         MR. RUSSO:  Your Honor, he did.

8         MR. PAGE:  Plus, goes beyond the scope of his report.

9    He doesn't discuss the MRIs or the EEGs in his report.  So to

10   the extent he's offering a --

11        MR. RUSSO:  Yes, he does.

12        MR. PAGE:  He talks about future life plan.  But what

13   counsel is asking him to do is opine on what the MRIs and EEGs

14   demonstrated, and it doesn't do that in the report.

15        MR. MAZUR:  It's not a matter of showing them.  It's

16   that he reviewed those and that's what his opinion is based on.

17        MR. RUSSO:  The report will show that he looked at the

18   EEG.

19        THE COURT:  You asked him to go into it.  He is laying

20   the foundation of how he came up with the conclusion.  He

21   understands it's pre-November 1st.  You can inquire, and if it's

22   based on something subsequent, I will instruct the jury to

23   disregard it.

24     (Bench conference was concluded, at which time the following

25   proceedings were held in the presence of the jury.)

1   BY MR. RUSSO:

2   Q.  If you could, explain to the jury the significance of the

3   MRI of Mr. Deaton.

4   A.  Well, we have -- based on many, many studies, we know what

5   the normal MRI of the brain is in somebody of Mr. Deaton's age.

6   We know what is normal.

7       His MRI is not normal.  It shows what the terminology

8   uses, increased signal.  White specks in the brain.

9       Now, those white specks in the brain don't say "carbon

10  monoxide" on them, but they say that there brain damage.

11  It's not a normal finding.  We might see this in a

12  70-year-old person who has had multiple strokes.  We might

13  see it occasionally -- well, actually, it's always abnormal.

14  But in his age group, since he has no risk factors, we call,

15  of stroke, he's not in the age group for stroke, this is

16  abnormal.  It doesn't say "carbon monoxide" on it.  But it

17  says it's abnormal.

18      And therefore, we, as clinicians, as doctors, put

19  together the clinical situation, what's going on in the

20  person's life, their age, other factors, and decide what

21  caused those white abnormalities in the brain which he has.

22      So he has an abnormal brain MRI, and based on his

23  exposure to carbon monoxide and the fact that he doesn't have

24  any other reason for these white normalities in his brain,

25  the conclusion I came to was that it was secondary to the

1  carbon monoxide.

2  Q.  When it comes to carbon monoxide poisoning, are these bright

3  spots consistent with findings in carbon monoxide poisoning?

4       MR. PAGE:  Objection, 611(c).

5       THE COURT:  Sustained.

6  BY MR. RUSSO:

7  Q.  What if any significance, when it comes to carbon monoxide

8  poisoning, are these findings?

9  A.  Well, as I mentioned before, the brain MRI is very

10  sensitive.  It shows damage to the brain, and this is a sign of

11  damage.  So he has a damaged brain.

12       MR. PAGE:  I apologize.  Your Honor, could I approach?

13       THE COURT:  Yes.

14     (The following proceedings were held at the bench outside

15  the presence of the jury.)

16       MR. PAGE:  Page 192 of Dr. Prockop's deposition.  He

17  discussed having a box of CVs and DVDs, talking about in terms

18  of MRI data.  And he indicates at this point that he did not

19  have those materials at the time of his November 1, 2007,

20  report, that that was information that was provided to him after

21  the report.

22       MR. RUSSO:  Let me see in.

23       MR. PAGE:  In fact, the report lists the materials he

24  reviews and the MRIs and EEGs are not listed.

25       MR. MAZUR:  I said that they were part of the UK medical

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-39

1    records.  That's what he has listed there.

2         MR. RUSSO:  There's a difference, your Honor, between

3    having the MRI films and having the MRI reports.  And that's

4    what --

5         THE COURT:  Which one did he have?

6         MR. RUSSO:  He had the reports.

7         MR. BENTLEY:  He had -- your Honor --

8         THE COURT:  What does it say?

9         MR. BENTLEY:  These are MRI reports.  This is the thing

10   that I want to be clear about.  I've got the date when the MRIs

11   and EEGs were done.  The EEG was done on October 1, 2007.  And I

12   highly suspect that Mr. Russo did not obtain that in that

13   month's interim to get to this man by November 1st.  I know the

14   date of them.  They were all done --

15        THE COURT:  Okay.  Mr. Russo, ask him when he got those

16   reports.

17        MR. RUSSO:  Okay.

18        THE COURT:  Let's hear it from him.

19        MR. RUSSO:  He does say all, regarding all plaintiffs

20   from the University of Kentucky.

21        MR. PAGE:  Look at the invoice.  It lists what he

22   actually looked at.

23        THE COURT:  You can probe that on cross.  Let's see when

24   he got them.  Go ahead.  Overruled.

25       (Bench conference was concluded, at which time the following

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-40

1   proceedings were held in the presence of the jury.)

2   BY MR. RUSSO:

3   Q.  Dr. Prockop, are you referring to an MRI report?

4   A.  Yes.

5   Q.  And did you have that MRI report before November 1, before

6   you did the report?

7   A.  Yes, I did.

8   Q.  And my question, my last question, was:  In carbon monoxide

9   poisoning, are these bright spots, are they -- have they been

10  associated, if they have in the literature, with carbon monoxide

11  poisoning?

12  A.  Yes.  Not only have they been associated in the literature

13  with carbon monoxide poisoning, they have been associated in my

14  experience.  I've seen many patients who have had these white

15  spots after exposure to carbon monoxide and exposure to nothing

16  else.

17  Q.  Now, when it comes to Mr. Deaton's medical record, could you

18  go over more with us what medical records you had and then could

19  you explain his individual cost projections?

20  A.  Yes.  In addition to the MRI, which we just discussed, I

21  reviewed a neurocognitive evaluation which was performed on two

22  separate days, 1/25/07 and 3/5/07.

23          MR. PAGE:  Your Honor -- never mind.

24          THE COURT:  All right.

25  BY MR. RUSSO:

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-41

1   Q.  All right.

2   A.  I reviewed the medical records of Dr. Berger, as I mentioned

3   before.  I reviewed something called a neurocognitive diagnostic

4   evaluation of Mr. Shade Deaton.  And I also read and reviewed

5   his own deposition.  So those were the bases of my opinions of

6   the future medical needs.

7        MR. PAGE:  I do need to approach on that last.  I'm

8   sorry.

9        THE COURT:  Ladies and gentlemen, I'm sorry.  I have put

10  them on time limits, so they are doing this at their peril.

11      (The following proceedings were held at the bench outside

12  the presence of the jury.)

13      MR. BENTLEY:  We established yesterday, Judge, that

14  those reports, the neurocognitive evaluations were not even

15  drafted until December of 2007.  There's clear evidence that

16  these are after the point.  I'm going to go back on the MRI

17  scans.  I know -- I respect Mr. Russo, but I know that these

18  were all taken in October of 2007, and I'm looking at the

19  medical releases, where he got them.  But I'm confident that he

20  didn't have them until afterwards to supplement this.

21      We made this clear.  It's clear that the neurocognitive

22  evaluations, because she said she didn't even write them

23  until after December of 2007.

24      MR. PAGE:  From a foundational perspective --

25      THE COURT:  Wait, here is what I'm going to do.  On the

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-42

1  foundation questions, I'm going to let you lead, okay?  Make

2  sure that whatever you ask him about, he had before November 1,

3  2007.  Don't object.  Lead him on those foundational questions.

4      Sustained.

5      (Bench conference was concluded, at which time the following

6  proceedings were held in the presence of the jury.)

7  BY MR. RUSSO:

8  Q.  Dr. Prockop, when it comes to Shade Deaton, could you

9  explain to the jury what you project for him in terms of future

10  medical expenses?

11  A.  All right.  Well, as a background, I took notes in my own

12  handwriting, which is very poor, unfortunately.  And I had some

13  typed notes, as well.

14      And in preparation for this event here, I had those notes

15  typed out so I could read them more carefully, or more

16  precisely.  I have the life care notes in front of me.

17      I projected his future medical needs.  Do you want me to

18  read those?

19  Q.  Yes.

20  A.  All right.  A cardiac, cardiological evaluation, in

21  consulting with a cardiologist and to include EKG, cardiac

22  stress test, and cardiac enzymes.  I estimated that as $850, but

23  I don't know exactly.  But that's a reasonable estimate.

24      MR. PAGE:  Objection, your Honor.  Foundation, beyond

25  the scope.

1      THE COURT:  How do you come up with that estimate?

2   Explain to the jury how you come up with that estimate.

3      THE WITNESS:  Well, I came up with that estimate based

4   on prevailing costs in the Tampa Bay area, and after discussion

5   with some folks, like Dr. Berger, who I know professionally but

6   not personally, to see whether there's a similar cost factor in

7   your area.

8      MR. PAGE:  Objection, your Honor.  Beyond the scope of

9   the report.

10      THE COURT:  Overruled.  Go ahead.

11   BY MR. RUSSO:

12   Q.  When it comes to Mr. Deaton's need for cardiologic review in

13   the future, what is the basis for that?

14   A.  Well, the basis for that is the well-established knowledge

15   that carbon monoxide, when it gets into the body, has two organs

16   of the body that it has special toxicity to; it's really

17   damaging to the brain, which is the area of the neurologist, but

18   it's also damaging to the heart.

19      So those two organs or parts of the body are specifically

20   very sensitive to carbon monoxide damage.  So if you want to

21   evaluate a person as far as their future potential need, you

22   don't get someone to look at their toes because it doesn't

23   particularly damage the toes.  You want them to look at their

24   brain and their heart.  And those are vital organs for our

25   life expectancy and for our quality of life.

1    So knowing this, from the literature and also from my own

2    experience, I've seen lots of people who come in that are

3    referred to me because they have brain damage or potential

4    brain damage.  I decide that they do have brain damage.  But

5    I also know that a large number of them, a majority of them,

6    have also heart damage.  So I know, as a physician, that if

7    they haven't been evaluated for their heart they should be

8    evaluated for their heart.

9        So as part of the future medical need I incorporated

10   cardiac, or heart evaluation, knowing that these people could

11   have a heart attack, they might die of a heart attack before

12   they die of Parkinson's disease or some other effect on the

13   brain.

14       If, God willing, they don't have a heart attack and they

15   live long enough, they will have neurological damage, if they

16   don't have it already.

17       But I want to be sure, as a physician, that their heart

18   is okay.  So I incorporated in the future medical needs heart

19   evaluation.

20   Q.  In Mr. Deaton's case, was Mr. Deaton evaluated at the time

21   of this carbon monoxide exposure with EKGs or cardiac enzymes,

22   or tests like that?

23   A.  Let me go back and refresh my memory.  I know the answer,

24   but I want to be sure.

25       As part of his headache evaluation for which he was seen

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-45

1   by Dr. Berger, it's noted that his heart was listened to.

2   But he had not had a specific cardiological evaluation, as

3   far as I know.  He wasn't seen by a cardiologist, he didn't

4   have the test I recommended, the EKG, the cardiac stress test

5   or the cardiac enzymes, which are more sensitive than just

6   listening to the heart.

7   Q.  So when you project into the future that he will need

8   cardiac follow-up, is that a precaution?

9   A.  Well, it's both a precaution and also a diagnosis.  If, for

10  instance, he has heart damage now, then he needs to be treated

11  now.  If he doesn't have heart damage now, he might develop it

12  in the future.  So he needs to be monitored in the future to be

13  sure that he doesn't develop heart damage and to pick it up when

14  it's early in the course of the heart damage, not wait until the

15  heart's completely damaged irreparably.  So you want to pick

16  this up early so you can do something about it, rather than wait

17  for the person to have a heart attack and die.

18  Q.  What are the other future projections, that you provided for

19  him?

20  A.  Well, I projected a general medical evaluation.  Knowing

21  that he lives in the area where we are, he needs general medical

22  attention.  He has headache and other people he can go to see,

23  so I projected four times a year that he sees a general primary

24  care physician of his choice, of his choosing, in his area so he

25  doesn't have to drive all the way to Lexington or some place

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination
Volume 5-46

1   else.

2       And that physician, whoever that might be, would be in

3   contact with his neurologist, who he is going to be seeing on

4   a yearly basis.

5       So my plan would be that he would see Dr. Berger or some

6   other neurologist on a yearly basis for diagnosis, for

7   management suggestions, but that since it's such a distance

8   Dr. Berger could suggest medications, maybe start the

9   medications, but then suggest they be continued.  But they

10  should be done under the supervision of somebody close at

11  hand, his primary care physician.

12      So I recommended both primary care treatment by a primary

13  care physician and also a neurologic -- and that's four times

14  a year.  And then neurological consultation follow-up.  He's

15  already been seen once at least by Dr. Berger.

16      And then a follow-up on a yearly basis for life, because

17  sometimes the damage occurs immediately and you can see it

18  immediately, but sometimes there's what's called a delayed

19  neurological sequelae.  Later on, after the exposure is over,

20  the person will develop neurological damage, and the

21  neurologist is especially trained to pick this up when it's

22  still early, before it gets too bad, to institute treatment

23  or whatever has to be done.

24      So I, as part of this health care plan, I included his

25  general medical treatment by a local physician, a primary

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-47

1    care physician, four times a year, and a neurological consult

2    follow-up yearly.

3    Q.  And what would be the expense of that?

4        MR. PAGE:  Objection, foundation.  Beyond the scope of

5    the report, your Honor.

6        THE COURT:  I'm sorry, ladies and gentlemen.  Now I'm

7    going to do it.  Can you approach for a minute, please?

8        (The following proceedings were held at the bench outside

9    the presence of the jury.)

10       THE COURT:  How would he know the expense of that

11   without knowing his insurance and everything?

12       MR. RUSSO:  Well, when it comes to Dr. Berger's

13   experience, we asked Dr. Berger about it.  And he estimated only

14   $100 for the family physician.

15       THE COURT:  Wouldn't that be based on hearsay?  And why

16   wouldn't Dr. Berger testify as to his general costs for

17   patients, versus this doctor, who is basing it on hearsay?  It's

18   clearly offered for the truth, because you are going to ask the

19   jury to find it.

20       MR. RUSSO:  Well, we are putting in the bills, the UK

21   bills for each client.

22       THE COURT:  They will speak for themselves, and you can

23   project it out in closing.  This is based on hearsay; where on

24   the $850 he looked at what the general practice is, he clearly

25   based this on Dr. Berger.

 1          MR. RUSSO:  That's an exception to the hearsay rules

 2   because I have him on the stand.  He's making the representation

 3   that he typically relies on the costs in his practice.  I think

 4   that's an exception to hearsay.

 5          MR. PAGE:  The other problem is, if he called

 6   Dr. Berger, he's clearly getting information that came after the

 7   report.

 8          MR. RUSSO:  Well, when it comes to the expense of

 9   Dr. Berger we can just let that go, because that's already in

10   evidence.  But when it comes to the family practitioner, I think

11   there there's an exception to the hearsay rule if he relies on

12   that kind of information.

13          MR. PAGE:  But did he rely on it, number one?  And the

14   foundation hadn't been laid.

15          THE COURT:  Lay the foundation that he determines this

16   and ordinarily determined it by November 1.  Although he can

17   give an updated in light of inflation, there's no reason, as

18   long as he made the determination before November 1, he can give

19   an update.  I'm going to give a limiting instruction.

20      (Bench conference was concluded, at which time the following

21   proceedings were held in the presence of the jury.)

22          THE COURT:  Ladies and gentlemen, when experts testify,

23   they often rely on hearsay; that is, underlying information.

24   Now, some of the underlying information you will hear from the

25   doctors themselves.  But a hearsay that an expert relies upon,

1  you can only -- you can't take those statements for the truth,

2  you can just give value to them as you hear them in the trial

3  from other doctors and other people and then credit this to

4  witnesses' testimony or discredit it, based upon whether you

5  believe the underlying information.  Do you understand that?

6      In other words, everything he relied upon can't be taken

7  for the truth.  Only the ultimate conclusions can you

8  consider, and it's up to you whether to accept or reject

9  those.  Does everyone understand that?  Okay.

10  BY MR. RUSSO:

11  Q.  Dr. Prockop, estimates of the cost of these things, did you

12  obtain these estimates before November 1, 2007, when you issued

13  your report?

14  A.  I don't know the answer to the question.  Did I -- did I --

15  please repeat the question again.

16  Q.  When you issued your report of November 1, 2007 --

17  A.  Yes.

18  Q.  -- were you prepared at that time to be able to discuss the

19  expenses of the things that you recommended?

20  A.  Yes.

21  Q.  So prior to the time of November 1, 2007, you had researched

22  or looked into what the expenses of the things that you had

23  prescribed for him would be?

24  A.  Yes, yes.  I know what medical expenses are, practicing

25  neurology and practicing medicine, being in a large group

1  practice.  So I would know what the charges are and what the

2  costs of these treatments are.

3  Q.  And what would be the expense of the family practitioner,

4  the four visits?  Just give me the expense that you assigned for

5  one visit.

6  A.  I assigned, per visit, for the primary care physician, $100.

7  Q.  And would you go through the other future projections of

8  medical care that you provided?

9  A.  A neurologist consultant follow-up every year, I projected

10  as $400 per year.

11      Then I took his expected life, his life expectancy, based

12  on tables that we have, and projected, multiplied for the

13  primary care physician $400 times his life expectancy and

14  came up with the figure of $20,000.  Likewise for the

15  neurology follow-up, $400 a year, I took the life expectancy,

16  the number of years which we would expect him to live, and

17  multiplied it by $400 and came up with the figure of $20,000.

18          MR. PAGE:  Object to the foundation.

19          THE COURT:  On the neurology, you have the primary care

20  physician, $400, because it's $100 a visit, four times a year?

21          THE WITNESS:  Right.

22          THE COURT:  The neurology, where did you get your

23  number?

24          THE WITNESS:  Well, I got that number based on our own

25  charges at the USF Medical Center, the knowledge of what the

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-51

1  prevailing charges are for neurologists in the area where I

2  practice.  And also what the prevailing costs would be in

3  Kentucky here, in Dr. Berger's group.

4       THE COURT:  Overruled.  You can answer that.

5  BY MR. RUSSO:

6  Q.  So let's move on to the next areas that you projected that

7  he will need in the future.

8  A.  Well, the next area I projected was the brain MRI.  As I

9  mentioned before, the brain MRI is a very sensitive index of

10  brain damage.  We saw brain damage already on the MRI that was

11  done already, but we need to do the MRI over the years,

12  repeatedly, to be sure that there's not progression of his brain

13  damage, that it's getting worse.

14       We know, based on experience in the literature and my own

15  personal experience, that brain damage does occur in what's

16  called a delayed fashion.  It's called delayed neurological

17  sequelae.  And this may show up days or weeks or months or

18  years after the initial exposure.

19       So the brain MRI should be repeated down the line.  Now,

20  the brain MRI is a very sensitive test, but it's called --

21  it's classified as noninvasive.  It doesn't hurt the person.

22  You don't have to do any injection, you don't have to do

23  anything to damage the person.

24       So it's like an x-ray of the chest.  You want to pick up

25  damage before it gets bad, before you can't do anything about

1    it.  You want to pick it up at a time when you can do

2    something about it.

3        So I projected that he needs a brain MRI every two times

4    a year for ten years and every five years for 20 years and

5    every ten years for the duration of his life.

6        Based on those number of studies multiplied what it costs

7    to get a brain MRI -- and I know the costs because that's

8    what it costs where I practice -- I came up with a figure or

9    $10,800 for his lifetime.  So I included that in my notes for

10   my life care notes.  So that figure is here.

11   Q.  And what other future projections?

12   A.  The next one was neuropsychological tests.  Remember, he's

13   already had a neurocognitive diagnostic evaluation, which is

14   another word for a neuropsychological test.  That's usually a

15   several-day test which costs a lot of money, because the

16   psychologist has to spend a lot of time with the individual

17   determining whether they have brain damage by that parameter, by

18   that way of looking at it.

19       The MRI takes a look at the brain, of how it looks, but

20   the neuropsychological tests tells you how the brain is

21   working.  Sometimes it looks bad, but it's working pretty

22   well.  Sometimes it looks good, but it's not working very

23   well.  We all know that.

24       So you need those two tests hand in hand; one is the

25   brain MRI and one is the neuropsychological test.

Case: 6:06-cv-00548-ART-EBA   Doc #: 695   Filed: 12/15/08   Page: 53 of 184 - Page ID#: 61137
Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination
Volume 5-53

1    I projected that he needs a neuropsychological test every

2    five years for 20 years and then every 10 years for the

3    duration of his life.

4    Multiplying what I know it costs to get a

5    neuropsychological test each time, multiplying it times the

6    number of tests he needs for his lifetime, I came up with a

7    figure of $16,160.  And I've included that in my typed

8    version of these notes.

9    Q.  What other projections?

10   A.  Well, there's another test called lumbar puncture.  That's a

11   test where you do a spinal tap.  It's called --

12        MR. PAGE:  Objection, your Honor.  Beyond the scope.

13        THE COURT:  Lay the foundation, and then he can answer.

14   BY MR. RUSSO:

15   Q.  When it coming to lumbar puncture, what is the medical

16   evidence that it may be helpful to him?

17        THE COURT:  I'm sorry, that he considered this at this

18   time and that it was part of this.

19   BY MR. RUSSO:

20   Q.  Did you consider the necessity of a lumbar puncture before

21   November 1, 2007?

22   A.  Yes.  A lumbar puncture is a rather standard test for

23   evaluation of potential brain damage.  The cerebrospinal fluid,

24   which is fluid that circulates around the brain, sometimes will

25   help us, tell us what's wrong, if something is wrong with the

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-54

1   nervous system; and, if so, what's wrong with it.

2          MR. PAGE:  Your Honor, if I could approach, I'm sorry.

3          THE COURT:  I see it.  You can cross him.  I understand.

4   Keep going.

5   BY MR. RUSSO:

6   Q.  When -- how many times would he need that in the future?

7   A.  Well, he needs one now, and then he needs one every ten

8   years for the duration of his life.  So I took the figure for a

9   spinal tap and the analysis of the cerebrospinal fluid and

10  multiplied it by the number of tests he needs over his lifetime

11  and came up with a figure of $3,600 that he'll need in terms of

12  lumbar puncture and analysis of the cerebrospinal fluid which

13  you obtain with a lumbar puncture.

14  Q.  Any other observations?

15  A.  I also projected that he needs physical therapy evaluation

16  and then treatment every five years for life.

17         MR. PAGE:  Objection, your Honor.  Beyond the scope of

18  the report.

19         THE COURT:  Overruled.

20         THE WITNESS:  I came up with a figure for therapy

21  evaluation and treatment for his lifetime of $2,260.

22      And finally, I have a figure for prescription and

23  nonprescription medication, mainly for his headache.  He has

24  lots of headaches, and sometimes we use across-the-counter

25  medication like aspirin and Tylenol, but sometimes we need

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-55

 1    other forms of medication.

 2           MR. PAGE:  Objection.  Also beyond the scope, your

 3    Honor.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  I projected in round figures, knowing what

 6    these things cost in general, $10,000 for his lifetime.  I have

 7    to say that that's kind of a low figure.  It depends on what

 8    medications cost.  It could be a lot more than that.  But I

 9    projected $10,000.

10    BY MR. RUSSO:

11    Q.  Is that the last projection for future care that you made

12    for him?

13    A.  Yes, I -- that's the last one.

14    Q.  Let's go to the next patient.

15    A.  All right.  The next folder I have here is Toney Dye, D-Y-E.

16    These are in alphabetical order, so he would come after the last

17    man.  Toney Dye.

18    Q.  Would you tell us, Dr. Prockop, of your review of Toney

19    Dye's medical records and what about his medical records formed

20    a basis for your future projections?

21    A.  I've listed this on my life care notes.  The records

22    reviewed were the records of Dr. Berger, Dr. Tucker, and

23    Dr. Allen, a psychiatric evaluation.

24           MR. PAGE:  Your Honor, could I approach?

25           THE COURT:  Ladies and gentlemen, why don't you give us

1  a ten-minute break, rather than them keep approaching, and I

2  will take care of this.  When you get back, we will start moving

3  a little smoother, okay?

4      (Jury leaves the courtroom at 9:35 a.m.)

5      THE COURT:  You can be seated.  Go ahead.  The jury is

6  out of the room, for the record.

7      MR. RUSSO:  I would just indicate to Mr. Page that

8  Dr. Allen is not part of this and I just indicated that I agreed

9  and that I think that was the objection.

10     MR. PAGE:  It would clarify things a whole lot, your

11 Honor, if Dr. Prockop would state the day of the reports that

12 he's referring to so we can -- he has a whole body of material,

13 and we are entitled to limit him to what he looked at before

14 November 1.

15     THE COURT:  Dr. Prockop, I guess I should supplement my

16 ruling to protect the record for the defendants.

17     But what I did this morning is I limited your testimony

18 to everything you did on or before November 1, 2007.  And I

19 did that because of technical rules.  And so while doctors

20 probably don't appreciate it, we're trying to function -- the

21 lawyers are trying to function within a set of rules that are

22 enforced by me.  And so what I would ask you to do is, when

23 you refer to things specifically only refer to things you

24 relied upon on or before November 1st in forming your

25 conclusion.  I know that's hard to do, because you're trying

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-57

1    to look back and the world doesn't break up easily like that.

2    But I will ask you and instruct you only to rely on things

3    before November 1.

4            THE WITNESS:  All right.

5            MR. RUSSO:  I will ask leading questions.

6            THE COURT:  With regards to that, you can lead.

7       There were things you testified about Shade Deaton, with

8    regards to the lumbar testing.  Was that something you

9    concluded before November 1st or after November 1st?

10            THE WITNESS:  Well, you're right, I don't mention it in

11   my report of November 1st, 2007.  I can't recall.

12            THE COURT:  I'm going to strike that part and ask you

13   not to refer to it at any time during the trial.

14            MR. PAGE:  Your Honor, that was also true with respect

15   to physical therapy.  There's no mention in terms of his general

16   opinions.

17            THE COURT:  What about physical therapy?

18            THE WITNESS:  Well, I wouldn't have, in this letter of

19   November 1st, 2007, mentioned everything.

20            THE COURT:  I recognize that.  But did you consider it?

21            THE WITNESS:  I would have considered it.

22            THE COURT:  Okay.  With the physical therapy, I'm going

23   to let him, based on my earlier ruling regarding notice and the

24   opportunity to depose him.  You could have asked about it.

25            MR. PAGE:  Well, your Honor --

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-58

1          THE COURT:  No, that ruling is done.  I'm not going to

2     play this game.

3          MR. PAGE:  Your Honor --

4          THE COURT:  Don't argue with me.  Sit down.

5      I'm going to supplement my ruling as to notice.  I did,

6     Mr. Russo, and I'm making this for the defendant's protection

7     on appeal.  I did limit his testimony to November 1st.  The

8     reason for that is Mr. Page showed me on Page 6 of his

9     deposition, as well as the limits placed therefore.  I don't

10    feel like defendants had fair notice of anything that

11    occurred thereafter because the report was not specific

12    enough to get to that.  I limited it to everything he did on

13    or before November 1, before he provided his report.

14     Mr. Page, do you want me to say anything additional on

15    that?  It's your record to protect, in case you appeal my

16    decision.

17     I'm sorry, I shouldn't have barked at you.

18          MR. BENTLEY:  You should credit him $100.

19          THE COURT:  I will do that.  At some point, I will do

20    that.

21          MR. PAGE:  I wasn't objecting about the PT.

22          MR. RUSSO:  He's got me fined $100, and his partner.

23          THE COURT:  I will try to fine him in the process and

24    have him pay Mr. Page.

25          MR. PAGE:  With respect to Dr. Prockop's opinion with

1    respect to prescription costs, specifically I want to reference

2    Page 225 of his deposition where he is asked about those costs

3    and Dr. Prockop states "I did not specify what medication should

4    be prescribed nor did I make any effort to find out how much

5    those medications should cost.  No. 7 is a broad general

6    statement and doesn't get into specifics as to what treatment

7    should be used or what would be the cost of that treatment,

8    either in the present or the future."

9        So to the extent that Dr. Prockop is offering those

10   opinions today, he specifically stated in his deposition he

11   is not going to offer those opinions and it's beyond the

12   scope of the report.

13       THE COURT:  Did he talk about prescriptions

14   specifically?

15       MR. RUSSO:  He talked about -- he went through eight

16   separate evaluations.  Let me just look here for a second.  He

17   went through neurologic consultation, MRIs, neuropsychological

18   assessments, cardiologic consultation, EEGs, echocardiograms,

19   cardiac enzymes, frequent visits with general physicians every

20   one to four months.  Symptomatic treatment of headaches an other

21   such problems of.

22       Now, I think where he says symptomatic treatment of

23   headaches an over such problems that that gives them notice

24   that he's going to be talking about --

25       THE COURT:  In the deposition, he said "I did not

1    specify what medication should be prescribed for treatment of

2    those headaches, nor did I make any effort to find out how much

3    those medications would cost."

4           MR. RUSSO:  Okay, he does state on 225 that, "Understand

5    No. 7 is a broad general statement that says they need to be

6    treated for headaches and other symptoms, but it doesn't get

7    into specifics about what treatments should be used or what

8    would be the cost of that treatment, either in the present or

9    the future."

10          THE COURT:  Right before that, he said he never made

11   that determination.

12          MR. RUSSO:  Right.

13          THE COURT:  They had -- this is back to my notice rule.

14   They had the opportunity to depose him.  He answered.  He

15   doesn't make the determination.  I think its unfair now to bring

16   it on.

17      With the rest, don't do it.  As a remedy for those two

18   things, do you want me to strike the testimony?  My fear is

19   that it highlights them.  If we don't go through the other

20   seven and they can't argue on it in closing, I think it kind

21   of gets lost.

22          MR. PAGE:  I don't want the evidence in the record for

23   them to rely on at the end of the trial.  So, yes.

24          THE COURT:  Do you want me to strike it before the jury?

25          MR. PAGE:  Yes.

1          THE COURT:  I'll do that.

2          MR. PAGE:  I appreciate your comment about going smooth.

3     Can I have a standing objection?

4          THE COURT:  Yes, as far as I am concerned, you can have

5     a standing objection.  I think you have preserved it for the

6     entire testimony.

7          MR. PAGE:  For all plaintiffs.

8          THE COURT:  Yes, for all plaintiffs.  I think you did

9     that with your motion in limine this morning.  But for the

10    record, there's an objection to him opining on any dollar

11    amount.  I will overrule the objection with regards to anything

12    he did prior to November 1, 2007.  So I will strike the lumbar

13    and strike the reference to prescriptions.

14       Is there anything else?

15         MR. MAZUR:  Your Honor, if I could just get a quick

16    clarification, because I'm going to have to ask Dr. Prockop

17    about my client.  I had a specific line of questioning, I was

18    going to ask him in reviewing of the records he noted that my

19    client was taking medication.  Then I go on to ask whether or

20    not he believes in the future there's going to need to be

21    adjustments or changes in that medication.  Am I safe on those

22    grounds, if I don't go into dollars and cents?

23         THE COURT:  Yes, you're safe on those.  You can go into

24    dollars and cents with your client and how much it costs.

25         MR. PAGE:  I missed that part, I'm sorry.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-62

1        THE COURT:  Go ahead.

2        MR. BENTLEY:  Your Honor, what I understood you to say

3   is he could ask that question.  Dr. Prockop did not opine as to

4   dollars and cents.

5        MR. MAZUR:  I'm not going to ask him about dollars and

6   cents.

7        THE COURT:  He's not asking.  All I said is his client

8   can tell him how much the prescriptions cost.

9        MR. PAGE:  I assume this is the morning break, or would

10  we have another one?

11       THE COURT:  No, consider this our morning break.

12     When did I tell them to be back?

13       THE CLERK:  In ten minutes.

14       THE COURT:  All right.  Can you be back in five minutes?

15  We will continue in five minutes.

16     (Recess taken from 9:46 a.m. to 9:55 a.m.)

17     (Witness resumes the witness stand.)

18     (Jury enters the courtroom at 9:55 a.m.)

19       THE COURT:  Ladies and gentlemen, I think we worked out

20  the kinks, so hopefully it will be a little smoother sailing.

21  Go ahead, Mr. Russo.

22  BY MR. RUSSO:

23  Q.  Dr. Prockop, I'm going to ask you some questions about Toney

24  Dye.

25       THE COURT:  Mr. Russo, could I do one thing?  I'm sorry

 1    for interrupting.

 2             MR. RUSSO:  Sure.

 3             THE COURT:  Ladies and gentlemen, in working out the

 4    kinks, I made a couple of erroneous rulings.  I need to ask you

 5    to act like these things never happened.  He opined on two

 6    things which I shouldn't have allowed it to come in.  One was

 7    the lumbar therapy and the amount of that.  That's not going to

 8    be allowed to be referred to in this trial.  I'm going to ask

 9    you not to think about it.

10        And the other was the cost of the prescriptions.  And

11    I'll ask you not to -- to pretend that didn't happen and not

12    refer to it and strike it from your memory.  Okay?  Does

13    anyone have any questions about that?  When I say "Strike it

14    from your memory," I mean you're not to consider it ever

15    again.

16        Is that sufficient, Mr. Page?

17             MR. PAGE:  Yes, your Honor.  Thank you.

18             THE COURT:  All right.  Thank you.

19    BY MR. RUSSO:

20    Q.  Dr. Prockop, I'm going to ask you some questions about Toney

21    Dye.

22    A.  All right.

23    Q.  To make this go quicker, I will sort of lead you, with the

24    permission of the Court and counsel, through these questions

25    about Toney Dye.  All of my questions are going to be based upon

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**

**Leon Prockop, M.D., Direct Examination**

Volume 5-64

1    the amount of information that you had before November 1, when

2    you did your report.  Fair enough?

3        So whatever I ask you.

4        Now, in your November 1 report, is it fair to say that

5    you, in that report, discussed neurological consultations,

6    examinations, as yearly.  And then for lifetime, the above

7    should include MRI initially and every three years for life.

8    It should include neuropsychological assessment initially and

9    every five years for life.  Refined cardiological

10   consultation, initially and every three years for life.  The

11   above should include ECG, 2D echo, cardiac enzymes, and

12   scintography studies of the heart with the 99 MTc.  And the

13   ECG second echo with cardiac enzymes should be repeated every

14   three years for life.  And frequent visits with general

15   physicians once every four months for symptomatic treatment

16   of headaches and other such problems.  And psychological

17   sessions for marital counseling and for individual every

18   three months for life.

19   A.   Yes.

20   Q.   And that's included in your November 1, 2007, report?

21   A.   Yes.

22   Q.   So when it comes to Mr. Dye, could you tell us of his

23   medical records that you reviewed, which formed a basis for

24   these recommendations?

25   A.   All right.  I reviewed his brain MRI report dated 12/26/06.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-65

1   Another brain MRI report dated 7/9/07.  A medical record

2   generated by Dr. Berger dated April 11, 2006.  An independent

3   psychiatric evaluation of Mr. Dye dated 11/08/06.  Another

4   psychiatric input -- intake evaluation, it doesn't have the

5   date, but it preceded the November -- the November 1st date.  A

6   neurocognitive diagnostic evaluation dated 1/29/07.  And his

7   deposition, which is dated July 20th, '07.

8        So those were the medical records upon which I based my

9   conclusion.

10            MR. BENTLEY:  Your Honor, may we approach again?

11            THE COURT:  Yes.

12        (The following proceedings were held at the bench outside

13   the presence of the jury.)

14            MR. BENTLEY:  It's the same objection I made last time.

15   It's because this gentleman doesn't understand.  He looked at

16   the date of 1/29/07.  That's the neurocognitive exam.  That's

17   the same one we know for sure that was developed sometime after

18   December '07, after the cutoff date.

19            MR. MAZUR:  That was Bonnie Levin's exam.

20            MR. RUSSO:  Didn't he say the date was 1/29/07.

21            MR. BENTLEY:  That's because of the date we established

22   yesterday.

23            THE COURT:  Doctor, could I see the report?  This

24   occurred on March 1st.

25            MR. BENTLEY:  This is the one that I went over with

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

**Leon Prockop, M.D., Direct Examination**

Volume 5-66

1   Dr. Mattingly at length that she didn't prepare, because she was

2   on maternity leave, and we established that this wasn't prepared

3   until December of '07.

4           THE COURT:  Was this prepared by her or Dr. Levin?

5           MR. BENTLEY:  This is UK's report.

6           MR. RUSSO:  If it's after November 1, what is the date

7   of it?  That's my only concern.

8           THE COURT:  It's not dated.  Remember, he went through

9   this yesterday.

10          MR. BENTLEY:  1/8/08 is the fax.

11          MR. RUSSO:  That doesn't mean anything.  Let me see who

12  authored it, and I can tell the Court.

13          MR. BENTLEY:  They all have the same signature, your

14  Honor.

15          MR. RUSSO:  Yeah, but --

16          THE COURT:  How can you tell?

17          MR. BENTLEY:  They all have the same signature.

18          MR. RUSSO:  I don't think that he would have had this

19  before November 1.  Here is what I will do, I will just ignore

20  it.

21          THE COURT:  Okay.

22          MR. PAGE:  With respect to any references to Dr. Allen,

23  because Dr. Allen has already been excluded.

24          THE COURT:  Dr. Greenlee.

25          MR. PAGE:  Greenlee, as well.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-67

1        THE COURT:  All right.

2     (Bench conference was concluded, at which time the following

3  proceedings were held in the presence of the jury.)

4  BY MR. RUSSO:

5  Q.  So, Dr. Prockop, in the future, the projections you made for

6  Mr. Dye were that the refined neurologic consultation, and you

7  gave us a price; would that be the same prices for the

8  neurologic consultation of $400 and the $100 for the family

9  physician that he would be seeing four times a year and once for

10  the neurologist?

11  A.  Yes.

12  Q.  And the MRI would be done every three years.  And would that

13  be the same prices that you gave us?  I don't remember.  Would

14  you go over that price?

15  A.  Well, for Mr. Dye, I calculated in terms of dollars and

16  cents for the MRI, $9,600.

17  Q.  And the neuropsychological assessment every five years for

18  life, what was the number on that?

19  A.  I calculated that to be $13,800.

20  Q.  And for the cardiologic consultations, which are four

21  through six because they have different tests and so on, how

22  much did you calculate for that?

23  A.  I calculated for the initial cardiac evaluation $850, but

24  for follow-up evaluations, $10,000.

25  Q.  And then for psychiatric consultation or psychological and

1  marital counseling, for individuals and their spouses, every one

2  to three months for life.  How much was that?

3  A.  I don't have that as part of my typed notes, but I recall

4  having to construct that or come to a conclusion about that.

5  Again, I don't have it as part of my notes.

6     But a psychiatric evaluation and/or marital counseling,

7  either one or the other, would be $250 initially.  And then

8  depending on the complexity of the issue -- what was the

9  figure I noted?  How often did I think I needed there?

10         MR. PAGE:  Objection, your Honor.

11         THE COURT:  Sustained.  Doctor, you have got to figure

12  that out.

13         THE WITNESS:  Oh, okay.

14  BY MR. RUSSO:

15  Q.  You said in your report once every one to three months for

16  life?

17         MR. BENTLEY:  Objection.

18         MR. PAGE:  Objection, leading.

19         THE COURT:  Sustained.

20         MR. RUSSO:  Well, I'm allowed to lead here, or not.

21         THE COURT:  Not on this.  Let him find it.

22         THE WITNESS:  That would also be $16,000.

23  BY MR. RUSSO:

24  Q.  If you look on your report of November 7th?

25  A.  Yes.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-69

1        THE COURT:  November 1st.

2        THE WITNESS:  November 1st.

3   BY MR. RUSSO:

4   Q.  Of November 1, 2007?

5        THE COURT:  That's okay.

6   BY MR. RUSSO:

7   Q.  No. 8, what did you indicate there?

8   A.  Psychiatric consultation initially leading to psychological

9   and marital counseling sessions for the individuals and their

10  spouses every one to three months, for life.

11  Q.  Now, with Mr. Dye, do his medical records support that

12  future projection of the medical expenses that he will face?

13  A.  Yes.  In my opinion, yes.

14  Q.  Let's go to the next patient.

15  A.  All right.  I'm pulling out of my file here, the next one I

16  have a folder on is Sammy Faris, F-A-R-R-I-S.

17  Q.  Okay.  Did you review Mr. Faris's medical before November 1,

18  2007?

19  A.  Yes.  The records I reviewed were those of Dr. Mattingly --

20  M-A-T-T-I-N-G-L-Y; Dr. Houff, H-O-U-F-F; Dr. Allen, who is also

21  an unsigned report.  And I reviewed the deposition of Mr. Faris.

22  And that was dated July 23rd, 2007.

23  Q.  And did you make a future projection for Mr. Faris

24  individually?

25  A.  Yes.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-70

1   Q.  And could you tell us what it was?

2   A.  Well, Mr. Faris is severely afflicted, based on my review of

3   the medical records.  He has significant brain damage and he has

4   the probability of going on to develop Parkinson's disease.

5          MR. PAGE:  Objection, your Honor.  Beyond the scope of

6   his report.

7          THE COURT:  Sustained.

8   BY MR. RUSSO:

9   Q.  Are you discussing the evidence in the record from a

10  standpoint of MRI or EEG, or --

11  A.  I'm basing that opinion on the review of the medical records

12  that I've discussed, including his own deposition.

13         THE COURT:  Okay.  Overruled, based on that.

14         THE WITNESS:  It does include, specific to your

15  question, it does include the brain MRI, which is dated 9/20/07.

16  BY MR. RUSSO:

17  Q.  And when it comes to the future for Mr. Faris, did you make

18  allowances for Mr. Faris's future as an individual?

19  A.  Yes.  Each of these projections are as an individual.

20  Q.  And could you tell us what you projected for Mr. Faris?

21  A.  Well, the typed notes I have, which are based on my

22  handwritten note, include the cardiologic evaluation for $850.

23  Follow-up consultation, $4,600.

24  Q.  Was this for cardiology?

25  A.  Cardiology only.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-71

1  Q.  Okay.

2  A.  The general medical treatment by a primary care physician,

3  I based that again on $400 a year multiplied by his life

4  expectancy, that came up to $18,400.

5      Likewise, the cardiology consultation once every year for

6  his expected life would be $18,400.

7      The MRI projections, based on the figures we gave before,

8  the dollar amount would be $13,200.

9      The neuropsychological tests, based on the figures we've

10  given before and on his life expectancy, would be $16,100.

11      Now, Mr. Faris, unfortunately, was severely damaged, more

12  severely damaged than some other people, very severely

13  damaged.

14          MR. PAGE:  Objection, your Honor.  Beyond the scope of

15  the report.

16          THE COURT:  Lay the foundation for how he would know

17  that.

18  BY MR. RUSSO:

19  Q.  Dr. Prockop, when it comes to your review of the medical

20  records, are you able to establish the severity of the injury

21  based upon your review of the MRIs, the EEGs, and the medical

22  records that you reviewed?

23  A.  Yes.

24  Q.  And is that based upon both your experience, your knowledge

25  of the literature, and your expertise in treating long-term

1   patients that have had carbon monoxide poisoning?

2   A.  Yes.

3        MR. PAGE:  Your Honor, if you could indulge me one

4   moment, I apologize.  If I could approach.

5        THE COURT:  Let me ask one more question.

6     In making your determinations in this November 1st report

7   regarding the ultimate conclusions that you reached, did you

8   consider all these things, along with the severity of each

9   individual's injury?

10       THE WITNESS:  Yes.  I looked at each person as an

11  individual.  They were general features that pertain to the

12  whole group.  But when I constructed these life care plan

13  suggestions, I looked at each person as an individual.

14       THE COURT:  Okay.  If there's -- if it's anything beyond

15  that, if it's a page you want me to look at, give me your page.

16       MR. PAGE:  No, your Honor, it's clarifying a different

17  point, which is why I couldn't just make the objection out here.

18       THE COURT:  All right.  Approach.

19     (The following proceedings were held at the bench outside

20  the presence of the jury.)

21       THE COURT:  This is your seventh approach.

22       MR. PAGE:  It's my last witness today, your Honor.

23       THE COURT:  I'm talking about the defendants.

24       MR. PAGE:  Okay.  My concern is that he's offering

25  medical opinions in terms of injury causation, which is not part

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-73

1   of the report.

2          THE COURT:  I thought he had medical injury, no

3   causation.

4          MR. PAGE:  When he's providing medical opinions without

5   the records --

6          THE COURT:  That's cross-examination.  You guys have

7   done a great job of pointing out all the things.  I think it's

8   more effective on cross than if I just limit it here.

9      I understand that.  I will overrule the objection and let

10  you go into that, but I will give them leeway on cross.

11         MR. RUSSO:  Sure.

12     (Bench conference was concluded, at which time the following

13  proceedings were held in the presence of the jury.)

14  BY MR. RUSSO:

15  Q.  Dr. Prockop, based upon the severity of the injury to

16  Mr. Faris, as you see it from the medical record, do you have

17  any different projections for different expenses for Mr. Faris?

18  A.  Yes, I do.  I added a line to his -- the typed notes of my

19  future medical needs.  And I'll read from that.  "Expected

20  development of Parkinson's disease by age 50."  So it's my

21  opinion that, based on the medical records and the severity of

22  his brain damage, that he will probably develop Parkinson's

23  disease by age 50.  That will require special treatment, and I

24  projected that by the age of 60 -- that is, ten years after he

25  first develops the Parkinson's disease, he will become

1   incapacitated from activities, routine activities of daily

2   living and will require skilled nursing care or assisted living

3   facility care.

4        MR. PAGE:  Objection, your Honor.  Beyond the scope of

5   the report.

6        THE COURT:  Overruled.  I will give you a continuing

7   objection on that grounds.  Go ahead.

8        THE WITNESS:  And I calculated the cost based upon

9   knowledge I have about the cost of skilled care or assisted

10  living facilities, and I multiplied that by the number of years

11  one would expect him to live after he became incapacitated and

12  requiring that care, that projected to $720,000.  That was

13  included in my life care plan suggestions that we have that

14  money available to him because, in my opinion, he will need it.

15  BY MR. RUSSO:

16  Q.  And did you have this information available to provide at

17  your deposition?

18  A.  I had that information available, but to my surprise I

19  wasn't asked about it.  It's not in the record of the

20  deposition, because I wasn't asked the question.

21  Q.  Let's move on, then, to the next patient.

22  A.  The next record I have here is that of Jason Engle,

23  E-N-G-L-E.

24  Q.  Do you have the medical records of Mr. Engle that you

25  reviewed?

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-75

1  A.  Yes, I have them in this file folder.  And the records

2  reviewed were those of Dr. Mattingly, M-A-T-T-I-N-G-L-Y --

3          THE COURT:  Mr. Russo, can we skip this one for now and

4  go to the next one?

5          MR. RUSSO:  Skip this patient?

6          THE COURT:  Yes, and go to the next one.  We can discuss

7  it at the lunch break.

8          MR. RUSSO:  Okay.

9  BY MR. RUSSO:

10  Q.  Let's skip Mr. Engle here for a second.

11  A.  All right.  The next one is my file is Dr. -- I mean, is

12  Mr. Marcum, M-A-R-C-U-M.

13  Q.  Did you have Mr. Marcum's medical records?

14  A.  Yes, I did.

15  Q.  I will ask you a few questions.  Did Mr. Marcum see

16  Dr. Houff or Dr. Berger?

17  A.  According to my records, he saw Dr. Houff.

18  Q.  And did he have MRI scans or EEG analysis?

19  A.  He had both.  He had an MRI dated 10/29/07, and I don't see

20  any EEG -- here is the EEG report, 10/29/07.  So he had both the

21  brain MRI and an EEG, and also a psychiatric evaluation

22  performed by Dr. Allen.  That was dated 6/30 -- excuse me,

23  2/05/07.

24      Also, I had the opportunity of reading his deposition,

25  which is dated July 12th, '07.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-76

1  Q.  What are your future projections for Mr. Marcum?

2  A.  Well, as before, he needs cardiological evaluation.  As

3  previously, I opined the initial cardiological evaluation was

4  $850 and that follow-up cardiological evaluations would be

5  $4,600.  His general medical treatment by his primary care

6  physician every for months for life, based on the figures I've

7  given before, would be $18,400.

8      The neurology consultation every year for life would be,

9  likewise, $18,400.  The brain MRI studies, based on the need

10  to have these repeated over the years, as was mentioned

11  before, would be $13,200.

12      Neuropsychological tests, as we mentioned before, with

13  the frequency needed would be $13,800.

14  Q.  And are those the things that Mr. Engle is going to need, in

15  your opinion?

16  A.  Mr. Marcum, we're referring to?

17  Q.  I'm sorry; yes, Mr. Marcum.

18  A.  Yes, in my opinion, he will definitely those.

19  Q.  All right.  Let's go to the next patient.

20  A.  Mr. Mills.  M-I-L-L-S.

21  Q.  In reviewing his medical records, did you have a chance to

22  review his previous medical records before November 1, 2007, in

23  order to project his future needs?

24  A.  Yes.  I can read off the records that I had available to me,

25  if you'd like.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-77

1  Q.  All right.

2  A.  First, there was a brain MRI performed on 10/8/07.  Then

3  there was another report of the same study.  There was also a

4  report by Dr. Berger dated June 21, '06.  An independent

5  psychiatric evaluation performed 11/6/06, and that was signed by

6  Dr. Timothy Allen.  Another neurology outpatient consultation

7  note.  He was apparently seen by another neurologist, as well,

8  Dr. Tucker, T-U-C-K-E-R.  That is dated August 15, '06.

9      Also a neurocognitive diagnostic evaluation performed on

10  1/22/07 and 2/01/07.  So I had the opportunity of reviewing

11  all the records prior to my constructing or coming up,

12  deciding on his life care needs.

13      THE COURT:  Wait.  I'm sorry, Mr. Russo.  Ladies and

14  gentlemen, indulge me for 30 seconds.

15      Doctor, can you step around and come over here?  I need

16  to ask you something.  Counsel, you can approach.  This will

17  take 30 seconds.

18    (The following proceedings were held at the bench outside

19  the presence of the jury.)

20      THE COURT:  Doctor, I'm going to ask you, with all the

21  patients, not to refer to Dr. Allen.  It's another ruling, but

22  he's been excluded.  And the plaintiffs have agreed to that.

23      MR. MAZUR:  There's also Dr. Greenlee.  That is another

24  psychologist we agreed to.

25      THE COURT:  Dr. Greenlee, too.  Thanks.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-78

1    (Bench conference was concluded, at which time the following

2  proceedings were held in the presence of the jury.)

3  BY MR. RUSSO:

4  Q.  All right.  I think we were at the point where we were

5  asking if you were able to make future projections of medical

6  needs for this patient, and if so, could you tell us.

7  A.  Some of these are repetitive, but I'll do it anyway.

8    The initial cardiological evaluation, again, is $850.

9  The follow-up cardiological evaluation is $5,600.  Primary

10 care physician every four months for life was $22,400.  The

11 neurology consultation once a year for life was $22,400.  The

12 brain MRIs in the frequency that we have discussed before add

13 up to $13,200.  The neuropsychological tests with the

14 frequency we described before is $18,400.

15 Q.  All right.  If we could, let's go to the next patient.

16 A.  The next file I pulled is David House, H-O-U-S-E.

17    MR. PAGE:  Your Honor?

18    THE COURT:  Yes.  Could we skip him, as well, and go to

19 the next one?

20    THE WITNESS:  Skip him?

21    THE COURT:  Yes, please.

22    THE WITNESS:  The next one is David Pennington,

23 P-E-N-N-I-N-G-T-O-N.  Medical records I reviewed were the brain

24 MRI, the neurocognitive diagnostic evaluation, neurology

25 outpatient consultation notes, and another note, unsigned.  And

**Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)**

**Leon Prockop, M.D., Direct Examination**

Volume 5-79

1   then also a referral letter signed by Dr. Houff, H-O-U-F-F.  And

2   also an independent psychiatric evaluation.  Those were the

3   medical records that I used to construct his life care plan.

4   BY MR. RUSSO:

5   Q.  And did you have a life care plan for Mr. Pennington?

6   A.  Yes, I did.

7   Q.  And what is it?

8   A.  It's, again, similar to some of the others.  It depends

9   somewhat.  There's changes in the figures, depending on their

10  life expectancy.  They are different ages, these people.

11      In any case, the cardiologic exam was $850.  The

12  follow-up consultations and evaluations were $4,100.  Primary

13  medical treatment by his primary care physician was $400.

14  The consultation follow-up once a year for life was $16,400.

15  The brain MRIs with the frequency we described before are

16  $13,200.  The neuropsychological teste with the frequency

17  described before was $13,800.

18      And then in his case I also projected -- it is my belief

19  and opinion that based on the medical records he will also

20  develop Parkinson's disease or Alzheimer's disease, one or

21  the other, perhaps both, at age 50.  And that by the time

22  he's 60, he will be incapacitated from activities of daily

23  living.

24      Again, as the other person I mentioned, he will require

25  skilled nursing care or assisted living care.  And the

 1  calculation of that from age 60 to his death would be

 2  $720,000.

 3  Q.  What is there in the medical records of Mr. Pennington that

 4  provides a basis for your assumption of Parkinson's and

 5  Alzheimer's?

 6  A.  Good question.  Let me look.

 7      Well, this is based, in part, upon his neurocognitive

 8  diagnostic evaluation I mentioned before performed early in

 9  '07.

10          MR. PAGE:  Your Honor, may we approach?

11          THE COURT:  Yes.

12      (The following proceedings were held at the bench outside

13  the presence of the jury.)

14          MR. BENTLEY:  Your Honor, this is the same objection.

15  This is the Dr. Mattingly report.  He is using this as the basis

16  for projecting a $720,000 prognosis of dementia, Parkinsonism,

17  reported by Dr. Mattingly.  If you look at this, I'll bet this

18  is also faxed January '08.

19          THE COURT:  Doctor, may I see the report?  Thank you.

20          MR. BENTLEY:  Also, he continued to rely on Dr. Allen to

21  project the future psychological needs.  Dr. Allen has been

22  excluded from this, and therefore he's basing his opinion on

23  something that's been excluded.  We have worn out our record.

24  But I could ask that the testimony be stricken from the record

25  and be told to be disregarded.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-81

1    MR. RUSSO:  When he looks at these records, I don't make

2    anything of it.  I don't go back and cover the psychiatric

3    substance at all.

4    MR. PAGE:  It doesn't mean we are not being damaged by

5    inappropriate testimony.

6    MR. RUSSO:  You are not being damaged by inappropriate

7    testimony.  What damage is there?  There's no substance.  I'm

8    not going into any substance of any nature.

9    MR. PAGE:  He's putting $720,000 up on the blackboard.

10   MR. RUSSO:  It's Parkinsonism, based on that report.

11   MR. PAGE:  Not based on that report.

12   THE COURT:  We'll find out what it's based on.

13   (Bench conference was concluded, at which time the following

14   proceedings were held in the presence of the jury.)

15   BY MR. RUSSO:

16   Q.  Dr. Prockop, aside from the neuropsychological report, what

17   is your opinion with regard to Mr. Pennington on the future

18   based upon, aside from that report?

19   A.  Right.  Well, there was a detailed and excellent report by

20   Tarvez Tucker, T-U-C-K-E-R.  That's dated August 15, 2006.  In

21   this report, Dr. Tucker records the fact that he was 35 years

22   old at the time.  He was working five days a week previous to

23   his carbon monoxide exposure and conducting his activities of

24   daily living.

25   However, subsequently, and I'll put in quotes, I'll just

1    quote Dr. Tavaris; quotation marks:  "He's had a lot of

2    trouble with his memory.  He said he's recorded 107 errors on

3    the job in the last three months, and in the nine months

4    prior to this event he had only 10 errors."

5        "He said he forgets whole days, he does not remember what

6    he did.  His children, although he's separated, feel he is

7    just lazy.  Mr. Pennington has headaches, they awaken him."

8        But the important thing is the recording of the specific

9    memory deficits.  This was not a general statement, it was a

10   very specific statement.  He forgets whole days.  Now, for a

11   35-year-old person, that's not normal.  And Dr. Tavaris

12   recorded this.

13       And in his assessment at the end, I will quote from

14   Dr. Tavaris.  He put him on various medications in the hope

15   of improving his condition.  Quotation marks:  "I have

16   cautioned him that this medication may further worsen his

17   memory, and the best way to avoid this is to increase food

18   and water intake."

19       So he's saying that he has a memory problem and the

20   medications that he's giving him to try to help him might

21   make it worse.

22       But he says his memory is bad, but it might make it

23   worse.  From this I concluded, and knowing Dr. Tavaris's

24   thorough opinions, that David Pennington was already

25   intellectually impaired.  He had behavior problems and memory

**Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-83

1    problems, but mostly memory problems.

2        And at the age of 35, if you are having memory problems I

3    projected then, based on my knowledge and experience in

4    seeing people like this that by the age of 50 he would

5    develop severe intellectual impairment.  It would be gradual,

6    but by the age of 50 the diagnosis of Alzheimer's would be

7    made and he would be treated for that, and by the age of 60

8    he wouldn't be able to work or take care of himself.  He

9    would require skilled nursing care or assisted living, one

10   way or the other.

11       And that calculated out, again, based on his life

12   expectancy, $720,000.

13   BY MR. RUSSO:

14   Q.  Putting aside the neuropsychological report for a minute --

15   A.  All right.

16   Q.  -- does the MRI give him any indication that his case is

17   going in this direction?

18   A.  The MRI does not.  It was dated 1/20 -- at the time of his

19   MRI, actually, the MRI was subsequent to the November 1th, '07,

20   so I can't refer to that.

21   Q.  Okay.

22   A.  So I can't answer your question.

23   Q.  All right.  So when it comes to your overall assessment of

24   this patient, and put aside the neurological report, it comes

25   down to Dr. Tucker's report and your experience?

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-84

1   A.  Yes.

2   Q.  And when a person is 35 years old and they have those kinds

3   of symptoms and they have been exposed to carbon monoxide, what

4   experience have you had with those kinds of findings?

5   A.  Well, I've had a lot of experience.  I've had a lot of

6   experience with people that haven't been exposed to carbon

7   monoxide that develop intellectual impairment, Alzheimer's

8   disease.  And I have experience with people that have been

9   exposed to carbon monoxide who develop Alzheimer's disease.

10      And in my experience and what's stated in the literature

11  which supports my own experience, they get Alzheimer's disease

12  earlier and it's more severe than in the average person, a

13  normal person who isn't exposed to carbon monoxide.

14      We unfortunately don't know what causes Alzheimer's

15  disease.  It's a terrible disease, it afflicts a lot of

16  people.  It usually comes on at age 65 or 70 and is a bad

17  disease.  We don't know what causes it.

18      In this case, we know what causes his problem; that is,

19  the carbon monoxide.  And we know, based on my experience and

20  what we read in the literature, we know that his disease will

21  come on, his Alzheimer's -- we will call it Alzheimer's

22  disease -- will come on earlier and it will be more severe.

23      And he will require care.

24  Q.  All right.  Let's go to the next patient.

25  A.  The next one is Denver Pennington.  Apparently, they are

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-85

1   related, Denver Pennington.  D-E-N-V-E-R.

2        THE COURT:  Can we skip that one, as well?

3        THE WITNESS:  Skip that one.

4      The next one is Sanborn, S-A-N-B-O-R-N.

5   BY MR. RUSSO:

6   Q.  All right.

7   A.  The medical records I reviewed were his brain MRI dated

8   August 17th, '07, the records from the Department of Neurology.

9   And this one was signed by -- performed and signed by

10  Dr. Berger.  That's dated June 21, '06.  There also is an

11  unsigned psychological evaluation.

12       MR. BENTLEY:  Objection, your Honor.

13       THE COURT:  Sustained.

14       THE WITNESS:  And there's another report by Dr. -- a

15  follow-up report, a follow-up visit by Dr. Berger that's dated

16  January 18th '07.  Dr. Berger apparently saw him on more than

17  one occasion.  And then there was the deposition of this

18  gentleman, and that's dated July 27th, '07.

19     So those were the medical records I used to come to my

20  conclusions and to formulate the life care plan.

21  BY MR. RUSSO:

22  Q.  What is the specific life care plan for Mr. Sanborn that you

23  formulated?

24  A.  The initial neurological evaluation is the same amount I

25  indicated before, $850.  In his case, because of his life

1    expectancy, follow-up care and cardiac evaluation was $4,800.

2    The treatment by the primary care physician every four months

3    for life came up to $18,800.  The neurology consultation

4    follow-up care for life was $18,400.  The brain MRI with the

5    frequency we noted before was $18,200.  The neuropsychological

6    test with the frequency I alluded to before was $13,800.

7    Q.  And are those the future needs of Mr. Sanborn?

8    A.  Yes.

9    Q.  Now, we have two more patients, Mr. Sizemore and Mr. Taylor.

10   A.  This is Mr. Sizemore.  In coming to my future medical needs

11   opinion, I looked at the report of the brain MRI dated September

12   17, '07.  Another report dated the same date.  An outpatient

13   clinical evaluation, neuropsychological, signed by Dr. Houff,

14   H-O-U-F-F.  Another report from neurology by Dr. Tucker,

15   T-U-C-K-E-R.  The neurocognitive diagnostic evaluation --

16          MR. PAGE:  Objection, your Honor.

17          THE COURT:  Sustained as to that.

18          THE WITNESS:  And the deposition of Mr. Randall Sizemore

19   dated July 16th, '07.

20   BY MR. RUSSO:

21   Q.  Do you have a future projection of Mr. Sizemore's needs,

22   medically?

23   A.  Yes.  They are similar to the other figures I mentioned.

24   The initial cardiological evaluation was $850.  Follow-up care

25   cardiologically was $4,000.  General treatment by a primary care

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-87

1   physician is $16,000 for life.  Neurology consultation follow-up

2   every year for life was $16,000.  The brain MRI with the

3   frequency we noted before was $13,200.  The neuropsychological

4   tests with the frequency we discussed before was $18,000.

5   Q.  And are there any other future projections for Mr. Sizemore?

6   A.  Well, there were other future projections, but apparently I

7   should not be discussing those.

8   Q.  Were the other future projections for Mr. Sizemore related

9   to your review of the medical records for him?

10  A.  Yes.

11       THE COURT:  Specifically, what?

12       THE WITNESS:  Well, the headache medications for life, I

13  rounded out to $10,000.

14       MR. PAGE:  Objection.

15       THE COURT:  No, I'm sorry, I was asking what they were

16  related to; in other words, from what did you determine this?

17  Is it just related to medications?

18       THE WITNESS:  Well, in the report by Dr. Houff dated

19  August 4th -- excuse me, June 21st, '06, he makes record of his

20  depression, which would require medications.

21       THE COURT:  Let me ask it this way.  I'm sorry.  Doctor,

22  did you put this, what you're about to testify to, in your

23  November 1st report?

24  A.  I used it as the basis of my opinions coming up with his

25  medical needs.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-88

1      THE COURT:  All right.  Move on.

2   BY MR. RUSSO:

3   Q.  Other than the medication needs of Mr. Sizemore, were there

4   any other medical projections that we missed?

5   A.  No.

6   Q.  Now, the next patient is Chris Taylor, or Stephen Chris

7   Taylor.

8   A.  Yes, C. Taylor.

9   Q.  And did you review his medical?

10  A.  Yes, there are a number of medical records here.  There was

11  a brain MRI report of 11/8/07.  Another one, brain MRI report of

12  6/21/06.  There was a brain spectroscopy that was also dated

13  6/21/06.  There is a neurology outpatient consultation note by

14  Dr. Tucker.  A letter from Dr. Houff, H-O-U-F-F, based on his

15  evaluation of him.  A letter sent to Dr. Hasni -- H-A-S-N-I --

16  and that's dated June 21st, '06.  There is an independent

17  psychiatric evaluation, this is by Dr. Greenlee.

18      MR. PAGE:  Objection, your Honor.

19      THE WITNESS:  I don't know whether I can mention that or

20  not.

21      THE COURT:  No.  Move on, please.

22      THE WITNESS:  Okay.  And then the deposition of Stephen

23  Christopher Taylor dated June 27, '07.

24      Based on those medical records, I have the future medical

25  needs projected.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-89

1   BY MR. RUSSO:

2   Q.  Will you tell us what they are?

3   A.  Again, the cardiology evaluation which he needs initially

4   was $850.  Follow-up evaluations $4,800.  The medical treatment

5   by the primary care physician every four months for life was

6   $19,200.  The neurologist on an annual basis was $19,200.  The

7   brain MRIs with the frequency I mentioned before came up to

8   $13,200.  The neuropsychological tests with the frequency I

9   mentioned before is $16,100.

10  Q.  Any other projections for Mr. Taylor?

11  A.  No.

12  Q.  So these individual life care plans for the future with

13  regard to future medical, these were based on review of each

14  individual chart?

15  A.  Yes.

16  Q.  And then you sort of tailor-made an individual plan for each

17  person?

18  A.  Yes, I did.

19       MR. RUSSO:  Thank you, Dr. Prockop.

20       THE COURT:  Mr. O'Brien.

21       MR. O'BRIEN:  I'm going to ask Mr. Mazur to conduct the

22  direct.

23       THE COURT:  Are you taking the day off, Mr. O'Brien, or

24  just the morning?

25       MR. O'BRIEN:  No, I'm with you.  I'm with you.

```
 1                          DIRECT EXAMINATION

 2   BY MR. MAZUR:

 3   Q.  Good morning, Dr. Prockop.

 4   A.  Good morning.

 5   Q.  I would just ask you, I've had handed to you a copy of the

 6   medical records that you reviewed on behalf of my client, Donald

 7   Greg Wells.  Could you just take a minute and look at those and

 8   verify that those are, in fact, the records you reviewed?  I'd

 9   appreciate it.

10   A.  Yes, these are the medical records I reviewed previously on

11   Mr. Wells.

12   Q.  And those are medical records from the University of

13   Kentucky?

14   A.  Yes, they are.

15   Q.  And included in those medical records did you also review an

16   MRI report and an EEG report?

17   A.  Yes.

18   Q.  Okay.  In preparing your November 1st, 2007, report dealing

19   with the minimal life care plan for Donald Greg Wells, did you

20   review those medical records and his deposition?

21   A.  Yes, I did.

22   Q.  Based upon your review of those medical records, did you

23   come up with a framework of future care that Mr. Wells is going

24   to need?

25   A.  Yes.
```

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-91

1  Q.  And does that framework consist of eight points?

2  A.  Roughly eight points, yes, very similar to the ones that we

3  just reviewed.

4  Q.  Okay.  If we could go over your minimal life care plan for

5  Mr. Wells, the first point, if you could explain to the jury and

6  myself what you're talking about there and why does Greg need

7  it?

8  A.  Well, the first one has to do with cardiological evaluation,

9  evaluation of his heart.  As I mentioned before.  Carbon

10  monoxide has a predilection for damaging the brain and heart, so

11  we always evaluate the brain and the heart with somebody that

12  has been exposed to carbon monoxide.  So that would be very

13  important for Mr. Wells to be sure that he doesn't have heart

14  damage at the present time and be sure he doesn't develop heart

15  damage over the course of time, heart damage of the type that

16  could limit his life and limit his work, his activities of daily

17  living.

18  Q.  Dr. Prockop, in your review of Mr. Wells' medical records

19  and also his deposition testimony, do you recall whether or not

20  he had complaints of heart palpitations following exposure to

21  carbon monoxide in December of 2005?

22  A.  Let me refresh my memory of these records.

23      I find records of his fatigability, his headaches, and

24  his thinking and memory problems, called cognitive

25  dysfunction that were recorded in his records.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-92

1   Q.  Doctor, to speed things along, I want you to assume in the

2   medical records that you reviewed and in his deposition

3   testimony that you reviewed of Donald Greg Wells previously --

4   along with everybody's medical records you did, so it's probably

5   all in your head -- that there was a complaint of heart

6   palpitations?

7   A.  All right.

8   Q.  What was the significance of that, and how does that relate

9   to your first area of the life care plan with regard to

10  Mr. Wells?

11          MR. BENTLEY:  Objection, foundation.

12          THE WITNESS:  Well, Mr. Wells --

13          MR. MAZUR:  Wait a minute.

14          THE COURT:  Lay the foundation for that that would be

15  relevant.

16  BY MR. MAZUR:

17  Q.  As parts of your life care plan, do you have a section

18  called refined cardiological consultation?

19  A.  Yes.

20  Q.  With regard to Mr. Wells, I asked you to assume there was a

21  complaint of heart palpitations.  How does that complaint of

22  heart palpitations relate to your section of the life care plan

23  as to why he would need that cardiological consultation?

24          MR. BENTLEY:  Objection.  Assumes facts not in evidence.

25          THE COURT:  Overruled.  It's a hypothetical, based on

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-93

1    his assumption.

2         THE WITNESS:  Heart palpitations are generally because

3    of a pounding sensation that somebody has in their chest.  These

4    sometimes occur, not normally, but what we call benignly.  They

5    come and go.  They don't mean severe underlying heart disease.

6         However, sometimes and frequently they are an early

7    warning sign of heart disease.  So if you feel palpitations,

8    you should have it checked out, because if something is going

9    to go away, fine.  But we don't have crystal balls and we

10   can't be sure.  If you have palpitations of your chest, you

11   should have it evaluated by a cardiologist to be sure it's

12   nothing serious.

13        Mr. Wells, according to what you're saying, developed

14   palpitations after his exposure to carbon monoxide, and that

15   can be and frequently is an early warning sign of heart

16   disease.

17        Palpitations occur because the conduction system of the

18   heart is damaged.  It's not conducting signs and you get

19   palpitations, missed beats or too many beats.  Palpitation

20   has been known to cause that kind of damage to the heart.

21        So therefore, anybody complaining of palpitations, even

22   if they haven't been exposed to carbon monoxide but certainly

23   if they have been expose to do carbon monoxide, they should

24   have it checked out to make sure it's not something

25   dangerous.

1  Because palpitations of the heart could lead to cardiac

2  arrest, the heart stops beating and you're dead.  So you want

3  to pick it up before the heart stops beating and the person

4  is dead; so therefore, they need a cardiological evaluation.

5      THE COURT:  Let me clean this up.  Ladies and gentlemen,

6  when they objected to facts not in evidence, that's a proper

7  objection.  What that means is that this expert just gave an

8  analysis based on what the lawyer told him were facts in

9  evidence.

10  Ultimately, you are to decide what facts are in evidence.

11  If you conclude these facts aren't in evidence, then you

12  disregard everything he said.  If you conclude they are in

13  evidence, then you ultimately decide whether and what weight, if

14  any, to give this doctor's testimony.

15  Go ahead.

16      MR. MAZUR:  Thank you, your Honor.

17  BY MR. MAZUR:

18  Q.  Doctor, in another part of your minimal life care plan for

19  Mr. Wells is refined neurological consultation and examination.

20  Do you recall that in the plan?

21  A.  Yes.

22  Q.  That's in your November 1, 2007, report?

23  A.  Yes.

24  Q.  If we could use the guideline when we're doing things, I

25  think that could move it a lot faster, because you have been up

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**
Volume 5-95

1  there a long time and I'm sure the jury is tired of my voice

2  already.

3       So the refined neurological consultation, what is it and

4  why does Greg need it?

5  A.  Well, he needs to be asked questions relevant to his nervous

6  system; how is his memory, is it getting better or worse or the

7  same.  He needs to be asked questions whether he's getting

8  blackout spells or not.  The EEG is abnormal.  Sometimes carbon

9  monoxide or other diseases will produce loss of consciousness,

10 blackout spells, so he needs to be evaluated for that.  He needs

11 to be evaluated to make sure he doesn't have any dysfunction,

12 what's called damage, to the nervous system in the areas that

13 carbon monoxide is known to produce damage.

14      So he needs an evaluation by someone who knows what they

15 are looking for.  This is not to discredit the primary care

16 physician, but sometimes they're not looking for things that

17 a neurologist will look for.

18      So he needs this evaluation on an annual basis because of

19 delayed neurological sequelae.  Sometimes neurologic problems

20 don't show up immediately, they show up down the road, so to

21 speak.  So the neurologist can be aware of this and look for

22 it.

23 Q.  Doctor, let me ask you, in the medical records you reviewed

24 from the University of Kentucky for Mr. Wells, did you review an

25 MRI report and an EEG report?

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-96

1  A.  There was both an MRI report and an EEG report.

2  Q.  And what were their findings?

3  A.  The brain MRI show white matter hyperintensities that we

4  discussed before, the white spots on the brain which is

5  abnormal, particularly for his age.

6      And brain wave, EEG dated 12/7/06, showed an abnormal EEG

7  because it had occasional slowing.  It's not normal, it's not

8  rhythmical in the normal fashion.  Periodically, it slows

9  down, and it's not indicative of a normal brain.

10 Q.  Doctor, based on your review of those two tests, did you

11 determine whether or not Mr. Wells has brain damage?

12          MR. PAGE:  Objection.  Beyond the scope of the report,

13 your Honor.

14          THE COURT:  Sustained.

15          MR. MAZUR:  Your Honor, can I approach on that?

16          THE COURT:  You may.

17      (The following proceedings were held at the bench outside

18 the presence of the jury.)

19          MR. MAZUR:  The reason I'm going into that, if he has to

20 make a life care plan as a neurologist, he's going to have to

21 make a determination of whether or not there's brain damage.  He

22 made the determination.  That explains why he's having him go

23 for normal neurological.

24          THE COURT:  Was that prior to November 1?

25          MR. MAZUR:  My client was not seen prior to that.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-97

1        THE COURT:  He has to do that based on the analysis,

2   what he based it upon.

3        MR. MAZUR:  No problem.  Thank you, your Honor.

4        MR. RUSSO:  Judge, I left out two patients.

5        THE COURT:  You what?

6        MR. RUSSO:  I left out two patients.

7        THE COURT:  Okay.  I will let you go after him.

8        MR. RUSSO:  Thanks.

9        MR. MAZUR:  Are we going to be taking a break for lunch?

10   Give me the high sign, because I think these people are

11   starving.

12        THE COURT:  It's only 11:00.

13        MR. MAZUR:  Sorry, it's the contacts.  Wishful thinking

14   on my part.

15     (Bench conference was concluded, at which time the following

16   proceedings were held in the presence of the jury.)

17   BY MR. MAZUR:

18   Q.  Dr. Prockop?

19   A.  Yes.

20   Q.  In creating your life care plan that you've put together for

21   the November 1, 2007, report, did you come to any conclusions

22   with regard to Mr. Wells' brain damage in determining what type

23   of future care he would need?

24   A.  Yes.

25   Q.  And what were your determinations with regard to Mr. Wells

1  having brain damage or not having brain damage?

2  A.  I came to the conclusion at the time I evaluated his medical

3  records; and based on the data in the medical records, he does

4  have brain damage.

5  Q.  Is there a cure for brain damage?

6  A.  Well, some forms of brain damage, there's something to help

7  it.  But the kind of brain damage that's caused by carbon

8  monoxide, there's no cure for it.  Maybe down the road we will

9  find a cure, but right now we don't have a cure.

10  Q.  Is the best thing you know for it is to control the symptoms

11  with medications?

12  A.  Yes.  We offer what's called symptomatic therapy.  If a

13  person has headaches, you treat the headaches.  If they have

14  poor impulse control, acting out on impulses, you give

15  medication to try to control that.  So it's all symptomatic

16  therapy.  You can't cure the underlying brain damage.

17  Q.  In preparing your report from the November 1, 2007, report,

18  did you see where he was taking medication to help control some

19  of the symptoms that he complains of?

20  A.  Dr. Berger says in the last sentence of a report on July 13,

21  2007, quotation marks:  "I would suggest that we continue his

22  same therapeutic regimen."  Quotation marks.  That means he's on

23  medication, including Tenormin and Topamax.  And Dr. Berger was

24  of the opinion that those medications should be continued.

25  Q.  Okay.  And over time, does a patient need adjustments in his

1   medication or change in medication?

2   A.  Frequently, you do.  Several things happen.  One medication

3   wears off, and its benefit to the body adjusts to a particular

4   medicine.  So you have to change medications.

5        Sometimes the side effects build up.  All medications

6   have a potential for adverse side effects.  We start out

7   treating, hoping that the good effects far outweigh the bad

8   effects.  But sometimes, in the course of time, the good

9   effects diminish and the bad effects increase, so we have to

10  stop that medication and use something else.

11  Q.  How does Greg go about getting his medication changed over

12  his lifetime?

13  A.  Well, that would be a combination of seeing his primary care

14  physician four times a year and seeing his neurologist at least

15  one a year.  That's how that decision would be made.

16  Q.  And did you note in his medical records from UK whether or

17  not he was also seeing a headache specialist?

18  A.  He was seeing Dr. Berger, a general neurologist.  And he

19  also thought that he should see Dr. Tucker, who is a neurologist

20  who apparently is a headache specialist.

21  Q.  So that's one of those other doctors that, over time when he

22  needs changes in medication, he'd have to go to?

23  A.  Yes.

24  Q.  What factors did you consider in coming up with this life

25  care plan for Mr. Wells?

**Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-100

1   A.  Well, the factors I considered were the medical records we

2   discussed, and combining that with my experience with other

3   patients and knowing what happens down the road.  I've seen

4   patients ten years after carbon monoxide exposure, 20 years, et

5   cetera, so I have a basis for predicting what they might develop

6   into.  We try to -- I have individualized each of these cases,

7   looked at each person as a person, not as a group.  And you

8   can't always predict exactly what's going to happen with an

9   individual, but you base your predictions on what your

10  experience has been.

11      So it's a probable development of these things.

12      Again, I don't have a crystal ball, as I mentioned.  I

13  can't be positive 100 percent.  Only God knows 100 percent.

14  But in all probability, this is what will happen to him.

15  Q.  Just out of curiosity, when you are making this minimal life

16  care plan up, did you take into consideration Mr. Wells' age?

17  A.  Yes, I did.

18  Q.  And the degree of his injury?

19  A.  Yes, I did.

20  Q.  And the type of support system that he has?

21  A.  Yes, he's a particular individual, because he has

22  aspirations to become a policeman.  And given these problems

23  that he has, I think that's very unlikely.  I think other

24  doctors have come to that conclusion, and I had to come to that

25  conclusion, as well.  It's very unlikely he will be able to do

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-101

1   that kind of work.

2   Q.  With regard to this life care plan that you provided to

3   everybody on November 1, 2007, that was based on all the

4   information that you had at that moment in time?

5   A.  Yes.

6   Q.  And that is -- strike that.

7       What you are trying to do there is come up with a minimal

8   plan of -- strike that, too.  I'm going for two strikes here.

9       What you are trying to do here is project out over time

10  the minimal amount of care that Mr. Wells is going to need

11  over his lifetime.

12          MR. BENTLEY:  Objection, leading.  Three strikes.

13          THE COURT:  Overruled.

14          MR. MAZUR:  Thank you, your Honor.

15          THE WITNESS:  It's a minimal life care plan.  I think I

16  mentioned that in my deposition.  If any of these people, as an

17  example, get into behavioral problems with poor impulse control

18  and get into an automobile accident as a result and they break a

19  rib or a hip or whatever, I haven't included that kind of care

20  in this.  That's a reality, a possibility, a distinct

21  possibility.  I don't have a crystal ball to say that.  They

22  might get into a gun fight, whatever.  Any of those things could

23  happen.

24      I did not include those types of issues in my life care

25  plan.

1   BY MR. MAZUR:

2   Q.  What I was getting at, more importantly, that your snapshot

3   in time ended on November 1, 2007?

4   A.  Yes.

5   Q.  Their conditions could either improve or get worse after

6   that?

7   A.  Well, I don't think they are going to improve.  They are

8   going to be either stable or get worse; but get worse,

9   unfortunately.  I don't think they are going to get better.

10  Q.  If they get worse, they will require further care that is

11  not articulated fully in your report of November 1, 2007?

12  A.  Exactly, exactly.

13  Q.  With regard to the brain MRI, I think that's No. 2 on your

14  report of 2007 -- November 1, 2007?

15  A.  Yes.

16  Q.  What's the purpose of that, and why does he need them into

17  the future?

18  A.  Well, I don't want to be repetitive.  I think I mentioned

19  this before.  But there are what's called delayed neurological

20  sequelae.  Sometimes the first MRI doesn't show damage, but the

21  next one does.  Maybe the second one doesn't, the third does.

22  And you can see a progression of these events, and you want to

23  catch the damage before it gets irreversible and severe to see

24  if you can help the person before it gets real, real bad.

25      So that's the purpose of what we call serial, sequential

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination
Volume 5-103

 1    MRIs.  As I mentioned before, the MRI is expensive, but it

 2    doesn't do any damage to the person.  It's not invasive, it's

 3    not harmful.  So let's get it to be sure the person is doing

 4    all right and not getting worse, by the criteria from the

 5    MRI.

 6    Q.  And you are projecting it out that he's going to need one

 7    every three years for the rest of his life?

 8    A.  Yes.

 9    Q.  And what was the age you estimated him to live?

10    A.  78.

11         MR. BENTLEY:  Objection, lack of foundation.

12         THE COURT:  Sustained.

13    BY MR. MAZUR:

14    Q.  Doctor, did you determine a life expectancy for Mr. Wells?

15    A.  The age 78 is determined statistically by what is called

16    actuarial figures.  In the United States --

17         MR. PAGE:  Objection, your Honor.

18         THE COURT:  Overruled.  Go ahead.

19         THE WITNESS:  In the United States, I learned by reading

20    that the average male lives to be 78.  That's a figure that's

21    given that's been validated by statistical analysis, by looking

22    at large populations of people.

23         THE COURT:  Is that the figure you used in calculating

24    this?

25         THE WITNESS:  Yes.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-104

1          THE COURT:  Okay.  The objection is sustained.

2     BY MR. MAZUR:

3     Q.  Do you know how long Greg Wells is going to live?

4     A.  No.

5     Q.  So it would be a guess out there?

6     A.  Well, it's an educated guess.

7     Q.  Okay.  You hope he lives a long time?

8     A.  I hope he lives to be 120 or 140 or 200, or whatever.  I

9     don't know.

10    Q.  What are the symptoms of Parkinsonism?

11    A.  The symptoms of Parkinson's, first of all, there's a

12    Parkinson's disease and a Parkinsonian's syndrome.  The syndrome

13    is what occurs after toxic exposure, such as carbon monoxide.

14          MR. PAGE:  Objection, your Honor.  Beyond the scope.

15          THE COURT:  Overruled.  Go ahead.

16          THE WITNESS:  The symptoms of Parkinson's syndrome,

17    which is known to occur after carbon monoxide exposure, or what

18    is call bradykinesia, the body doesn't move well.  It doesn't

19    move well because of cogwheel rigidity, the muscles can't move.

20    The person loses coordination and rapid successive movements.

21    Sometimes they develop tremor, a shaking of the body that's more

22    characteristic of Parkinson's disease but sometimes is seen in

23    Parkinsonian's syndrome after carbon monoxide exposure.  And

24    sometimes there's an associated medical impairment which we call

25    medical dementia.  So that's what we are concerned about in this

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-105

1   gentleman.

2   BY MR. MAZUR:

3   Q.  Let me ask you something.  In your review of Mr. Wells'

4   medical records, did you note anywhere that he had tremors?

5   A.  Tremors were not recorded, as far as I recall.

6       Excuse me.  On June 13th, 2007, a report by Dr. Berger,

7   near the end of the first page he says "The slight terminal

8   tremulousness was noted of the outstretched upper

9   extremities."  So there was a tremor noted.  I apologize for

10  not bringing that to your attention before.

11  Q.  Doctor, you reviewed a lot of records, so don't worry about

12  it.

13      Did you note anywhere in the record as to whether or not

14  he was having balance issues and went for any sort of balance

15  therapy?

16  A.  Yes.  The first line of Dr. Berger's report of June 13,

17  2007, says:  "He has recently completed a course of balance

18  therapy at Cardinal Hill Rehabilitation Hospital."  So this is

19  apparently approved his balance, but he does start out with a

20  balance problem.

21  Q.  And going back to your eight points in the life care plan

22  you developed for Mr. Wells, are those the types of things that

23  you noticed in the medical records that require him to have the

24  future neurological care and evaluation?

25  A.  Yes.  Mr. Wells would, in addition to other costs I alluded

1    to, would need periodic therapy to keep his balance as good as

2    possible.  That's to prevent falls and other such complications

3    of poor balance.  If he falls, God forbid, and breaks a hip,

4    then we have other medical treatments that are necessary.

5        But hopefully, physical therapy with attention to his

6    balance could prevent a serious fall.

7    Q.  And what about your -- your indication that he needs

8    neuropsychological assessment initially and every five years for

9    life?  Why does he need that?  What's the purpose for that?

10   A.  Well, it's alluded to and mentioned strongly in his medical

11   records that he has medical problems already.  So we need to

12   track that and see if it gets worse.  It might limit his life

13   expectancy, it might limit his occupational abilities, it might

14   lead to particular therapies that are needed for that problem.

15       So again, we want to anticipate, we want to get the --

16   see the problems before they get real bad.

17   Q.  Why can't you do it every three years?

18   A.  As I mentioned before, there is a delayed neurological

19   sequelae, which is sometimes all the damage is seen initially

20   but sometimes it doesn't develop for weeks, months, or years

21   after the exposure to carbon monoxide.  It's a delayed effect.

22   Q.  Going back to what we talked about previously, and I

23   apologize for going back for a second, but the cardiological

24   consults every three years for life.  With regard to the studies

25   that you mentioned in your report, if you could just tell us

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)

**Leon Prockop, M.D., Direct Examination**

Volume 5-107

 1  briefly what they are.  I know you're not a cardiologist; but

 2  obviously, you think they are important, and I'd like to know

 3  why.

 4  A.  Let me go back to that report.

 5     Well, I mentioned the EKG.  That's a cardiac rhythm test.

 6  It will tell whether the palpitations are going away or

 7  getting worse.  Also the EKG, which is a routine test, can

 8  determine the presence of heart wall damage; that is, whether

 9  part of the heart wall has been damaged.

10     The more refined test is 2D echo.  What is a test that's

11  done to see whether the ventricles of the heart are

12  contracting and expelling the blood correctly.  That's a very

13  sophisticated test that should be done if you suspect, as in

14  the case with Mr. Wells, that his heart wall is damaged.  It

15  may be beating, but it's not beating strong enough to get the

16  blood out into his body.  So the 2D echo is a test for that.

17     The cardiac enzymes are a test that determine whether the

18  heart wall muscle is breaking down and it shows up in the

19  blood stream.  The enzymes are released by the heart wall

20  muscle and show up in the bloodstream.  So this could be an

21  early sign of a heart attack.  Before the heart attack gets

22  severe and is fatal, you can see early signs of a heart

23  attack by examining the cardiac enzymes.

24     And the scintography study is another sophisticated test

25  that shows small areas of heart wall damage, as opposed to

1  big areas of wall damage.  So you want to find the area

2  before it gets severe and treat the person appropriately.

3  Q.  Doctor, just so I'm clear, in looking at the medical records

4  and looking at the history of carbon monoxide exposure, the

5  reason you put this in your report is because you are concerned

6  about future cardiac problems?

7  A.  Yes.

8  Q.  And in medicine, is it good to practice preventive medicine

9  or do you wait until something happens?

10          MR. PAGE:  Objection, leading.

11          THE COURT:  Overruled.

12          THE WITNESS:  There is an old saying, "an ounce of

13  prevention is worth a pound of cure."  So that's what we try to

14  do.  We try to find out problems before they get severe so we

15  can hopefully stop them from getting severe.

16  BY MR. MAZUR:

17  Q.  Doctor, with regard to your review of Mr. Wells' medical

18  records and of his deposition testimony, did you note anything

19  in there that would require him to get some psychiatric care and

20  counseling?

21  A.  Well, as I mentioned before, he had an aspiration to become

22  a Kentucky State Policeman.  I don't think he's going to achieve

23  that.  That could cause depression and severe reaction to

24  something like that.  His life is not what it's going -- his

25  life will not be what he had hoped it to be, and that can

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination
Volume 5-109

1    produce psychiatric problems.

2        So I think he'll need some help adjusting to that change

3    in his lifestyle, change in his life goals.

4    Q.  And did you note anywhere in his record that he was

5    suffering from anxiety and depression?

6    A.  I've noted his depression, secondary to his not being able

7    to get into the Kentucky State Police.  Reported his headaches,

8    his fatigability, his blackout spells.  I don't see anxiety

9    specifically mentioned.

10   Q.  With regard to your life care plan of November 1, 2007,

11   you've estimated out, based on what you reviewed in his records,

12   that he's going to need to see a psychologist or a therapist one

13   of three -- strike that.  About four times a year?

14   A.  Yes.

15   Q.  Dr. Prockop, could you give me a ballpark estimate of how

16   many carbon monoxide-poisoned patients you have consulted on or

17   treated in your career?

18   A.  Well, as I mentioned in my deposition, as a consultant I see

19   many patients referred to me for opinions.  So I have seen more

20   patients in consultation than I have in everyday or every week

21   or every month treatment.

22       Probably in terms of consultation, 60 or 80.  And in

23   terms of specific treatment on a monthly basis or every three

24   months, or whatever they need, it's probably another 20.

25   Q.  Dr. Prockop, based upon your experience and consulting on

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-110

1  and treating patients that have been poisoned by carbon

2  monoxide, and your review of Mr. Wells' medical records and

3  deposition testimony, and your knowledge and understanding of

4  the medical literature on carbon monoxide, do you have an

5  opinion within a reasonable degree of medical probability as to

6  the long-term prognosis of Donald Greg Wells?

7  A.  Well, I think his headaches are going to stay with him and

8  get worse.  I think his balance problem has stayed with him and

9  will probably get worse.  I think his depression, unless he

10  miraculously finds some other way to guide his life outside of

11  the Kentucky State Police, is going to get worse.  So I think he

12  is probably going to get worse over the course of time.

13  Q.  Dr. Prockop, based on your experience in treating and

14  consulting on patients poisoned by carbon monoxide, and your

15  review of Mr. Wells' records and deposition testimony, and your

16  knowledge and understanding of the medical literature on carbon

17  monoxide poisoning, do you have an opinion within a reasonable

18  degree of medical probability that the life care plan you

19  developed for Mr. Wells, is that the minimum level of care that

20  you believe he will need for the rest of his life?

21  A.  Yes.

22  Q.  Dr. Prockop, if you weren't here testifying today, where

23  would you be?

24  A.  I would be home in Tampa at the University of South Florida

25  College of Medicine.  This morning I would have seen patients

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Direct Examination**

Volume 5-111

1  all morning, and this afternoon I would have been preparing for

2  a lecture that I'm giving on Friday.  So I would have been

3  working all day.

4  Q.  So you have taken time away from your normal duties and

5  responsibilities at the University of South Florida to be here

6  today with us?

7  A.  Yes.

8  Q.  Dr. Prockop, we are compensating you for being here today,

9  aren't we?

10  A.  Yes.

11  Q.  We are compensating you for your time away from your normal

12  duties from the University of South Florida?

13  A.  Yes.

14        MR. MAZUR:  Thank you, Dr. Prockop.  I have no further

15  questions.

16        THE COURT:  Mr. Russo, you had a little additional that

17  you missed?

18        MR. RUSSO:  Thank you, your Honor.

19                    DIRECT EXAMINATION (Resumed)

20  BY MR. RUSSO:

21  Q.  Dr. Prockop, we have Mr. Asher and Stacy.  I would like to

22  go over those two files with you very quickly.

23  A.  All right.  I have Mr. Willie Asher.

24  Q.  Did you go over his medical records in terms of establishing

25  his future medical needs?

1    A.  Yes, I did.

2    Q.  And what are those future medical needs -- well, let's

3    review his medical records first.

4    A.  All right.  There was a report of June 22, 2006, signed by

5    Dr. Houff, H-O-U-F-F, as part of his medical records.  There is

6    another report by Dr. Houff.  There is a neurocognitive

7    diagnostic evaluation by Dr. Mattingly, M-A-T-T-I-N-G-L-Y.

8    There was a brain MRI report of October 1st, 2007, and then

9    there was a deposition of William Harris Asher dated July 7,

10   2007.

11   Q.  And based upon that medical, did you make a future

12   projection for Mr. Asher?

13   A.  Yes, I did.

14   Q.  And what are those future projections?

15   A.  Well, that included the cardiological evaluation, similar to

16   the ones we discussed before.  But in his case, the initial

17   cardiological evaluation I submitted it being $850, the

18   follow-up cardiological evaluation and care being $4,500.  The

19   general medical treatment by his primary care physician every

20   four months for life was $17,600.  The neurology consultation

21   follow-up every year for life, likewise, was $17,600.  The brain

22   MRIs with the frequency that we have already discussed added up

23   to $13,200.  The neuropsychological tests with the frequency we

24   already discussed adds up to $13,000.

25   Q.  Are there any other future projections that you have for

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-113

1    Mr. Asher in terms of future medical needs?

2    A.  Well, as I mentioned before, this is a minimal medical

3    amount.  If he develops future complications, which I can't

4    predict, there would be further expenses, but those are the ones

5    I addressed in my life care plan notes.

6    Q.  Let's talk about Mr. Stacy.

7    A.  Mr. Stacy.  Yes, I have the file on Mr. Stacy, S-T-A-C-Y.

8    Q.  Did you go through the past medical records?  Tell us what

9    those were.

10   A.  Yes.  There was a brain MRI on 10/29/07.  There was a

11   neurological report by Dr. Houff -- H-O-U-F-F -- dated June 22,

12   '06.  Another report by the same doctor, August 15th, '06.

13       There was the neurocognitive diagnostic evaluation dated

14   1/18/07.  And there was the deposition of Mr. Joshua Stacy

15   dated July 10, '07.

16   Q.  And did you come to an opinion about the future medical

17   needs of Mr. Stacy?

18   A.  Yes, I did.

19   Q.  And what -- what future minimal needs have you provided for

20   him?

21   A.  Similar to some of the other people, his initial

22   cardiological evaluation was $850.  His follow-up cardiac

23   consultations and evaluations was $5,200.  His primary care

24   physician treatment for life was $20,800.  His neurological

25   follow-up was likewise $20,800.  The brain MRIs with the

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-114

1  frequency we discussed is $14,400.  The neuropsychological tests

2  were $16,100.

3  Q.  Will there be any other future medical needs that you

4  project for Mr. Stacy?

5  A.  Again, unless he develops complications, which I can't quite

6  predict, he might need orthopedic care, he might need other

7  care, but I didn't include that in my medical needs for the

8  future.

9  Q.  Have all these opinions that you have testified to regarding

10 these patients that you have testified to the jury today, have

11 all your opinions been based on reasonable medical probability?

12 A.  Yes, they have.

13 Q.  And have they been based on the medical records of each

14 individual?

15 A.  Yes.

16 Q.  The MRIs, the EEGs, and all of the other records?

17 A.  As I mentioned before, I looked at each person individually.

18 Q.  And have these been based on your experience, training,

19 background, and review of medical literature --

20 A.  Yes.

21 Q.  -- regarding carbon monoxide?

22 A.  Yes, they have.

23 Q.  Now, there were some EEGs that you had that were missing.

24 Would you like to have copies of them?

25 A.  Please.

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Direct Examination**

Volume 5-115

1          MR. BENTLEY:  May we approach, your Honor?

2          THE COURT:  You may.

3       (The following proceedings were held at the bench outside

4    the presence of the jury.)

5          THE COURT:  It's the longest period without an approach.

6    I've got to put the time.

7          MR. BENTLEY:  You have to give me the football if I win

8    it, because I'm going to win this one.

9          MR. MAZUR:  Could he just get the red flag, your Honor?

10         THE COURT:  Go ahead.

11         MR. BENTLEY:  Your Honor, as I have done throughout

12   here, I have objected at every moment of the ones that are

13   post-November 1st.  So what we are having are EEGs --

14         THE COURT:  Well, okay, you don't have to go any

15   further.  The ones post-November 1st, you're right.  See, that's

16   why I don't give you the time.  The post-November 1st, he can't

17   look at.  I don't have any -- I don't care, but I don't think

18   Mr. Bentley has any objection, because it will be overruled, to

19   pre-November 1.  But post-November 1 would be.

20         MR. RUSSO:  The first one was Shade Deaton, October 1,

21   2007.  He didn't have that one.

22         THE COURT:  That's fine, just give him that one.

23         MR. BENTLEY:  Because, for example, the MRI he just

24   mentioned, I looked it up.  It was done October 29, 2007.  I'm

25   confident, if it was done October 29th, it wouldn't get to him

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)

**Leon Prockop, M.D., Direct Examination**

Volume 5-116

1  by November 1st.

2        THE COURT:  You can cross him on that.  I thought you

3  would.

4        MR. BENTLEY:  The problem, your Honor, it shouldn't be

5  admitted, so for me to cross him, I can't strike it completely.

6        THE COURT:  I can't strike things before November 1.

7        MR. BENTLEY:  Can you go back once we find out?

8        THE COURT:  Yes.

9        MR. BENTLEY:  Okay.

10        MR. PAGE:  I don't understand what we are doing here.

11  Are we giving him the EEGs he didn't bring with him?

12        MR. RUSSO:  These are all before November 1st.

13        THE COURT:  There was one that's dated 2008.  Did you

14  take that out?

15        MR. RUSSO:  Which one?  Yeah, that one.

16        THE COURT:  That's what cross-examination is for.

17        MR. BENTLEY:  Here is one I was looking at right here,

18  your Honor, October 29.

19        THE COURT:  You can cross-examine him on October 29th,

20  if you'd like.

21     What do you think about breaking for lunch after the direct,

22  and then starting cross?  I will ask the jury, but I think they

23  will tell me.

24     (Bench conference was concluded, at which time the following

25  proceedings were held in the presence of the jury.)

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-117

1  BY MR. RUSSO:

2  Q.  So these are some of the EEGs and MRIs that were before

3  November 1, 2007?

4  A.  Yes, they are.

5      MR. RUSSO:  Thank you, Dr. Prockop.

6      THE COURT:  Okay.  Ladies and gentlemen, we could start

7  cross, or we could break for lunch.  What do you all think?  Do

8  you want to break for lunch now?  Either nod "Yes" or nod "No."

9  Okay.  I see some nodding "Yes," so I will let the minority

10 rule, since the rest didn't voice -- you could have in noded

11 "No," by the way.

12     But there's one thing I want to cover with you before

13 lunch, and that's a little bit of good news.  I will leave it

14 up to you.  At the end of this trial, for those of you that

15 serve, you will be permanently excused from jury service, so

16 long -- and I have to put out an order doing it, but I got

17 permission to do that.  So long as you request it.  So if you

18 had fun and you want to come back and do trials, I won't

19 excuse you.  But at the end of the trial I will excuse you,

20 unless you request otherwise.  That's one bit of good news.

21     As I told you, I continuously work with the lawyers to

22 keep it moving.  I promise you the lawyers will keep it

23 moving.  We worked into the night to keep going smoothly.

24     Since we are breaking early, how about an hour and 15

25 minutes?  That will give us a little time with the lawyers

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-118

1     and allow us to get lunch, as well.

2         Okay, I will see you at 12:45.

3         (Jury leaves the courtroom at 11:32 a.m.)

4         THE COURT:  You may be seated.  The jury is out of the

5     courtroom.  I have a few things I want to cover.  I will excuse

6     you.  I know you all haven't gotten much of a break this

7     morning, so I appreciate it.

8         Okay.  As to -- Mr. Page, I asked you this before.  I

9     don't know that I got a response, so I'm going to assume

10    you're happy with my ruling for your record.  But

11    post-November 1, I didn't let the plaintiffs go into, and I

12    will give a brief synopsis of why so that you have it in the

13    record.  If you feel like I need to supplement -- and I

14    always offer this to the plaintiffs, as well.  Whenever I

15    rule, if you don't feel my ruling is thorough enough, since

16    I'm doing it somewhat off the cuff sometimes, I'm happy to

17    supplement the record so your record is protected.

18        My basis on the post-November 1, as I think I explained

19    the thrust of those, is both notice and opportunity.  As I

20    ruled, pre-November 1 they had notice and opportunity, but

21    post-November 1, they did not.  So I feel like it's a fair

22    balance to exclude anything post November 1 but not

23    pre-November 1, since he did offer it in his report.  Plus, I

24    feel like even if he hasn't and the report was insufficient,

25    in light of the defendant's opportunity pre-November 1, it

1    was harmless.  But I don't feel like they have that same

2    opportunity post-November 1, and therefore I find it harmful

3    under the cases I cited before.

4        Is that sufficient?

5        MR. PAGE:  Your Honor, I certainly agree with your

6    ruling.

7        THE COURT:  But I want to know if I made the record

8    such -- my question is not, I guess, whether or not you all

9    agree, because I appreciate when you agree.  Whenever one of you

10   agrees, it means the other side disagrees.

11       What really matters is that I have made a sufficient

12   record for you.  My goal in this is to get every ruling

13   right.  I recognize perfection is impossible.  That's why

14   they give us the abuse of discretion standard and other

15   deferential standards.  Perfection is rarely achieved but

16   often strived for.

17       At the same time, the last thing I want is for me not to

18   give a thorough-enough ruling that you all go up on appeal

19   and lose and come back and have to go through this again.  I

20   would rather be wrong, for all the reasons I stated, and they

21   say, "Look, you just got it wrong," than "You didn't give us

22   enough," if you see what I'm saying.

23       So to both sides, I say that.

24       Okay, as to the -- oh, I wanted to note, the best

25   objection of the day and of the trial so far goes to you,

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Direct Examination

Volume 5-120

1   Mr. Bentley, which is the three strikes.  I like that, I

2   almost couldn't rule for you, because I didn't want him to

3   have to sit down.  But I thought it was the best objection of

4   the trial.

5         MR. BENTLEY:  Thank you.

6         THE COURT:  As to the time limits, I just wanted to

7   supplement my ruling.  I guess it doesn't protect either of you,

8   but it protects the Court.  The Sixth Circuit has expressly

9   held, quote:  A District Court has broad discretion to place

10  limits on the presentation of evidence to prevent delay, waste

11  of time, and needless presentation of cumulative material."  And

12  that's Trepel v. Roadway Express, 40 Fed.Ap. 401 at 408, Sixth

13  Circuit, 2002, permitting ten hours per side to present

14  evidence.

15     There's also a case called Sutkiewicz v. Monroe County

16  Sheriff, 110 F.3d 352-361, Sixth Circuit 1997, permitting 25

17  hours per side to present evidence.

18     That case then cites a Third circuit case which I found

19  particularly informative that says, quotes -- it's Duquesne

20  Light -- and I'm probably saying it wrong.  I'm sure the

21  school would have an objection to the way I say it.  But it's

22  D-U-Q-U-E-S-N-E -- Duquesne Company v. Westinghouse Electric

23  Corp., and I'm quoting -- it's 66 F.3d 604.  Quote:

24  "Numerous Courts have inferred from these provisions a

25  Court's authority to set time limits."  I'm not going to go

1  through all the cases they cited.

2      But then they said, "As one court has explained," colon --

3  and I think this quote is somewhat telling -- "It requires

4  counsel to exercise a discipline of economy, choosing between

5  what is important and what is less so.  It reduces the

6  incidence of the Judge interfering in strategic decisions.

7  It gives a cleaner, crisper, better-tried case.  It gives a

8  much lower cost to the clients.  Finally" -- I like this

9  particularly -- "it will save months of our lives."

10     So they -- I think every Circuit that I found, no Circuit

11  has reversed a District Court.  Every Circuit has looked at

12  it.  They said, "In exercising the discretion, the Court

13  should be careful to give equal time to equal sides," which I

14  have done.

15     So as I said, Mr. Bentley, if I feel like at some point

16  the time limits are unfair, I will revisit them.  But at this

17  point, I feel like it's more than enough time.  I think you

18  all are doing a good job and have been very cooperative with

19  me.  In fact, I'm down 1 00 bucks to Mr. Page.

20     But I do think this will prevent the needless

21  presentation of cumulative material, to cite the Sixth

22  Circuit.  And I think it's, to use Mr. Bentley's word, less

23  draconian to both sides.  Of course, used out of context

24  there.

25     I think that's it.  You had one objection, Mr. Bentley,

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination
Volume 5-122

1  to facts not in evidence.  I gave a limiting instruction.

2  Because oftentimes, in trials like this, to require either

3  side to put all the facts in before they call a certain

4  witness would create all kinds of circuses where we have

5  witnesses constantly reappearing.  Having said that, I gave a

6  limiting instruction, and if those facts don't come in I will

7  entertain a motion to strike.

8      But I think you all should ask the doctors hypothetical

9  questions -- I'm sorry, I should have let you leave,

10  Dr. Prockop.  You can go to lunch, I won't be offended.

11      You can ask them hypothetical questions, and the jury

12  should consider that until the facts come into evidence, as I

13  instructed.

14      Anything else we need to cover?  Okay.  Well, I will look

15  forward to seeing you at 12:45.  That's what I said, right?

16  Okay.  Have a very nice lunch.

17      (Recess taken from 11:39 to 12:45 p.m. )

18      (Jury enters the courtroom at 12:45 p.m.)

19      (Witness resumes the witness stand.)

20          THE COURT:  You may proceed, Mr. Page.

21          MR. PAGE:  Thank you.

22                    CROSS EXAMINATION

23  BY MR. PAGE:

24  Q.  Good afternoon, Dr. Prockop.

25  A.  Good afternoon.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-123

1   Q.  It's my understanding you are trained as a neurologist

2   primarily, right?  That's your specialty in the practice of

3   medicine?

4   A.  Yes, I'm Boarded by the American Board of Psychiatry and

5   Neurology.

6   Q.  You have no training as a cardiologist; is that right?

7   A.  No.

8   Q.  And have you received any training as a physical therapist?

9   A.  No.

10  Q.  Okay.  Do I understand correctly that you have provided

11  expert testimony for Mr. Russo in other cases?

12  A.  Yes.

13  Q.  Okay.  I understand you previously testified in a carbon

14  monoxide case for Mr. Russo, a case involving exposure to nine

15  folks back in 1998; is that right?

16  A.  Pardon?  I missed your question.

17  Q.  You testified on behalf of Mr. Russo's clients in a carbon

18  monoxide exposure case back in 1998; is that correct?

19  A.  I don't remember the date exactly, but that sounds right.

20  Q.  I think you previously told us you have been an expert for

21  Mr. Russo at least five or six times in the past, all for cases

22  involving carbon monoxide; is that right?

23  A.  That's correct.

24  Q.  In fact, you once wrote a medical article pertaining to a

25  case you handled for Mr. Russo entitled "Carbon Monoxide Brain

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-124

1  Toxicity, Clinical Magnetic Resonance Imaging, Magnetic

2  Resonance Spectroscopy and Neuropsychological Effects in Nine

3  People," correct?

4  A.  That's correct.

5  Q.  And in that article you wrote that "Magnetic resonance

6  imaging spectroscopy provides evidence of CO-induced brain

7  damage," correct?

8  A.  Correct.

9  Q.  You wrote another paper which we talked about earlier, "An

10  Updated Review of Carbon Monoxide Intoxication," in 2007.  Do

11  you recall that one?

12  A.  I believe that's correct.

13  Q.  You noted in that paper that magnetic resonance

14  spectroscopy, also MRS, quote:  "Precisely reflects the severity

15  of symptoms," end quote, and was a useful tool in diagnosing

16  carbon monoxide toxicity and its severity, correct?

17  A.  I don't remember the exact quote, but if you quoted that

18  I'll agree with you.

19  Q.  Okay.  Do you still believe that, sir?

20      MR. O'BRIEN:  I'm sorry, this is my one today, okay?

21  May I approach on this?

22      THE COURT:  You get more than one; but, yes.

23      (The following proceedings were held at the bench outside

24  the presence of the jury.)

25      MR. O'BRIEN:  Your Honor, as long as we're going to do

 1    learned treatises or talk about articles and things like that, I

 2    think we ought to go on with Rule 803(18) which talks about

 3    learned treatises and how we do those things.  You're supposed

 4    to --

 5            THE COURT:  Go ahead.

 6            MR. O'BRIEN:  First of all, I think the Court has

 7    already stated, you have got to hand the -- that's not in the

 8    rules.  But I think that's just part of the process.  You've got

 9    to hand it to them.  And the other is, I'm not specifically

10    talking about this instance, but you've got to establish them as

11    authoritative, the whole thing.

12            MR. PAGE:  This is his.

13            THE COURT:  He will hand it to him, but it's his paper.

14    Are you saying it's not authoritative?

15            MR. O'BRIEN:  No, I'm not saying that at all.

16            THE COURT:  I will hold you to the rule.  If you don't

17    object, if you give him a paper that you agree is authoritative,

18    I would ask that, rather than go through the needless time at

19    the bench.

20            MR. O'BRIEN:  No, I won't do that at all.

21            THE COURT:  If you say "Object, 803(18)."  You can say

22    "803(18)," and he can hand him the paper.

23        (Bench conference was concluded, at which time the following

24    proceedings were held in the presence of the jury.)

25    BY MR. PAGE:

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-126

1  Q.  Dr. Prockop, that might not have been fair to you.  Would

2  you like to see a copy of the 2007 paper?

3  A.  Please.

4  Q.  Sure.  Sir, the part that I was quoting and asking you about

5  is at Page 11 of 22.  Starting with "Kamada, et al. " Do you see

6  where I am, sir?

7  A.  Yes, at the top of the page.

8  Q.  Okay.  Did I quote your paper correctly?

9  A.  Well, you quoted the paper, the sentence in part.  You

10  didn't refer to Kamada, et al., reported that "MRS in patients

11  with delayed sequelae with carbon monoxide exposure precisely

12  reflects the severity of symptoms."  I'm quoting Dr. Kamada.

13  I didn't say that myself.

14  Q.  Okay.

15  A.  If you want to refer to that article, which goes back to

16  Article 56, that's a 1994 article by Kamada and his colleagues

17  from Japan.  They report through the metabolic change in carbon

18  monoxide studied by magnetic resonance spectroscopy.  Now,

19  again, to be precise, I didn't say that.  I'm quoting Dr. Kamada

20  and his colleagues.

21  Q.  I guess, since it's in your paper, I guess I should ask.  Do

22  you believe that, I assume, Dr. Kamada is correct in terms of

23  what he states there?

24  A.  Well, I can't answer that question in one or two words.

25  Again, I don't want to be trivial.  Do you want my ten-word

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-127

 1   answer or do you want my hour lecture?  Because I'm a professor

 2   and I like to lecture.

 3          THE COURT:  Ten words.

 4          THE WITNESS:  Ten words?  Ten words is that it's not

 5   been proven that MR spectroscopy, it's not been validated, it

 6   hasn't been proven.  Dr. Kamada and his group reported that, but

 7   there hadn't been any other proof of that.  There aren't 100

 8   papers you can refer to.  It hasn't been validated.  The medical

 9   term is it hasn't been validated.

10   BY MR. PAGE:

11   Q.  And it would be important to you to have validation of

12   opinions in literature?

13   A.  Well, at least two questions, again.  If the literature is

14   the Bible, we don't need a lot of validation of that.  If it's a

15   scientific paper, with need more validation.  It depends on what

16   the article is, who wrote it, what the database is.  You can't

17   just make a blanket statement like that.

18   Q.  For example, today we have talked about a lot of life care

19   plans.  Are you aware of any literature that sets forth those

20   plans?

21   A.  Well, there is literature.  I didn't make this out.  But

22   again, you have to decide whether my life care plan is valid.

23   You have to decide that and the jury has to decide that.  I'm

24   not God, I don't make things up out of the sky.  I base this on

25   my own experience, I base it on what I read in the literature.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-128

1    That's how I come to a conclusion.

2    Q.  Let me shift bases on you for a moment, doctor.  I can hand

3    you a copy of your November 1 report.  I believe I saw that up

4    there with you; is that right?

5    A.  Yes, I have it here.

6    Q.  At the back of that report, part of the report was an

7    invoice that you submitted to Attorney Russo, correct?

8    A.  Yes, there is an invoice.

9    Q.  And it reflects that you're charging, at least on November

10   1st of 2007, $500 per hour for your time; is that accurate?

11   A.  That's correct.

12   Q.  Has that changed, doctor?

13   A.  I don't think it changed.  I don't make up the billing.  I'm

14   not a bookkeeper, but I think that's probably still correct.

15   Q.  Okay.  This is the only invoice that I had seen prior to

16   November 1 of 2007.  Have there been any other invoices

17   reflecting time that you've spent prior to this date for this

18   case?

19   A.  I can't answer that.  I don't know.

20   Q.  If the Court rules had required you to produce all invoices

21   up to this date, would it be your assumption that this would be

22   the only invoice that pertained to the time that you spent?

23   A.  I don't know.  I'm not the bookkeeper, as I say.  If I'm

24   requested to get the invoices, I will make every effort to get

25   the invoices.  There's nothing hidden here.

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-129

1  Q.  Sure.  Let's talk about some of the time on the invoice, if

2  we could.  If you will start on the first page, on the general

3  time it indicates that you charged for calls to attorneys with

4  Mr. Russo's office, it looks like you spent two and-a-half hours

5  on that.

6      I've added up the various times, to save you some trouble,

7  but I can break them down if you need me to.

8  A.  Seems reasonable.

9  Q.  Okay.  And then in addition it looks like you charged three

10  and-a-half hours for a review of the notebook of records from

11  UK.  Do I see that correctly?

12  A.  It looks -- that's what written down there, yes.

13  Q.  Okay.  Two hours for review of medical literature?

14  A.  Yes.

15  Q.  You have -- actually, I see another two-hour charge for

16  review of medical literature, if I read that correctly.  Maybe

17  I'm mistaken.  Okay.

18      Then you have four hours for preparing a report; is that

19  right?

20  A.  Yes.

21  Q.  Okay.  And then you have some specific time broken out with

22  respect to some of the plaintiffs in this case, correct?

23  A.  That is correct.

24  Q.  Okay.  If I could have you turn over to the second page for

25  Shade Deaton.  You put on your invoice for the review of the

1   deposition testimony of Shade Deaton and you review of U of KU,

2   I assume that's University of Kentucky.  And you billed one hour

3   for that; is that right?

4   A.  That's correct.

5   Q.  This is Mr. Deaton's deposition and exhibits.  Do you

6   remember that it's about this size?

7   A.  That doesn't look familiar to me, but I can pull it up if

8   you like.

9   Q.  Okay.  My deposition with Shade Deaton is 374 pages, plus

10  exhibits.  Do you know what you have with respect to

11  Mr. Deaton's deposition?

12  A.  I can look in my file folder to see, but I can't recall.

13  Q.  Do you have it handy?

14  A.  I think it's here.  There it is.  Wouldn't you know, it's

15  the last one.  This is the deposition that I reviewed.

16  Q.  Okay.  It looks like you probably have a crunch copy, which

17  is four pages to one.  You might check the end.  Does it look

18  like it's 374 pages?

19  A.  It says it's 372 pages, yes.

20  Q.  Okay.

21  A.  No, 374.

22  Q.  All right.  Thank you.  And then you spent an hour reviewing

23  that transcript and reviewing the medical records for

24  Mr. Deaton?

25  A.  That's correct.

1  Q.  And then next we have Sammy Faris, his deposition and

2  exhibits.  And you say that you reviewed that deposition and

3  reviewed medical records and this transcript.  This transcript

4  is a little more than 250 pages long.  Is that your

5  recollection?

6  A.  Well, I can look in that file, if you'd like.  We're talking

7  about Faris?

8  Q.  That would be Sammy Faris.

9  A.  Here we are.  This is the deposition that I reviewed.

10  Q.  Okay.  And that was, what, 251, I think?

11  A.  252.

12  Q.  Okay.  I may be off a page or two.  And you spent

13  nine-tenths of an hour, according to your invoice; is that

14  correct?

15  A.  If that was down there, that's what I did.  I'm very

16  scrupulous and go by the clock.

17  Q.  Mr. Marcum's deposition, you reviewed that and the medical

18  reports, and your invoice said you spent .9 hours on that?

19  A.  Who is that you're referring to?

20  Q.  I'm going down the invoice.  Timothy Marcum was next.

21  A.  Oh, okay.

22  Q.  Your invoice said you looked at Mr. Marcum's deposition and

23  you spent .75 of an hour; is that right?

24  A.  Yes.

25  Q.  And Joshua Mills, you reviewed his deposition and his

1   medical reports, and that's .9 hours?

2   A.  Correct.

3   Q.  Pennington, that was also .9 hours to review them?

4   A.  Correct.

5   Q.  Josh Stacy, you spent .9 for review?

6   A.  Yes.

7   Q.  William Asher, you spent .9 hours to review the depositions

8   and medical reports?

9   A.  Correct.

10  Q.  A few more.  Charles Sanborn.  This is his deposition, and

11  you reviewed that and his reports for .9 hours?

12  A.  That's correct.

13  Q.  And Randall Sizemore, you reviewed his deposition and

14  medical records for .9 hours, correct?

15  A.  Yes.

16  Q.  A couple more.  Stephen Taylor, .75 hours reviewing his

17  deposition and his report from the University of Kentucky?

18  A.  That's what it says.

19  Q.  And finally, Mr. Dye, you reviewed his deposition and his UK

20  report.  And again, that was .75 hours.  Correct?

21  A.  Correct.

22  Q.  You had talked earlier about looking through the medical

23  reports, looking through the EEGs, MRIs.  Are you aware that

24  Mr. Marcum's EEG and MRI were both normal?

25  A.  I'll have to look at his file.  Do you want me to do that?

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)

Leon Prockop, M.D., Cross Examination

Volume 5-133

1  Q.  If you need to, sir.

2  A.  This is Mr. Marcum we're referring to, right?

3  Q.  Yes, sir.

4  A.  Well, when we discussed Mr. Marcum this morning, my

5  recollection is that I stated that I do not find his EEG report,

6  and I still don't find it in this file.

7  Q.  Okay.

8  A.  Maybe you want to show it to me, please.

9  Q.  Well, I'm interesting in knowing what you reviewed, so if

10  you don't have it in your file is it possible that you didn't

11  review it for purposes of formulating your opinion?

12  A.  If I said I reviewed it, I reviewed it.  It's not in my

13  file.  It's more likely it got lost in my file.  Sometimes I

14  lose a few.  I don't think I did, but perhaps I did.

15  Q.  Before we leave this invoice, the total time you charged

16  Mr. Russo was 26.75 hours, or a total charge of $13,350.

17  Correct?

18  A.  I think it is.

19  Q.  And this is an accurate summary of the total time that you

20  used to prepare this October 1, 2007, report?

21  A.  November 1, 2007, report, yes.

22  Q.  Right, okay.

23      Now, Dr. Prockop, the questions I'm going to ask you

24  today pertain to the work that you did in preparing this

25  report.  I'm not going to ask you anything that you may have

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-134

1   done after that date and I don't want you to include that in

2   any of your answers, okay?

3   A.  All right.

4   Q.  You indicated on Page 2 of this report that the opinions in

5   your report were based on the items -- I'll just quote:  "The

6   opinions expressed in this report are based upon my analysis of

7   the items listed above which provide the facts of this case."

8       Do you see that?

9   A.  Yes.

10  Q.  Okay.  And just so we can run through this quickly, there

11  were a number of depositions of the plaintiffs that we talked

12  about.  Medical records regarding claims from the University of

13  Kentucky.  The Bobcat owner's manual.  The OSHA report.  The

14  medical literature and articles.  A medical article that during

15  your deposition we weren't sure that Dr. Henry's article, you

16  weren't sure what that was, as I recall; is that right?

17  A.  I have my deposition here.  I can look at what you're

18  referring to, but I don't have an independent recollection of

19  it.  This was my deposition.

20  Q.  That's fine.  Reports of Mr. Rice, Dr. Weisman, Dr. Thom,

21  Dr. Henry, Dr. Spiller.  And a statement, right?

22  A.  Yes.

23  Q.  You do not indicate in that report that you examined any of

24  the plaintiffs personally for purposes of preparing that report;

25  is that correct?

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**
Volume 5-135

1  A.  Not at that time, I did not.

2  Q.  And in fact, at the time of this report you didn't

3  personally interview any of them?

4  A.  No.

5  Q.  You didn't bill for any trips to Kentucky or any interviews?

6  A.  No.

7  Q.  As a neurologist, you understand the term "differential

8  diagnosis?"

9  A.  Yes, I do.

10  Q.  And you would agree with me it's not possible to do a

11  differential diagnosis without actually meeting with the

12  patient, wouldn't you?

13  A.  I don't agree with you.

14  Q.  For your assessment of the plaintiffs, you had to rely upon

15  histories provided to you and reports from UK doctors.  Correct?

16  A.  In part, I did, yes.

17  Q.  Or deposition testimony?

18  A.  Yes.

19  Q.  And you would agree with me that your opinions at the time

20  of your report were based solely on your understanding that the

21  plaintiffs had experienced symptoms as a result of their

22  exposure to carbon monoxide in the freezer, correct?

23  A.  No, I don't agree with that.

24  Q.  Okay.  Do you not state at Page 2 of your report that "Toxic

25  levels known to produce damage to humans, especially damage to

1  the brain and heart, toxic levels of CO were shown to be

2  produced by generators.  These toxic levels caused symptoms and

3  symptom complexes in these individuals.  These symptoms are

4  clearly defined in the depositions of the individuals and the

5  records and reports of the University of Kentucky?"

6  A.  Yes, that's why I didn't agree with your statement.  The

7  sentence says, "The symptoms were clearly defined in the

8  depositions of the afflicted individuals and in the medical

9  records and reports issued by the officials at the University of

10 Kentucky."  So it wasn't only their own depositions, their own

11 complaints.  It was also statements made by medical people at

12 the University of Kentucky.

13 Q.  Okay.  So you are relying upon what treating doctors may

14 have said in those reports?

15 A.  Well, sometimes I think they were treating doctors and

16 sometimes they were consulting doctors.  I'm not sure which in

17 all cases.

18 Q.  Okay.  I think you had previously told us that exposure to

19 carbon monoxide is different from toxicity, right?

20 A.  Pardon?

21 Q.  Exposure to carbon monoxide is different from toxicity; in

22 other words, you can be exposed without experiencing a toxic

23 event?

24 A.  That's correct.

25 Q.  None of these plaintiffs, per your review of the records,

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**
Volume 5-137

1   were hospitalized; is that right?

2   A.   As far as I know, they weren't hospitalized.

3   Q.   Okay.  Would you agree with experts who would say that

4   unconsciousness is the single sentinel event that gives rise to

5   high-risk carbon monoxide poisoning?

6   A.   I would not agree with that, no.

7   Q.   You would not agree with that?

8   A.   Don't agree with that.

9   Q.   You would agree that none of these plaintiffs reported a

10  loss of consciousness while in the freezer, right?

11  A.   As far as I recall, none of them were unconscious in the

12  freezer, no.

13  Q.   Okay.  In your November 1 report, you did not opine that

14  your life care plan was based on the assumption that any of

15  these plaintiffs developed delayed neurological sequelae,

16  correct?

17  A.   Let me look at this before I answer, please.

18  Q.   Sure.  I can help you if you need me to, doctor.

19  A.   I happen to disagree with you.  On Page 3, there's No. 7,

20  No. 8, and a paragraph after that.

21  Q.   Right.

22  A.   In the middle of that paragraph, I said, quotation marks:

23  "Additional evaluations and treatments may be required for the

24  delayed onset neuropsychiatric syndrome."

25      Now, we doctors sometimes use two or three terms or words

1  for the same thing.  Delayed neuropsychiatric syndrome is the

2  same thing as the term "delayed neurological sequelae."  I

3  didn't use the term "delayed neurological sequelae," but I did

4  use the term "delayed onset neurologic syndrome."

5  Q.  I appreciate that, doctor.

6    The entire paragraph, if I could read it:  "It should be

7  understood that the above evaluations and treatments will

8  address CO damage caused by the occupational event, but that

9  additional evaluations and treatments may be required for

10  delayed onset neuropsychiatric syndrome" -- which you have said

11  is DNS, or delayed neurological sequelae -- "which may develop

12  in any or all of these individuals.  The incidence of such is

13  not yet well defined.  A specific statement could follow, if

14  necessary?"

15    Right?

16  A.  The incidence of such is not yet well defined; no, it is

17  not.  We're still learning about that as we are standing here or

18  sitting here.  We're still learning about that.

19  Q.  Within your report, isn't it true that you do not

20  specifically offer the opinion that any of these plaintiffs had

21  at the time of your report developed DNS, or delayed

22  neurological sequelae?

23  A.  I don't think I addressed that issue, whether they had that

24  at the time of their evaluations, or others had that.  I don't

25  think other doctors used that term, but other doctors such as

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-139

1    Dr. Berger did cite their change in personality, their change in

2    character, their fatigability, their headache, their

3    forgetfulness, and intellectual issues.

4        They did not use the term "delayed neuropsychiatric

5    syndrome," but my interpretation of what they are saying is that

6    some of these people did in fact have that already.  But I would

7    have to look at each individual case in order to speak to each

8    individual.

9    Q.  Doctor, would you agree with me that, as your report states,

10   you have offered only general opinions concerning these

11   individuals as a group with regard to these future medical

12   needs?  That's at the top of the last paragraph on the second

13   page.

14   A.  My last sentence says, "It is my opinion that they each

15   require the following."  And "each" means each person.  Every

16   person needs that.

17   Q.  Right.  So why --

18   A.  To me, that means each person is an individual, each person

19   is not a group.

20   Q.  I understand.  But you do use the language here, "Let me

21   provide general opinions concerning these individuals as a

22   group," do you not?

23   A.  I did say that, but it doesn't mean I also didn't say that

24   each individual needs this, each, as an individual.

25   Q.  Right.  So while you may have been able to discuss these

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-140

1   plaintiffs individually, your report only discussed them as a

2   group, correct?

3   A.   That's not correct.  I said each of them needs this.  Each

4   is not a group.  Each is a person.

5   Q.   Doctor, I think you have agreed with me previously that it's

6   generally understood in your field that there's a wide variation

7   in individual responses to similar levels of carbon monoxide

8   exposure?

9   A.   Yes, that's the case with many, if not all, toxins.  There

10  is a wide range of individual susceptibility.  Some people are

11  more susceptible, some people are less susceptible.  That's a

12  fact of nature -- that's not a fact of nature, that's an

13  observation in nature.

14  Q.   You told --

15  A.   We're all different.

16  Q.   You told us, in the best of all possible worlds, you would

17  have an individual life care plan for each of the individuals

18  involved.  This was an overall life care plan that all of them

19  would need, and therefore it was very broadly stated.  Do you

20  recall saying that?

21  A.   Did I say that in my deposition?

22  Q.   Yes, sir.  Your deposition is on the corner there, if you

23  want to look at Page 122.

24  A.   All right.

25  Q.   The question was:  "How is that appropriate, to have a group

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-141

1   with the same medical treatment?  Is that an appropriate

2   opinion?"  And your response was you thought it was appropriate,

3   or else you wouldn't have done it.  And if you want to read the

4   rest, I'll let you.

5   A.  Page 122?

6   Q.  Starting at Line 10, with your response, sir.

7   A.  Yes.  Your question was:  "How is it appropriate to have a

8   group with the same medical treatment, if that is an appropriate

9   opinion?"  Answer:  "Well, I think it's appropriate, or else I

10  wouldn't have done it.  I'm trying to answer your question a

11  little bit more specifically.  In the best of all possible

12  worlds, we're not -- which we're not in -- we would have an

13  individual life care plan for each of the individuals involved.

14  This is an overall life care plan that all of them would need

15  and therefore is very broadly stated."

16      That's what I said, yes.

17  Q.  Doctor, didn't you also tell us that your opinions in this

18  case were not specific to any one individual plaintiff but

19  rather minimum recommendations or requirements for each

20  individual?  Do you recall that?

21  A.  I don't recall that.

22  Q.  Okay.  If you want to look at Page 144 of your deposition.

23  A.  Page 144?

24  Q.  Yes.  Are you there?

25  A.  Yes.

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-142

 1  Q.  Starting at Line 15: "As I understand it, all the opinions

 2  that you expressed in your report on November 1, 2007 and which

 3  you hold are general opinions about these plaintiffs, correct?

 4  That is, they are not responsive to any one individual

 5  plaintiff?"  Your response was:  "Well, they would be minimum

 6  recommendations for each individual."  Is that right?

 7  A.  Yes.  I said there would be minimum requirements for each

 8  individual.  So that's referring to each person, not as a group.

 9  Q.  Let me ask you about the specific opinions that you had

10  offered in your November 1st report.  And there are eight,

11  starting at the bottom of Page 2 and continuing to Page 3.  Are

12  you with me?

13  A.  Yes.

14  Q.  Okay.  Your first opinion was that each of these gentlemen

15  should have a refined neurological consultation and exam

16  initially, and at least yearly for an indefinite period,

17  correct?

18  A.  Comma, i.e., for lifetime.

19  Q.  And by reviewing the UK record, you are aware that each of

20  these plaintiffs has already had an initial exam from either

21  Dr. Berger or Dr. Houff, correct?

22  A.  I think they all had an evaluation by them, but I don't

23  recall off the top of my head whether all of them -- each and

24  every one was seen by Dr. Berger or Dr. Houff.  Is that the

25  case?

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-143

1  Q.  I believe so.

2  A.  All right, I will accept your word.

3  Q.  You are aware that Dr. Berger is also a neurologist?

4  A.  Yes.

5  Q.  He's the chief of neurology at UK, I think you told us?

6  A.  Yes.

7  Q.  And you're aware that the doctors at UK are treating these

8  gentlemen?

9  A.  Did he say that?  I'm not sure I remember reading that.  Did

10 he say that?

11 Q.  I believe his testimony at the trial has been that.

12 A.  If he said so, that's the case.

13 Q.  As the treating doctor, wouldn't he be better suited to make

14 this particular determination for a particular plaintiff, in

15 terms of his examination of what he's going to need?

16 A.  What's the question again?  I'm not sure I got it.

17 Q.  With Dr. Berger and Dr. Houff being these gentlemen's

18 treating physicians, wouldn't they be better suited to make the

19 determination whether these plaintiffs are going to need refined

20 neurological consultation yearly; i.e., as you have stated in

21 Paragraph 1?

22 A.  Not necessarily so.  I respect both of those people, but

23 they may not be in a position to render an opinion like that.

24      That would be, in a sense, self-referral.  It could be

25 construed as self-referral.  If they said that, they would be

1  saying, "Well, I need to see this person, I have to see this

2  person every year for life."  I don't know if a doctor should be

3  able to do that.  They should, but they would hesitate to do

4  that.

5  Q.  Do you not believe they are qualified to determine what

6  medical care their patients will need in the future?

7  A.  Well, I don't know their qualifications in that regard.  I

8  can't answer that.

9  Q.  Okay.  I think you previously told us that you're unaware of

10  any journal or study indicating that such a refined neurological

11  consultation would be required as a result of carbon monoxide

12  exposure; is that correct?

13  A.  I can't point to a specific article, but I can point to my

14  own experience and my knowledge in the field.

15  Q.  Okay.  You are licensed to practice medicine in Kentucky,

16  aren't you?

17  A.  No.

18  Q.  I believe you're licensed in New York, Pennsylvania, and

19  Florida, if I read correctly.

20  A.  That's correct.

21  Q.  So you have never practiced medicine here; is that correct?

22  A.  I have not.

23  Q.  So you have no personal knowledge in obtaining the treatment

24  recommended in the plan, assuming these patients stay in

25  Kentucky; is that right?

1  A.  I don't know what you mean by "personal."  Have I done the

2  charging?  Do I have a billing office here?  No, I don't.

3  Q.  Prior to November 1, did you consult with any Kentucky

4  physicians regarding costs involved in satisfying any of your

5  treatment recommendations?

6  A.  I don't know if I did or not.  Is that listed on my bills?

7  I don't remember if I did or not.

8  Q.  I did not see any phone charges to any UK doctors or other

9  Kentucky doctors.  Do you see anything on your invoice?

10  A.  I don't see that.

11  Q.  So then would it be correct that you had not consulted with

12  any Kentucky physicians prior to November 1, with respect to the

13  appropriate charges for any of your recommendations?

14  A.  I don't recall whether I discussed things directly with any

15  Kentucky physician.  I don't recall.

16  Q.  Okay.  Your general opinions about these plaintiffs depended

17  all on whether they suffered permanent injury?

18  A.  Pardon?

19  Q.  Your general opinions depended all on whether these

20  plaintiffs had suffered permanent injury?

21  A.  The question is, if I understand correctly, does my opinion

22  depend on whether they all have suffered permanent injury?

23  Q.  In other words, was it an assumption that you made in your

24  report that each of these gentlemen had suffered a permanent

25  injury when you made these recommendations?

1  A.  I didn't assume anything.  I looked at the records and made

2  up my own mind.  I didn't assume anything.

3  Q.  And did you conclude, then, based on your review of the

4  records that each of these gentlemen had sustained a permanent

5  injury?

6  A.  I probably did.  I'd have to look at each individual one.

7  I can't deal with the group.  I don't want to deal with the

8  group.  As a physician I deal with individuals, not with groups.

9  So if you want to address the question as to a specific

10  individual, I will be glad to try to answer it.

11  Q.  It is true that not every person exposed to carbon monoxide

12  suffers a permanent injury?  Correct?

13  A.  No, I think we have already discussed there is a huge

14  individual variation.  It depends on the amount of carbon

15  monoxide, and for how long.  So that there is -- you can't

16  generalize from an event.  You have to be specific to the

17  individual.

18  Q.  Okay.  You would agree that if these gentlemen had recovered

19  from their injuries they would not need to follow your life care

20  plan, if any of them had?

21  A.  If they had recovered, they wouldn't need -- no, I can't

22  agree with that.

23  Q.  So you would -- you would believe that even if these

24  gentlemen were no longer experiencing issues from their exposure

25  two years ago that they would still need to follow each of the

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**

**Leon Prockop, M.D., Cross Examination**

Volume 5-147

1   items in your life care plan?

2   A.  I don't know that they would have to follow each item, but

3   they would have to follow medical care.  Let me give you an

4   example, rather than speaking in generalities.

5       We all know that smoking cigarettes is not good for you.

6   There is a huge individual variation from person to person.

7   One person can smoke a pack of cigarettes for 40 years and

8   develop lung cancer.  Another person might smoke a pack of

9   cigarettes for 10 years and get lung cancer.  There's a big,

10  wide variation.

11      In my opinion, anybody who has smoked in their teens or

12  in their 20s or in their 30s should have a health checkup in

13  their 50s and 60s, x-rays of their chests, to be sure that

14  they didn't have delayed onset of lung cancer.  It happens.

15      Why not get a chest x-ray when you're older to make sure

16  you don't have lung cancer?  It happened.  So the person who

17  quits smoking at 20 or 22 feels good.  That doesn't mean they

18  shouldn't have a health checkup.  They should.  Because we

19  know smoking produces lung cancer and we want to pick up the

20  cancer before it spreads to the rest of the body and it's too

21  late.

22      So by the same token, even if these people weren't

23  complaining -- and they are complaining.  Even if they

24  haven't complained because of being exposed to carbon

25  monoxide, they should be checked.  Why not?  It's good

Case: 6:06-cv-00548-ART-EBA Doc #: 695 Filed: 12/15/08 Page: 148 of 184 - Page
ID#: 61232
Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
**Leon Prockop, M.D., Cross Examination**
Volume 5-148

1  medical practice.  It's good for individuals, people, it's

2  good medical practice.  So I disagree with your statement or

3  question.

4  Q.  Let me make sure I understand what you're telling me,

5  though.  Is it your opinion that any time someone experiences

6  symptoms from carbon monoxide exposure they should follow the

7  life care plan that you set forth in the general report?

8  A.  They don't have to follow this life care plan.  Again, it

9  would depend on the details of their exposure.  One, you would

10  have to validate that they were exposed to carbon monoxide.

11  Two, you have to validate for how long they were exposed to it.

12  Three, you have to validate that's no other explanation for

13  their symptoms.

14      So it's not so simple.  It's complex.  We have to think

15  about these things, we have to do tests to help us out.  You

16  just can't jump to a conclusion like that.

17  Q.  Okay.  The eight items that you set forth in your report, do

18  you distinguish an amount of exposure of carbon monoxide that

19  any of the 16 plaintiffs experienced in setting forth these

20  items?  Is there anywhere in this report that says, "With

21  respect to Mr. Dye, I believe he had 40 hours of exposure, and

22  therefore I recommend A, B, C; with respect to Mr. Sanborn, I

23  think he had 60 hours of exposure, I recommend D, E, and F?"

24      Is there anywhere in your report that distinguishes the

25  amount of exposure for these gentlemen?

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-149

1  A.  Well, if you look at Paragraph 2 on the second page of the

2  report, it gives a statement for the basis of my opinion.  It

3  was based on the analysis of the items, which are 12 above.

4      And that includes the report from the Environmental and

5  Public Protection Cabinet regarding Inspection

6  No. H008700406/309217198.

7      I looked at that report.  And that report, as far as I

8  know, applied for all of the individuals, all or in part.  So

9  each individual was considered when I read that report.

10      I looked at the owner's manual concerning the Miller

11  Bobcat 250.  Apparently, that Miller Bobcat 250, as far as I

12  know, was used in the procedure in the event, and all of the

13  people -- it was the same Bobcat that was there.  But all of

14  these people were working there.  So the details of that

15  Bobcat owner's manual pertains to everybody.

16  Q.  Right.  You have made reference to this Environmental and

17  Public Protection Cabinet report.  I think we commonly referred

18  to that in this case as the OSHA report; is that correct?

19  A.  I think so.

20  Q.  You recall in that OSHA report they were unable to identify

21  a particular amount of carbon monoxide in the freezer at the

22  time of the alleged exposure, correct?

23  A.  That's not -- you're misquoting.  My recollection, and I

24  would have to go back and look at that report for details.  My

25  recollection is that OSHA did not come to the facility at the

**Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-150

1   time of the exposure.  They came in January, about a month

2   later.

3   Q.  Right.  So they didn't have the opportunity to measure the

4   oxygen or the carbon monoxide content in the freezer room at the

5   time or near the time when these men were exposed?

6   A.  They came a month later.

7   Q.  I understand.

8   A.  And they still found carbon monoxide.  A month later, it was

9   still there.  They reported it was still there.

10      So we can only extrapolate back.  If it was still there a

11  month later it had to be higher, had they come during the

12  time.  But they didn't come.  I don't know whether they

13  weren't called or they were called and didn't come.  I don't

14  know that.

15      But I know they didn't measure the carbon monoxide until

16  January, a month later.

17  Q.  If there was expert testimony given in this case that

18  indicated whatever readings OSHA found at that time were not

19  reflective of what had been in the freezer at the time of the

20  exposure, you would disagree with that?

21  A.  I missed your question.  Sorry.

22  Q.  If there was expert testimony in this case that said

23  whatever readings OSHA found a month later had no bearing on

24  what was actually in the freezer at the time of the exposure,

25  you would agree with that?

**Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-151

1  A.  I don't think anybody would say that.  It had a bearing.  It

2  had to be higher.  It couldn't be lower.  It had to be higher

3  than what they found.

4  Q.  Okay.

5  A.  The fact that they found it means it had to be higher a

6  month earlier.  It had some bearing, but it didn't tell us

7  exactly what it would be, had they bothered to measure it at

8  that time.

9     We know it had some bearing.  They didn't get a reading

10  of zero.  They didn't get a reading of incidental.  We know

11  they got a reading.  It had to be higher.  It had some

12  bearing.

13  Q.  Opinion No. 3, discussing a neuropsychological assessment

14  initially and every five years for life.  Do you see that?

15  A.  I see that.

16  Q.  If another doctor testified that repeat neurological exams

17  is a clinical tool that has no value years after exposure, you

18  would disagree with that expert; is that correct?

19  A.  I don't want to comment on broad statements like that.  Who

20  is saying that, and why are they saying that?  What is the basis

21  of their opinion?  I have given the basis of my opinion, having

22  seen a lot of carbon monoxide victims and knowing there is a

23  delayed neuropsychiatric opinion.  I don't know who you're

24  talking about.  Who is the expert you're talking about?

25  Q.  I believe we will hear from Dr. Thom, and he had testified

1   previously that neuropsychological exams two years after the

2   incident have no value.  You would disagree with that; is that

3   right?

4   A.  I would like to see that in writing.

5   Q.  Okay.  In your November 1 report, you didn't identify any

6   specific plaintiff as experiencing cardiac complaints, correct?

7   A.  Well, we've already discussed that I read their depositions.

8   And in the three-page letter I did not comment on whether, in

9   any of their depositions, they -- or in their medical records

10  they went into cardiac symptoms.

11  Q.  Right.

12  A.  It's not mentioned in this report.

13  Q.  Your report --

14  A.  The fact it was not mentioned doesn't mean it wasn't there.

15  Q.  Your report doesn't mention by name any plaintiff that you

16  believe may have had preexisting cardiological conditions; is

17  that correct?

18  A.  That's correct.

19  Q.  And I believe you told us that your reference before of a

20  refined cardiac condition is purely prophylactic; is that right?

21  A.  I don't believe I used the words "purely prophylactic."

22  Q.  Okay.  If you could look at Page 93 of your deposition.

23  A.  Page what?

24  Q.  Page 93 of your deposition, sir.

25  A.  All right.

1   Q.  If you could read, starting at Line 1 -- unless the Court

2   prefers I read it -- of your remarks.

3   A.  Quote:  "As an example, in the life care plan I indicate

4   No. 4, comma, Refined Cardiological Consultation, and then list

5   other cardiologic tests that need to be done.  This would

6   support the recommendation that even though the individuals

7   themselves at the moment may not be complaining about heart

8   palpitations or chest pain or whatever, they should be

9   evaluated."

10      "Because they might have what we call subclinical heart

11  damage.  Maybe their heart is damaged, but they're not aware of

12  it.  They are not complaining about it, but let's be sure."

13      Because we know from the literature, as I cited here, that

14  carbon monoxide can produce heart damage.  So let's look at it.

15  Do prophylactic work."  End of quotation marks,

16      I didn't say it's purely prophylactic; but I said it is,

17  in part, prophylactic.

18      The person, as I stated there -- I think clearly, I hope

19  clearly -- a person may have heart damage and may not be

20  aware of it, so we want to test and be sure that they don't

21  have heart damage.  People have lots of problems that they're

22  not aware of, they just overlook it or they are not aware of

23  it.  We know that carbon monoxide produces heart damage, so

24  why not look at it?

25  Q.  So this opinion is based on speculation, not within a

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-154

1  reasonable degree of medical probability, correct?

2  A.  It's not speculation.  I don't speculate.  It's my opinion.

3  Q.  You were unable to say when you prepared your report, within

4  a degree of medical probability, that all these men had

5  subclinical heart damage.  Correct?

6  A.  How would I possibly know that without the tests being done?

7  I don't have divine insight.  That's why I wanted to have the

8  tests done to determine if they had heart damage.  How would I

9  know that if the tests weren't done?

10  Q.  Isn't it true that Issues 4 through 6 dealing with heart

11  issues would be better evaluated by a cardiologist?

12  A.  It depends on the cardiologist.  You're making a broad

13  general statement.  I'd like to know who you're referring to.

14  Q.  You have previously agreed with us that cardiologists would

15  be better qualified to determine a treatment plan for patients

16  suffering from heart problems?

17  A.  In general, cardiologists would be better.  However, there

18  are still cardiologists practicing who were trained in Timbuktu,

19  who aren't Board certified, who don't have qualifications, who

20  might be 110 years old, maybe they don't have experience.  I

21  can't make a blanket statement about cardiologists.  You have to

22  refer to specific cardiologists.

23  Q.  You have previously told us there is no database, as far as

24  you know, to show when heart symptoms or heart damage are going

25  to show up after carbon monoxide exposure.  Correct?

1   A.  As far as I know, there's not, because it hasn't been

2   studied.

3   Q.  So you couldn't say within a degree of medical probability,

4   based on what you reviewed for your report, that any of these

5   plaintiffs are ever going to have heart problems; is that right?

6   A.  I can say, based on my own experience, it's possible.  My

7   opinion is that it's probable.

8   Q.  Okay.  Opinion No. 7, frequent visits to a general

9   physician.  I think you previously told us that the need to see

10  a physician would vary, depending on the individual.  Correct?

11  A.  That's correct.

12  Q.  How familiar are you with London and the surrounding

13  counties?

14  A.  I don't know what you mean by that question.  How familiar

15  am I with it?  It's part of the United States.  It's another

16  state.  I've been in this state.  What do you mean by how

17  familiar am I?  I don't know every rock, every leaf in this

18  county or in the state.

19  Q.  Let me clarify for you, sir.  How familiar are you with the

20  medical treatment availability here in this area?

21  A.  I'm somewhat familiar.  I know it's a highly sophisticated

22  and civilized state, in a highly sophisticated and civilized

23  country.  So the availability of medical care is excellent here,

24  as far as I know.

25  Q.  Do you have an opinion with respect to whether the doctors

1  in this area could provide the same level of care as, say, the

2  doctors in Lexington?

3  A.  I can't answer that without knowing their qualifications and

4  who you're referring to.

5  Q.  You had mentioned earlier in your testimony your belief that

6  a couple of gentlemen, Messrs. David Pennington and Sammy Faris,

7  might develop Parkinsonian-type conditions.  Do you recall

8  telling us that?

9  A.  Yes, I recall that.

10  Q.  You would agree with me that you did not make any specific

11  reference in your report to either of those gentlemen developing

12  those types of conditions.  Correct?

13  A.  I didn't in this report, no.

14  Q.  You also did not make any reference in your report with

15  respect to life care medical needs of any of these gentlemen

16  having to spend any time in a nursing home.  Correct?

17  A.  I did not mention anything about a nursing home.  I did say,

18  in the third paragraph in the last quotation marks:  "It should

19  be understood that life expectancy and work life expectancy of

20  these individuals will be significantly" -- "will be reduced

21  significantly."

22       MR. PAGE:  Move to strike.  Nonresponsive.

23       THE COURT:  Please wait for the question and answer the

24  question that's asked.  Thank you.

25     Strike that answer, ladies and gentlemen.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Cross Examination

Volume 5-157

 1  BY MR. PAGE:

 2  Q.  Do you recall earlier discussing a number of facts that you

 3  took into consideration in discussing the type of future medical

 4  treatment that should be received?  Do you recall that

 5  discussion?

 6  A.  I'm not sure what you're referring to.  Maybe you can read

 7  it off, please.

 8  Q.  Sure.  If you need me to refer you to your deposition,

 9  starting at 110, we talked about degree and nature of damage

10  being an element.

11  A.  Page 110?

12  Q.  I think that's where the discussion began.

13  A.  Okay.  I have that page.  What's your question, please?

14  Q.  Do you recall us discussing a number of factors that you

15  believed were important in evaluating appropriate future medical

16  treatment?

17  A.  Yes, we did discuss factors.

18  Q.  And I just want to run through them for the jury's benefit

19  real quickly.  I had No. 1, degree and nature of damage.

20  A.  Yes.

21  Q.  Age of the individual, I had for No. 2.

22  A.  I don't see that stated in this depo, but it makes sense to

23  me.

24  Q.  Okay.  You mentioned comorbid conditions; in other words,

25  other problems that may be exacerbated by the problem.  Do you

1   recall that?

2   A.  Yes.

3   Q.  Support systems or lack thereof?

4   A.  I don't see that specifically here, but it makes -- oh, it's

5   on the next page.  It's Page 113.

6   Q.  Okay.

7   A.  Yes, comorbid conditions make a difference.

8   Q.  Okay.

9   A.  Support systems make a difference.

10  Q.  And evaluation of prior medical history?

11  A.  Pardon?

12  Q.  And evaluation of prior medical history?

13  A.  Yes.

14  Q.  Okay.  Let me ask you about that for a moment.  You have

15  seen these medical reports.  But doctor, have you seen any of

16  these particular plaintiffs' prior medical history?

17  A.  I saw what I mentioned I saw.

18  Q.  Would it not be important to you, in trying to determine a

19  future life plan, that particular point; i.e., what their past

20  medal history was?

21  A.  It might be, depending on what the prior medical history

22  might be.

23  Q.  For example, Mr. Wells, if Mr. Wells had medical history

24  reflecting that he had prior heart palpitations before and prior

25  treatment for that kind of issue, that might be something that

1  you would want to know before formulating your life care plan;

2  is that correct?

3  A.  That would make it even more important that he had the

4  cardiological evaluation.

5  Q.  The last two on the list, occupation life goals.  I think

6  that's Page 116.  Do you recall talking about that?

7  A.  Page 116.  What is your -- what's your question again?

8  Q.  As far as the factors that go into consideration, you

9  referenced occupation and life goals.  Do you recall that?

10  A.  Yes.

11  Q.  And finally, medications available in the area, I believe.

12  A.  I can't find reference to "medications available in the

13  area."

14  Q.  That's Page 118, I believe.

15  A.  Page 118.  "If" -- I'm quoting from what I said.  "If you

16  are constructing a life care plan in the country or an area of

17  the world where no medications, or very few medications are

18  available, then you don't have to factor -- you don't have to

19  factor into your life care plan those medications."

20      Well, that doesn't pertain to Kentucky.

21  Q.  Okay.  Now, I think you told us that those were factors that

22  you considered in formulating this life care plan, correct?

23  A.  Yes.  As a matter of routine, I would have considered those

24  things.

25  Q.  Okay.  But yet, in setting forth the eight items you don't

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-160

1   distinguish between any of the plaintiffs in taking the factors

2   into consideration, correct?

3   A.  We have gone back and forth on this.  This was a life care

4   plan for each individual, the minimum each individual would

5   need.  That's clearly stated in my report.

6   Q.  With respect to your opinion on Mr. Pennington, did you not

7   make any mention of your concern for Mr. Pennington to have --

8   Pennington to have either Parkinson's or Alzheimer's in the

9   future in this report, correct?

10  A.  Are you referring to David Pennington or Denver Pennington?

11  Q.  David Pennington, sir.

12  A.  David Pennington?  Let me look at my report.

13  Q.  I believe he's one of the two you indicated you believed had

14  a future risk of Alzheimer's or Parkinson's.

15  A.  This is the file folder on David Pennington.  What is your

16  question, again, please?

17  Q.  My question was whether your November 1 report made any

18  specific reference to Mr. Pennington being at risk for either

19  Alzheimer's or Parkinson's.

20  A.  I think we discussed this before, this morning in the report

21  by Dr. Tucker.

22  Q.  Right.

23  A.  I don't want to repeat myself, but, quotation marks:  "He

24  says he forgets whole days.  He does not remember what he did.

25  His children, although separated, feel that he's just lazy."

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Cross Examination**

Volume 5-161

 1    So that's support for the Alzheimer's consideration I made

 2    in my life care plan.  It would be either Parkinson's disease or

 3    Alzheimer's disease, or a combination of the two.  So we have a

 4    predicate, using your terminology, of the Alzheimer's disease as

 5    recorded by Dr. Tavaris.  At age 35, David Pennington says he

 6    forgets whole days.  He doesn't remember what he did.  Another

 7    quotation in the line above it, he has a lot of trouble with his

 8    memory.

 9    So at age 35, he has a lot of trouble with his memory.

10    So I use that for the basis in constructing the opinion that

11    by age 50 he will have Alzheimer's disease.  That belief is

12    based on my experience with Alzheimer's disease and carbon

13    monoxide and the combination of the two.

14    Q.  Dr. Prockop, don't you -- wouldn't you agree with me that

15    Dr. Berger or Dr. Houff or even Dr. Tucker, who have actually

16    treated and examined this patient, would be in a better position

17    to determine whether he's at risk for those conditions than you,

18    in Florida, reviewing a single record from Dr. Tucker?

19    A.  Well, I suspect they weren't asked about this or thought

20    about it.  My opinion, although I respect all three of them, is

21    that they didn't think about the long term of these individuals.

22    You would have to ask them about that.  Don't ask me, please.

23    Q.  Let me ask you a little bit about Mr. Wells.

24    A.  Mr. Wells.

25    Q.  Do you recall telling us earlier that you did not know

1  whether his shaking was in fact a tremor Parkinsonism, or not?

2  A.  Sorry for the time it takes to find the records.

3  Q.  No problem.

4  A.  But I want to speak to the individuals, not off the top of

5  my head.

6      Mr. Mills or Mr. Wells?

7  Q.  Mr. Wells.

8  A.  Mr. Wells was the individual I did not have the file on.

9  Q.  Counsel gave you those records?

10  A.  Yes, counsel gave me those records in a file folder.  Could

11  I have them again?

12  Q.  I assume you have them there.

13  A.  Okay.  There they are.

14      Dr. Berger reported, and I mentioned this before, he has

15  a slight terminal tremulousness that was noted in his

16  outstretched outer extremities.

17  Q.  Right.

18  A.  Dr. Berger does not say this is Parkinsonism, Parkinson's

19  disease; no, he doesn't.

20  Q.  You recall personally saying you did not know yourself

21  because you had never examined him, as far as you knew.  Do you

22  recall saying that?

23  A.  I'm not surprised that I said that.  I don't recall

24  specifically, but I'm not surprised.

25  Q.  And do you recall agreeing with us earlier there's no

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-163

1  specific reference in your November 1 report to Mr. Wells

2  suffering from either Parkinsonism or delay delayed neurological

3  sequelae?

4  A.  In my report of November 1, 2007, there's no specific

5  statement with respect to Mr. Wells and his potential for

6  Parkinson's disease, no.

7         MR. PAGE:  Thank you.

8      Just a moment, your Honor.

9      Thank you, Dr. Prockop.

10        THE WITNESS:  You're welcome.  Thank you.

11                  REDIRECT EXAMINATION

12  BY MR. RUSSO:

13  Q.  Dr. Prockop, Mr. Page was asking you about Mr. Wells, and I

14  think he suggested that Mr. Wells had heart palpitations prior?

15  A.  Yes, he did say that.

16  Q.  He asked you to assume that, in carbon monoxide poisoning,

17  when it comes to cardiology injury or heart injury, what does it

18  mean to you as a physician if a patient has any kind of cardiac

19  problems before and is then exposed to carbon monoxide?

20  A.  Well, that would mean to me that they have the possibility

21  or the probability of preexisting disease and that the carbon

22  monoxide would be more potent in its effect, or potentially more

23  potent in its effect.

24      In other words, if you have been hit on the head once,

25  then you're hit on the head a second time, the first hit on

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**

**Leon Prockop, M.D., Redirect Examination**

Volume 5-164

1  the head makes you more sensitive to the second hit on the

2  head.

3      That's a fact of nature, so to speak.

4  Q.  Well, if we have two patients here, A and B, and A has a

5  previous cardiac problem; it might be palpitations, it might

6  have been a heart attack, it might have been arteriosclerosis,

7  plaque, shortening the arteries down.  Which person will have

8  the greatest impact on his heart from the carbon monoxide

9  poisoning, the one who has no cardiac injury or the one who has

10  previous cardiac injury?

11  A.  The one who has previous cardiac injury.

12  Q.  I think Mr. Page asked, I think one of his first questions

13  was, "Do you have training as a cardiologist?" and your answer

14  was you did not.  When it comes to, however, carbon monoxide

15  poisoning and cardiac injury, could you tell the jury how much

16  experience you have with that?

17  A.  The question is, again, what?

18  Q.  Mr. Page asked you if you were a cardiologist.  I'm asking

19  how much experience you have with cardiologic injury in the

20  context of carbon monoxide poisoning.

21  A.  I've lots of experience.  Almost everyone that I've

22  evaluated neurologically for the presence or absence of brain

23  damage from carbon monoxide, if they have brain damage, most of

24  them also have cardiac damage.  In fact, sometimes people have

25  no brain damage, but in that particular individual their heart

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Redirect Examination**

Volume 5-165

1   is more sensitive and they have heart damage without brain

2   damage.  The two are usually in parallel, but not necessarily

3   so.  So if you have somebody with carbon monoxide exposure, you

4   should always evaluate both the brain and the heart.  It just

5   makes sense to do that.

6       May I give you an example?

7   Q.  Sure.

8   A.  Away from carbon monoxide, one of my responsibilities is to

9   teach stroke to our students and residents.  Stroke is a problem

10  with blood vessel circulation to the brain.  Most of the people

11  with strokes also have heart disease.

12      So if I saw somebody coming in with a stroke and I didn't

13  get them evaluated with their heart, it would be silly.  I

14  wouldn't be doing my job.  I wouldn't be a good doctor.

15      Every time somebody comes in with a stroke, we always get

16  their heart evaluated.  Sometimes it's normal, but usually it's

17  abnormal, so you always want to get both of them evaluated,

18  because you don't want to miss a heart problem that might be the

19  cause of a stroke problem.

20      So every time when I teach the students and residents

21  about stroke, we always get a heart workup.  Even though I am

22  not trained as a cardiologist, because we have evaluations of

23  our stroke people all the time, I'm quite familiar and

24  comfortable with cardiology.

25  Q.  Mr. Page asked you the questions about unconsciousness.  Do

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-166

1  you recall that?

2  A.  Yes, I recall that.

3  Q.  He also asked you about a case you handled in 1999 where

4  there were nine people carbon monoxide-poisoned.  Do you recall?

5  A.  Yes, I recall.

6  Q.  Were there Group A ant Group B?

7  A.  Yes, there were two different groups.  There were people in

8  the apartment where the carbon monoxide was in its highest

9  concentration, and there were people in the apartments nearby.

10  The people in the apartments nearby were one group, and the

11  people in the apartment itself where the carbon monoxide was

12  venting itself was another group.  There were two groups.

13  Q.  In that case, did you evaluate and treat a police officer?

14  A.  Yes, I did.

15  Q.  And did you evaluate and treat a lady that was in the middle

16  of her Ph.D. program?

17  A.  Yes, I did.

18  Q.  And did either of those patients ever become unconscious?

19         MR. PAGE:  Objection, your Honor.  Beyond the scope.

20         THE WITNESS:  Yes, I remember those cases.

21         THE COURT:  Overruled.  You have to wait for me to rule

22  on the objections.

23         THE WITNESS:  Excuse me.

24         THE COURT:  That's okay.  Go ahead.

25         THE WITNESS:  I remember the individuals quite well,

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-167

1    because I was very concerned about them.  The first person, the

2    lady of the two you mentioned, was a nurse with a bachelor's

3    degree in nursing and was working on her Ph.D.  She was in an

4    apartment next door to the apartment that was really

5    contaminated.  She was exposed to carbon monoxide.

6        She would go to the emergency room and say, "I have a cough,

7    fever, et cetera, et cetera," and she was diagnosed as having

8    the flu.

9        The third time this happened she figured she didn't get

10   the flu three times in a row.  She had the Health Department

11   come in and check the carbon monoxide concentration, and it

12   was elevated.

13       She was never unconscious, but she is brain damaged.  She

14   never was able to finish her Ph.D.  She lost 10 to 20 percent

15   of her brain cells, she can't do it anymore.  I don't know

16   what she's doing, but she can't finish her Ph.D. -- and that

17   was her aspiration -- because she had too much damage.

18       The police officer was a sad story.  Here was a man that

19   had been a Marine.  He had been in the Marine Corps, he was a

20   police sergeant; was a big, tough, wonderful man.  After

21   being in the Marines he joined the Miami Police Department,

22   and he was in a patrol car.  He would take the patrol car and

23   go around the city.

24       He was in an apartment next to or close by to an

25   apartment that was really contaminated.  Anyway, he never was

1   unconscious, but his memory was changed.  And he developed

2   something that was very interesting; interesting, but sad.

3   He had what's called medically geographic dislocation.  He

4   would get in his patrol car and he would have to go here,

5   there, or the other place, and he would lose his way.  He

6   couldn't find his way down streets where he had been many

7   times.

8       So they reduced him to sitting at a desk in the police

9   department, answering the phone.  It drove him crazy, because

10  he wasn't a desk kind of guy.  He was a guy that liked to get

11  in the patrol car and go out and get the bad guys.

12      But he couldn't do that because he would lose his way.

13  He would lose his way in the City of Miami, where he had been

14  many, many times.  He never lost consciousness, but he was

15  brain damaged.

16  Q.  When Mr. Page suggests that unconsciousness is a sentinel

17  event, it is, correct?

18  A.  It happens, but it's not necessary.

19  Q.  But it's not necessary for unconsciousness to occur to cause

20  a permanent injury?

21  A.  No, definitely not.

22          MR. BENTLEY:  Objection.

23          THE COURT:  Sustained.  Strike that answer.

24  BY MR. RUSSO:

25  Q.  What if any relevance is unconsciousness to permanency?

1   A.  There's not a direct connection.  Most of the time, if you

2 have been unconscious, it means you have really, really bad

3 brain damage.  But if you haven't been unconscious, it doesn't

4 mean that you haven't had brain damage.

5   Q.  Mr. Page asked you the question about whether you knew that

6 Mr. Marcum had a normal MRI and a normal EEG.  And I think you

7 didn't have the EEG with you.  But let's assume for the moment

8 that he has norm the MRI, just for instance.

9     Based upon your experience with carbon monoxide poisoning,

10 do you recall whether the nurse or the police officer that you

11 just talked about had normal MRIs?

12   A.  They had normal MRIs.  And just because you have a normal

13 MRI doesn't mean that -- does not mean that you haven't been

14 brain damaged.  If you have an abnormal MRI it means you have

15 been really bad brain damaged.  But a normal one does not mean

16 that you're normal.

17   Q.  When it comes to your experience with carbon monoxide

18 poisoning, and you're consulting with other doctors who call

19 you, does that happen in your practice where other doctors call

20 you to get advice about carbon monoxide poisoning and how to

21 treat patients?

22   A.  Yeah, they call or e-mail.  The current rage is to e-mail,

23 but I would rather talk to somebody on the telephone.  Sometimes

24 we play phone tag.  But I did talk to people on the phone or

25 respond to e-mails.

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-170

1   Q.  Mr. Page asked you about the facts of the case.  And I

2   believe you went through at the beginning of your testimony here

3   today some of the materials that you received from my office.

4       Did you receive Dr. Spiller's reports?

5   A.  Yes.

6   Q.  Dr. Rice?

7   A.  Yes.

8   Q.  Dr. Weisman?

9   A.  Yes.

10  Q.  And did they discuss the way that this carbon monoxide

11  accident caused a mechanical injury, if you recall?

12          MR. BENTLEY:  Objection, your Honor.  Leading.

13          THE COURT:  What's the basis?  I'm sorry?

14          MR. BENTLEY:  Leading.  Does it cause a mechanical

15  injury, if you recall?

16          THE COURT:  Overruled on that ground.  Anything else?

17          MR. BENTLEY:  That's all I can think of right now.

18          THE COURT:  Okay.

19  BY MR. RUSSO:

20  Q.  In other words, what information did you get from those

21  reports about the way this injury occurred?

22  A.  I don't have the reports in front of me, but my recollection

23  is that they all contributed to my knowledge as to how the

24  exposure occurred.  And I documented that exposure criteria or

25  details in my next paragraph.  All of the reports contributed to

1    that boiled-down paragraph.

2    Q.  Now, in formulating your proof, Mr. Page has asked you a

3    series of questions about a group.  When you performed your

4    evaluation and you provided your testimony today, did you

5    evaluate each one of these fellows on an individual basis, based

6    upon their past medical records, and provide an individual

7    future care plan for them?

8    A.  Yes.  It would have been done on an individual basis.

9    Q.  And then, when it got to minimum medical, what if anything

10   did you provide in terms of what the group would need?

11   A.  Well, I provided a minimum for the individuals in this

12   group.  And the reason the term "group" comes up in my mind is

13   that one of the principles of toxicology and neurotoxicology is

14   that you have to -- you don't have to, but it's helpful to have

15   an epidemiology.  In other words, if you have 100 people in a

16   room and one person has a headache, you can't blame it on the --

17   you're loath, you're hesitant to blame it on something in the

18   environment because at least 60 percent of them should have it.

19        That's why it's important to think of individuals, that's

20   number one, and also the group, for the diagnosis to be more

21   specific to carbon monoxide.

22   Q.  Now, when it comes to medical doctor charges in Florida,

23   Kentucky, or in different states here, are there standard

24   charges with which you are familiar that are charged around the

25   country, if that's true, for a family doctor visit, a neurology

 1   visit, an MRI; those kinds of things?

 2          MR. PAGE:  Object.  Calls for speculation.

 3          THE COURT:  Based on your knowledge, but also, it is a

 4   compound question.  Why don't you break it down, and also

 5   establish that he has a base of knowledge upon which to give

 6   this opinion.

 7   BY MR. RUSSO:

 8   Q.  You're licensed to practice medicine in New York?

 9   A.  Yes.

10   Q.  Pennsylvania?

11   A.  Yes.

12   Q.  Florida?

13   A.  Yes.

14   Q.  You have practiced medicine in New York, Pennsylvania,

15   Florida?

16   A.  Yes.

17   Q.  And you have practiced medicine and also given lectures in

18   other states, as well?

19   A.  Yes.

20   Q.  Do you have a general knowledge of what a practice is when

21   it comes to a family physician?

22   A.  Yes.

23   Q.  Neurological consultation?

24   A.  Yes.

25   Q.  MRIs?

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-173

1  A.  Yes.

2  Q.  And the type of cardiology evaluations that you prescribed

3  in the future for these fellows?

4  A.  Yes.

5  Q.  And is that where you derived the prices for the medical

6  expenses that you talked about?

7  A.  Yes.  I might add that many of these charges are dictated by

8  what the insurance companies will pay.  That's nation-wide.

9  They are pretty standard across the country.

10  Q.  When it comes to the age of these fellows, and the results

11  with regard to the neuroimaging; that is, the MRIs, did you take

12  that into consideration when evaluating what the MRIs showed

13  about these young men?

14  A.  Yes, I did take them into account.  If they had all been,

15  say, 80, that would be one thing that would be normal with

16  respect to the MRI.  But since they are 20 or 30, that's

17  entirely different.  So I took their age into consideration.

18  Q.  You spend how much of your time in a given week dealing with

19  issues of carbon monoxide poisoning?

20  A.  That's a difficult question.  The answer is difficult,

21  because some weeks it might be an hour and some weeks it might

22  be 30 hours.  So it varies from week to week and month to month.

23  It depends on whether I'm conducting a research project, a

24  clinical research project, whether I'm writing a paper.  And it

25  depends on my referrals from other doctors.  So it varies

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-174

1  considerably, but I do spend a lot of time on carbon monoxide in

2  general.

3       MR. BENTLEY:  Your Honor, objection, five-minute rule.

4       THE COURT:  That's for recross.  Move on, finish.

5  MR. RUSSO:

6  Q.  And when you evaluate patients for carbon monoxide

7  poisoning, do you bring to the table how many years of

8  experience?

9  A.  Well, I have been at the University of South Florida for 35

10 years.  I won't tell you my experience, it will give away my

11 age.  But I have been there for 35 years.

12 Q.  And has your interest in carbon monoxide poisoning given you

13 years and years of experience, both from writing about it,

14 seeing patients about it, receiving referrals from other doctors

15 about it?

16      MR. PAGE:  Object, leading.

17      THE COURT:  Sustained.

18 BY MR. RUSSO:

19 Q.  What is your basic, fundamental experience with carbon

20 monoxide poisoning?  That's my last question.

21 A.  I see lots of carbon monoxide poisoning.  Some doctors don't

22 see any; either they don't see it or it's not there, I don't

23 know which.  But I'm referred cases and I see the cases.

24 Q.  And you have written and published peer-reviewed articles

25 about it?

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination
Volume 5-175

1  A.  Yes, many.  I don't want to be immodest, but I have written

2  a lot of articles on the topic.

3  Q.  And do you consider yourself an expert in carbon monoxide

4  poisoning amongst other physicians?

5  A.  Well, I will let other people speak for me.  My peers and

6  colleagues say I'm an expert.

7  Q.  And have the opinions that you've provided today been given

8  to us within a reasonable degree of medical probability?

9  A.  Yes, they are.

10          MR. RUSSO:  That's all I have.

11                    REDIRECT EXAMINATION

12  BY MR. MAZUR:

13  Q.  Doctor, do you have the records for Greg Wells there?

14  A.  Yes, I do.

15  Q.  Super.  Mr. Page had asked you about delayed neurological

16  sequelae, I'm just going to call it DNS, because I don't know if

17  I can say it three times right.

18      If you will take a look for me at the April 11, 2006,

19  record for Mr. Wells by Dr. Berger.

20  A.  April -- I have one for June 13th for Dr. Berger.

21  Q.  It's towards the back, if that helps.

22  A.  August 15, June 21.

23  Q.  Keep going, I promise it's there.

24  A.  April 11th, yes.

25  Q.  Okay.  If you would go to Page 3 of that report for me, and

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-176

1   look at the third paragraph, sir.

2   A.  Sure.

3   Q.  When you were reviewing these records, did you note anything

4   with regard to any examinations Dr. Berger did with regard to

5   ocular mobility?

6   A.  Yes.

7   Q.  And what did you find?

8   A.  It says "Ocular:  I'm quoting.  "Ocular mobility was

9   normal," quotation marks.

10  Q.  And if you could take a look now at the June 21, 2006.

11  Actually, let me step you back a second.  In reviewing the April

12  11, 2006 record, did you note anywhere where they found a

13  problem with Mr. Wells' gait or imbalance?

14  A.  The examination revealed perfectly normal tone, strength,

15  and bulk.  His balance was good on a narrow base.  So he didn't

16  find anything, no.

17  Q.  If you could go to June 21 of '06 for me?

18  A.  June 21, '06, he says --

19  Q.  You need to take a look at the first page, fourth paragraph.

20  A.  "His balance moving backward is markedly impaired."  So

21  there has been a change.  He went from normal balance to

22  abnormal balance.

23  Q.  If you recall back at the April 11, 2006, record by

24  Dr. Berger, did he note any tremors?

25  A.  No.

1    Q.  Okay.  And in the June 21, 2006, did he note any tremors?

2    A.  No.

3    Q.  If you look at Page 2.

4    A.  Page 2?

5    Q.  June 21, 2006?

6    A.  Oh, yes, there's slight tremulousness of the outstretched

7    upper extremities, but no head or neck tremor was noted.

8    Q.  Doctor, my question for you is, would the change in

9    Mr. Wells' condition, from not having tremors, not having a

10   balance issue to, in June of 2006, having tremors, having a

11   balance issue, be delayed neurological sequelae, DNS?

12   A.  Probably so.  There's been a change, there's been a

13   deterioration.  He's getting worse.

14   Q.  In your review of Mr. Wells' medical records from Dr. Berger

15   and Dr. Tucker, did you note that there was any indications of

16   cognitive disabilities and memory problems?

17   A.  Well, it says on his report of June 13th, 2007, "He

18   continues to experience memory impairment."  So it was present

19   previously, and now it's still there.

20   Q.  Is that normal for a 30 year old?

21   A.  No, it's not normal.

22   Q.  Okay.  And earlier, you spoke about some individual other

23   plaintiffs who were 35 years old and were displaying cognitive

24   difficulties and memory problems?

25   A.  That's correct.

Asher v. Unarco, 6:06-cv-2548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-178

1  Q.  Is Mr. Wells in the same category as they are, at increased

2  risk of developing early-onset Alzheimer's or dementia?

3  A.  In my opinion, yes.

4  Q.  As a result of that, would he require additional care and

5  medical treatment in the future because of that?

6  A.  My opinion is yes.

7  Q.  And what type of treatment and care in the future would he

8  require, and what did you determine the cost for that care to

9  be?

10      MR. BENTLEY:  Asked and answered.

11      THE COURT:  I'm sorry.

12      MR. MAZUR:  It wasn't asked about Mr. Wells previously.

13      THE COURT:  Approach.

14   (The following proceedings were held at the bench outside

15  the presence of the jury.)

16      THE COURT:  If it wasn't asked, why isn't it beyond the

17  scope?

18      MR. MAZUR:  He brought up the delayed neurological

19  sequelae.

20      THE COURT:  That was in direct response to direct

21  examination.  Why wasn't this asked initially?

22      MR. MAZUR:  Why wasn't it asked initially?  That's a

23  good question, your Honor.  I honestly can't tell you what I

24  asked initially.  I'm following up on it based on what I had in

25  my notes.  If it's beyond the scope, I'm fine with that.

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Redirect Examination

Volume 5-179

1          MR. RUSSO:  Mr. Page went through that whole scenario

2    with Greg Wells with Dr. Prockop; even in the report, you don't

3    mention Greg Wells.

4          THE COURT:  Why should I open it up for this?

5    Everything before that was fine, but how is the amount of --

6          MR. MAZUR:  Because he gave it for everybody else.  I'm

7    trying to get in the same number to close up the gap.  If I

8    can't get the number in, that's fine.

9          THE COURT:  I will allow it, but I will allow it as

10   limited recross.

11         MR. MAZUR:  Thank you, your Honor.

12      (Bench conference was concluded, at which time the following

13   proceedings were held in the presence of the jury.)

14         MR. MAZUR:  Could you read back my question, madam court

15   reporter, because I totally forgot it.

16      (Requested portion of the record was read.)

17         THE WITNESS:  Based on the further review of his record,

18   he's going for normal cognition, intellectual function to

19   abnormal.  I read it further while we were waiting.  It says

20   here, as an example, Dr. Berger says, "For instance, he needs

21   his wife to give him directions to the University of Kentucky

22   for today's visit.  He has been here many times, and this is

23   quite unusual."

24      So he's really having the geographic dislocation that I

25   mentioned regarding the police officer.  And this is

1  progressive.  So it would be my prediction that, in all

2  probability, he will develop dementia of the Alzheimer's type

3  when he's 50 and he will probably be incapacitated when he's

4  60.

5  BY MR. MAZUR:

6  Q.  Is that within a reasonable degree of medical probability?

7  A.  Yes, it is.

8  Q.  And what would the future medical costs be, if you know,

9  that would be associated with it?  Can you make an estimation

10  within a reasonable degree of medical probability?

11  A.  I think the recommendations on these plans was $720,000.

12      MR. MAZUR:  Thank you, doctor.  I have no further

13  questions.

14                  RECROSS EXAMINATION

15  BY MR. PAGE:

16  Q.  Really quick, Dr. Prockop.  If I understand correctly,

17  before you walked in here today you didn't have an opinion one

18  way or the other with respect to whether Mr. Wells has

19  Alzheimer's, correct?

20  A.  I hadn't addressed that issue.  It didn't come up.  It

21  wasn't asked in questions.

22  Q.  Obviously, it certainly wasn't part of your November 1

23  report and wasn't part of your opinion before you sat up there

24  today; is that correct?

25  A.  I wasn't asked the questions before, in the deposition that

**Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)**
**Leon Prockop, M.D., Recross Examination**

Volume 5-181

1  I gave that you were there.  I wasn't asked the question, so it

2  didn't come up.

3  Q.  All right.  Thank you.

4     Now, you were asked by counsel for Mr. Wells about a report

5  from Dr. Berger dated April 11, 2006.  I think you still have

6  that in front of you?

7  A.  Yes.

8  Q.  And in that report, Dr. Berger indicated that Mr. Wells'

9  gait was fairly -- his balance was good, didn't have particular

10  gait issues, as I recall you said.  Right?  Motor exam revealed

11  perfectly normal tone, strength, and bulk.  Balance was good on

12  a narrow base, standing on one leg or the other?

13  A.  Yes, he had no difficulty with his walking, according to

14  this report.

15  Q.  Who was this letter written to?

16  A.  Pardon?

17  Q.  Who was this letter written to?

18         MR. MAZUR:  Objection, your Honor.

19         THE WITNESS:  Who was what?

20         THE COURT:  Wait?  Basis, rule?

21         MR. MAZUR:  I apologize.  It's a former ruling, your

22  Honor.

23         MR. O'BRIEN:  It's a former ruling?

24         THE COURT:  Okay.  Approach.

25       (The following proceedings were held at the bench outside

Asher v. Unarco, 6:06-cv-548, Jury Trial (12/2/08)
Leon Prockop, M.D., Recross Examination

Volume 5-182

1    the presence of the jury.)

2         MR. MAZUR:  It was a motion in limine that was granted

3    with regard to any mention of previous representation by

4    Mr. Russo's office.

5         MR. RUSSO:  This document, I just put it in the record.

6         THE COURT:  What?

7         MR. RUSSO:  I put that document in the record.  The jury

8    is going to have it.

9         MR. MAZUR:  The jury is going to have it.  Your Honor,

10   they can make the decision on their own.

11        THE COURT:  It was a letter written to his lawyer,

12   without putting it in the record?

13        MR. PAGE:  It was written to the plaintiffs' lawyer.

14        MR. RUSSO:  Okay.

15        THE COURT:  Well, you know you get as much recross as

16   you want.  Do you understand that you're not limited?

17        MR. PAGE:  I understand.  I'm tired of talking.

18        THE COURT:  I didn't know if I misspoke before, but I

19   wanted to be clear about that.

20        MR. MAZUR:  I apologize for not having a number.

21     (Bench conference was concluded, at which time the following

22   proceedings were held in the presence of the jury.)

23   BY MR. PAGE:

24   Q.  Dr. Prockop, the letter of April 11, 2006, that was written

25   to Mr. Wells's counsel, correct?

**Asher v. Unarco, 6:06-cv-7548, Jury Trial (12/2/08)**

**Leon Prockop, M.D., Recross Examination**

Volume 5-183

1  A.  It's addressed to Steve Cornman, Law Offices of Don Russo,

2  yes.

3  Q.  Okay.  And then you were asked about a subsequent report; is

4  that correct?

5  A.  Yes.

6  Q.  And in that subsequent report -- well, first of all, let me

7  ask.  With respect to the April letter, this would have been

8  roughly four months after the exposure, assuming the exposure

9  was November 29 through December 11-12.  We're looking at

10  Mr. Wells seeing Dr. Berger roughly four months after the

11  exposure; is that right?

12  A.  That seems correct.

13  Q.  And then goes and sees Dr. Berger again in June?

14  A.  June 21, '06, yes.

15  Q.  That would be about six months after the exposure, correct?

16  A.  Yes.

17  Q.  Within that two-month period, between the April letter that

18  was sent to Mr. Wells' counsel and the June report, Mr. Wells

19  had a downturn in his condition, based on that report; is that

20  right?

21  A.  Based on the report, yes.

22       MR. RUSSO:  Okay.  Thank you.

23       MR. O'BRIEN:  No questions, your Honor.

24       THE COURT:  Thank you, Dr. Prockop.  You're excused.

25       THE WITNESS:  Thank you.  I need a minute to collect all

Asher v. Unarco, 6:06-CV-548, Jury Trial (12/2/08)

**Leon Prockop, M.D., Recross Examination**

Volume 5-184

1    stuff.

2         THE COURT:  While he is getting his stuff together, why

3    don't we take a brief recess.  That way, they can get their next

4    witness up here and you all can take a break.  I will see you at

5    2:35.  Is that okay?  Probably 16 minutes.

6         (Jury leaves the courtroom at 2:20 p.m.)

7         (Witness leaves the courtroom.)

8         I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

9

10       /s/ Rhonda S. Sansom                    12/15/2008
     _____      _____

11     Rhonda S. Sansom, RPR, CRR                  Date

12            ORIGINAL TRANSCRIPT FILED ELECTRONICALLY

13                      I-N-D-E-X

                                                            Page
14
     Testimony of LEON PROCKOP, M.D.:
15       Direct Examination by Mr. Russo                    18
         Direct Examination by Mr. Mazur                    90
16       Direct Examination (Resumed) by Mr. Russo         111
         Cross Examination by Mr. Page                     122
17       Redirect Examination by Mr. Russo                 162
         Redirect Examination by Mr. Mazur                 174
18       Recross Examination by Mr. Page                   179

19

20

21

22

23

24

25